JEFFREY L. HOGUE (SBN 234557)
jhogue@hoguebelonglaw.com
TYLER J. BELONG (SBN 234543)
tbelong@hoguebelonglaw.com
RAE-ANNA M. SOLLESTRE (SBN 336754)
rsollestre@hoguebelonglaw.com
**HOGUE & BELONG**
170 Laurel Street
San Diego, CA 92101
Telephone:  (619) 238-4720
Facsimile:   (619) 238-5260

Attorneys for Plaintiffs  and all others similarly situated

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO

| | |
|---|---|
| ROSA NAVARRO, individually and on behalf of all others similarly situated; NIHLA OLSEM, individually and on behalf of all others similarly situated; and ROES 1 through 100, inclusive;<br><br>Plaintiffs ,<br><br>v.<br><br>APARTMENT MANAGEMENT CONSULTANTS, LLC, a California corporation; and DOES 1 through 100, inclusive,<br><br>Defendants. | Case No.: 3:24-cv-06829-AMO<br><br>**FOURTH AMENDED CLASS ACTION COMPLAINT SEEKING DECLARATIVE RELIEF, DAMAGES, INJUNCTIVE RELIEF AND RESTITUTION**<br><br>CLASS ACTION<br>(Plaintiff Class, Cal. Code Civ. Proc., § 382)<br><br>1. Violation of Civil Code § 1950.5<br>2. Violation of California Civil Code § 1671<br>3. Unfair Competition (Bus. & Prof. Code §§ 17200, *et seq.*)<br><br>**JURY DEMAND**<br><br>[Imaged File] |

Plaintiffs aver:

## JURISDICTION

1.      This Court has jurisdiction over the claims for relief asserted herein pursuant to Article 6, Section 10 of the Constitution of the State of California, which grants the Superior Court "original jurisdiction in all causes except those given by statute to other courts."  The statutes under which this action is brought do not specify any other basis for jurisdiction over Plaintiffs' claims to another court.

2.      This Court has jurisdiction over all defendants because upon information and belief, each defendant is a citizen of California, has sufficient minimum contacts in California, and/or otherwise intentionally avails itself of the California market so as to render this Court's jurisdiction over it consistent with traditional notions of fair play and substantial justice.

## VENUE

3.      Venue of this civil action is properly fixed in the United States District Court, Northern District of California, because many of the acts herein complained of occurred in the County of Alameda, and Plaintiffs' resulting injuries were sustained there.  Further, Defendants own and operate real property in California, including within the County of Alameda, from which the allegations in this suit arise.

## CERTAIN AVERMENTS UPON INFORMATION AND BELIEF

4.      The averments of fact contained within certain paragraphs of this Fourth Amended Complaint (hereinafter, the "Complaint") are made upon information and belief, which may be grounded in whole or part upon matters discovered through investigation conducted by the undersigned counsel.

## PARTIES

5.      Plaintiff ROSA NAVARRO is an individual, a resident of Alameda County and a citizen of the State of California who resided at one of the Defendants' (defined below) apartment complexes in Alameda County during all relevant times.

6.      Plaintiff NIHLA OLSEM is an individual, a resident of Sacramento County and a citizen of the State of California who resided at one of the Defendants' (defined below) apartment

complexes in Sacramento County during all relevant times.

7.    Plaintiffs ROES 1 through 100 are former tenants of one or more of the Defendants herein, who, though not yet identified, are similarly situated to the above-named Plaintiffs, and who may serve as additional class representatives. The true names of Plaintiffs ROES 1 through 100 will be added to this Complaint when their identities become known.  Hereinafter, plaintiffs ROSA NAVARRO, NIHLA OLSEM, and unidentified plaintiff ROES 1–100 shall be collectively referred to as "Plaintiffs ."

8.    Defendant APARTMENT MANAGEMENT CONSULTANTS, LLC, a Utah limited liability company (hereinafter "AMC"), has been registered as doing business in California since 2003 and holds itself out as a "full-service property/asset management company […] committed to exceeding the expectations of owners & asset managers. [… AMC] strive[s] to make each of the properties we manage perform to their potential by […] overcoming any obstacles that might be presented along the way. […]." AMC is a multi-dwelling residential apartment advisor and property management juggernaut with its offices and business operations in California and Utah, including, without limitations, four California office locations in the following California cities: Chino Hills, San Marcos, Rocklin, and Brentwood.  California is the only state in which AMC has more than one corporate office. In fact, AMC has four times more California offices than it has in any other state. According to AMC's own publication, as of 2022, AMC is the sixth largest apartment complex property management company in the United States and directly manages hundreds of apartment complexes (thousands of apartment units) in California.

9.    Plaintiffs are informed and believes that Defendant AMC's Chief Executive Officer and founder is Greg B. Wiseman, its controller Connie J. Wirthlin, its President of Property Management Operations Brenda Barrett, and one of its managing members Sep VI AMC Holdings, which operates out of Marina Del Rey, California.

10.    AMC exclusively manages and controls the real properties outlined below.  More specifically, AMC manages, controls and operates at least 174 California-based apartment complexes within the AMC portfolio, each of which are described in paragraph 11 below ("APARTMENT COMPLEXES").

FOURTH AMENDED CLASS ACTION COMPLAINT SEEKING DECLARATORY RELIEF, DAMAGES, INJUNCTIVE RELIEF AND RESTITUTION

11.     AMC, in bad faith, retains security deposits from residential tenants at its APARTMENT COMPLEXES in violation of California law and additionally charges its tenants unlawful and excessive late fees when they are late on their rent payments.  AMC has intentionally designed a centralized security deposit and late fee administration of the APARTMENT COMPLEXES by developing and administering security deposit and late fee policies, practices, systems and databases uniformly across all APARTMENT COMPLEXES.

12.     This case involves exclusively California-based apartment complexes owned and/or operated by AMC.  The APARTMENT COMPLEXES that are exclusively managed, controlled and operated by AMC and subject to AMC's uniform, systematic and unlawful administration of residential security deposit and late fees are as follows:

a.   The APARTMENT COMPLEX doing business as "Aloha," a multi-dwelling residential apartment complex generally located at 250 W Jackson St, Hayward, California 94544.

b.   The APARTMENT COMPLEX doing business as "Amber Court," a multi-dwelling residential apartment complex generally located at 34050 Westchester Terrace, Fremont, California 94555.

c.   The APARTMENT COMPLEX doing business as "Amber Grove," a multi-dwelling residential apartment complex generally located at 4009 Marconi Avenue, Sacramento, California 95821.

d.   The APARTMENT COMPLEX doing business as "Anaheim Cottages," a multi-dwelling residential apartment complex generally located at 2544 W. Winston Road, Anaheim, California 92804.

e.   The APARTMENT COMPLEX doing business as "Appian Terrace," a multi-dwelling residential apartment complex generally located at 4481-4489 Appian Way, El Sobrante, California 94803.

f.   The APARTMENT COMPLEX doing business as "Arbor At Palmdale," a multi-dwelling residential apartment complex generally located at 1000 East Avenue Q, Palmdale, California 93550.

g.   The APARTMENT COMPLEX doing business as "Arbor Court," a multi-dwelling residential apartment complex generally located at 44916 10th Street, Lancaster, California 93534.

FOURTH AMENDED CLASS ACTION COMPLAINT SEEKING DECLARATORY RELIEF, DAMAGES, INJUNCTIVE RELIEF AND RESTITUTION

h. The APARTMENT COMPLEX doing business as "Arbor Fiels," a multi-dwelling residential apartment complex generally located at 530 W Jackman Street, Lancaster, California 93534.

i. The APARTMENT COMPLEX doing business as "Arbor Gardens," a multi-dwelling residential apartment complex generally located at 710-726 W. Kettering Street, Lancaster, California 93534.

j. The APARTMENT COMPLEX doing business as "Arbor Grove Senior Housing," a multi-dwelling residential apartment complex generally located at 855 West Jackman Street B120, Lancaster, California 93534.

k. The APARTMENT COMPLEX doing business as "Arbor Lofts," a multi-dwelling residential apartment complex generally located at 661 West Lancaster Blvd, Lancaster, California 93534.

l. The APARTMENT COMPLEX doing business as "Arbor on a date," a multi-dwelling residential apartment complex generally located at 44927 Date Ave, Lancaster, California 93534.

m. The APARTMENT COMPLEX doing business as "Arlington Creek," a multi-dwelling residential apartment complex generally located at 8131 Walerga Road, Antelope, California 95843.

n. The APARTMENT COMPLEX doing business as "Atwater Cove Apartments," a multi-dwelling residential apartment complex generally located at 425 Merrimac Way, Costa Mesa, California 92626.

o. The APARTMENT COMPLEX doing business as "Avery Park," a multi-dwelling residential apartment complex generally located at 2000 Clay Bank Rd, Fairfield, California 94533.

p. The APARTMENT COMPLEX doing business as "AVION," a multi-dwelling residential apartment complex generally located at 3250 Laurelhurst Drive, Rancho Cordova, California 95670.

q. The APARTMENT COMPLEX doing business as "Bay Vista," a multi-dwelling residential apartment complex generally located at 470 Central Ave, Alameda, California 94501.

r. The APARTMENT COMPLEX doing business as "Beachwalk," a multi-dwelling residential apartment complex generally located at 234 S Voluntario St, Santa Barbara, California 93103.

s. The APARTMENT COMPLEX doing business as "Bella Vista," a multi-dwelling residential apartment complex generally located at 1500 Vista Club Circle, Santa

FOURTH AMENDED CLASS ACTION COMPLAINT SEEKING DECLARATORY RELIEF, DAMAGES, INJUNCTIVE RELIEF AND RESTITUTION

Clara, California 95054.

t.  The APARTMENT COMPLEX doing business as "Bennington," a multi-dwelling residential apartment complex generally located at 2780 N Texas St, Fairfield, California 94533.

u.  The APARTMENT COMPLEX doing business as "Beverly Park Senior," a multi-dwelling residential apartment complex generally located at 1071 S. La Cienega Blvd, Los Angeles, California 90035.

v.  The APARTMENT COMPLEX doing business as "Bridges at San Ramon," a multi-dwelling residential apartment complex generally located at 309 Springfield Drive, San Ramon, California 94583.

w.  The APARTMENT COMPLEX doing business as "Brio on Broadway," a multi-dwelling residential apartment complex generally located at 1636 Broadway Street, Fresno, California 93721.

x.  The APARTMENT COMPLEX doing business as "Camden Village," a multi-dwelling residential apartment complex generally located at 38000 Camden Street, Fremont, California 94536.

y.  The APARTMENT COMPLEX doing business as "Casa Arroyo," a multi-dwelling residential apartment complex generally located at 405 Rancho Arroyo Parkway, Fremont, California 94536.

z.  The APARTMENT COMPLEX doing business as "Casa De Luna," a multi-dwelling residential apartment complex generally located at 5175 N Fresno Street, Fresno, California 93710.

aa. The APARTMENT COMPLEX doing business as "Casa Del Sol Apartment," a multi-dwelling residential apartment complex generally located at 5155 N Fresno Street, Fresno, California 93710.

bb. The APARTMENT COMPLEX doing business as "Cedar Ridge," a multi-dwelling residential apartment complex generally located at 2105 East Ave. J-8, Lancaster, California 93535.

cc. The APARTMENT COMPLEX doing business as "Chaparral," a multi-dwelling residential apartment complex generally located at 38441 5th St. West, Palmdale, California 93551.

dd. The APARTMENT COMPLEX doing business as "Chatham Village," a multi-dwelling residential apartment complex generally located at 16331 McFadden Ave., Tustin, California 92780.

- 5 -

ee. The APARTMENT COMPLEX doing business as "City Walk," a multi-dwelling residential apartment complex generally located at 4215 Vineland Avenue, North Hollywood, California 91602.

ff. The APARTMENT COMPLEX doing business as "City Walk Apartment Homes," a multi-dwelling residential apartment complex generally located at 1412 San Pascual St, Santa Barbara, California 93101.

gg. The APARTMENT COMPLEX doing business as "Coral Court," a multi-dwelling residential apartment complex generally located at 1491 Detroit Avenue, Concord, California 94520.

hh. The APARTMENT COMPLEX doing business as "Costa Azule Senior," a multi-dwelling residential apartment complex generally located at 10829 Fulton Wells Ave, Santa Fe Springs, California 90670.

ii. The APARTMENT COMPLEX doing business as "Cotton Wood," a multi-dwelling residential apartment complex generally located at 6500 Cotton Wood Circle, Dublin, California 94568.

jj. The APARTMENT COMPLEX doing business as "Crocker Oaks," a multi-dwelling residential apartment complex generally located at 8000 Painted Desert Way, Roseville, California 95747.

kk. The APARTMENT COMPLEX doing business as "Desert Oasis," a multi-dwelling residential apartment complex generally located at 38260 5th Street E, Palmdale, California 93550.

ll. The APARTMENT COMPLEX doing business as "Echo Pointe," a multi-dwelling residential apartment complex generally located at 4300 Echo Court, La Mesa, California 91941.

mm. The APARTMENT COMPLEX doing business as "Elevate Long Beach," a multi-dwelling residential apartment complex generally located at 225 W 3rd Street, Long Beach, California 90802.

nn. The APARTMENT COMPLEX doing business as "Enclave," a multi-dwelling residential apartment complex generally located at 3081 N Main Street, Walnut Creek, California 94597.

oo. The APARTMENT COMPLEX doing business as "Estancia," a multi-dwelling residential apartment complex generally located at 1720 E. D Street, Ontario, California 91764.

pp. The APARTMENT COMPLEX doing business as "Foothill Villas," a multi-dwelling residential apartment complex generally located at 2631 W 2nd Street, San

FOURTH AMENDED CLASS ACTION COMPLAINT SEEKING DECLARATIVE RELIEF, DAMAGES, INJUNCTIVE RELIEF AND RESTITUTION

Bernardino, California 92410.

qq. The APARTMENT COMPLEX doing business as "Galleria Townhomes & Casa Galleria," a multi-dwelling residential apartment complex generally located at 4422 W. 172nd Street, Lawndale, California 90260.

rr. The APARTMENT COMPLEX doing business as "Glasdore Lofts," a multi-dwelling residential apartment complex generally located at 30 Dore Street, San Francisco, California 94103.

ss. The APARTMENT COMPLEX doing business as "Greenleaf," a multi-dwelling residential apartment complex generally located at 27495 Manon Avenue, Hayward, California 94544.

tt. The APARTMENT COMPLEX doing business as "Hampshire," a multi-dwelling residential apartment complex generally located at 570 Hampshire Ave, Redwood City, California 94063.

uu. The APARTMENT COMPLEX doing business as "Harbor Cove," a multi-dwelling residential apartment complex generally located at 900 E Hillsdale Blvd, Foster City, California 94404.

vv. The APARTMENT COMPLEX doing business as "Harborside Marina Bay," a multi-dwelling residential apartment complex generally located at 14015 West Tahiti Way, Marina Del Rey, California 90292.

ww. The APARTMENT COMPLEX doing business as "Harmony Gates," a multi-dwelling residential apartment complex generally located at 5220 Harmony, North Hollywood, California 91601.

xx. The APARTMENT COMPLEX doing business as "Harvest Ridge," a multi-dwelling residential apartment complex generally located at 1388 E. Palomar Street, Chula Vista, California 91913.

yy. The APARTMENT COMPLEX doing business as "Hawthorn Village," a multi-dwelling residential apartment complex generally located at 3663 Solano Ave, Napa, California 94558.

zz. The APARTMENT COMPLEX doing business as "Hazeltine," a multi-dwelling residential apartment complex generally located at 7250 Hazeltine Avenue, Van Nuys, California 91405.

aaa. The APARTMENT COMPLEX doing business as "Heratage Park Escondido Senior," a multi-dwelling residential apartment complex generally located at 2549 E Valley Parkway, Escondido, California 92027.

FOURTH AMENDED CLASS ACTION COMPLAINT SEEKING DECLARATIVE RELIEF, DAMAGES, INJUNCTIVE RELIEF AND RESTITUTION

bbb. The APARTMENT COMPLEX doing business as "Heritage Park Livermore," a multi-dwelling residential apartment complex generally located at 1089 Bluebell Drive, Livermore, California 94551.

ccc. The APARTMENT COMPLEX doing business as "Heritage Village Anaheim Senior," a multi-dwelling residential apartment complex generally located at 707 W Santa Ana Street, Anaheim, California 92805.

ddd. The APARTMENT COMPLEX doing business as "Hillside Terrace," a multi-dwelling residential apartment complex generally located at 3262 College Place, Lemon Grove, California 91945.

eee. The APARTMENT COMPLEX doing business as "Hollywood View Towers," a multi-dwelling residential apartment complex generally located at 5724 Hollywood Blvd, Hollywood, California 90028.

fff. The APARTMENT COMPLEX doing business as "Horizon," a multi-dwelling residential apartment complex generally located at 2414 N Tustin Ave, Santa Ana, California 92705.

ggg. The APARTMENT COMPLEX doing business as "Huntington Breeze," a multi-dwelling residential apartment complex generally located at 16171 Springdale Street, Huntington Beach, California 92649.

hhh. The APARTMENT COMPLEX doing business as "Imperial Tower," a multi-dwelling residential apartment complex generally located at 333 J Street, Sacramento, California 95814.

iii. The APARTMENT COMPLEX doing business as "Jefferson Sola," a multi-dwelling residential apartment complex generally located at 10920 Garfield Avenue, South Gate, California 90280.

jjj. The APARTMENT COMPLEX doing business as "Juniper," a multi-dwelling residential apartment complex generally located at 9190 Blue Point Ln, Sacramento, California 95826.

kkk. The APARTMENT COMPLEX doing business as "Kendallwood," a multi-dwelling residential apartment complex generally located at 10522 Santa Gertrudes Avenue, Whittier, California 90603.

lll. The APARTMENT COMPLEX doing business as "Kittridge Villas," a multi-dwelling residential apartment complex generally located at 18303 Kittridge Street, Reseda, California 91335.

mmm. The APARTMENT COMPLEX doing business as "La Vina," a multi-dwelling residential apartment complex generally located at 4601 Gerrilyn Way, Livermore,

FOURTH AMENDED CLASS ACTION COMPLAINT SEEKING DECLARATORY RELIEF, DAMAGES, INJUNCTIVE RELIEF AND RESTITUTION

California 94550.

nnn. The APARTMENT COMPLEX doing business as "Lakeside," a multi-dwelling residential apartment complex generally located at 4170 Springlake Drive, San Leandro, California 94578.

ooo. The APARTMENT COMPLEX doing business as "Lakeview Village," a multi-dwelling residential apartment complex generally located at 3115 Sweetwater Springs Blvd, Spring Valley, California 91978.

ppp. The APARTMENT COMPLEX doing business as "Lantern Lofts," a multi-dwelling residential apartment complex generally located at 1168 Folsom St, San Francisco, California 94103.

qqq. The APARTMENT COMPLEX doing business as "Legacy At Westglen," a multi-dwelling residential apartment complex generally located at 1151 Sonora Ave, Glendale, California 91201.

rrr. The APARTMENT COMPLEX doing business as "Links at Westridge," a multi-dwelling residential apartment complex generally located at 25330 Silver Aspen Way, Valencia, California 91381.

sss. The APARTMENT COMPLEX doing business as "Longhorn Pavillio," a multi-dwelling residential apartment complex generally located at 36523 25th Street East, Palmdale, California 93550.

ttt. The APARTMENT COMPLEX doing business as "Los Feliz Bliss," a multi-dwelling residential apartment complex generally located at 4646 Los Feliz Blvd, Los Angeles, California 90027.

uuu. The APARTMENT COMPLEX doing business as "Luxe at Burbank," a multi-dwelling residential apartment complex generally located at 1731 Rogers Place, Burbank, California 91504.

vvv. The APARTMENT COMPLEX doing business as "Madrid," a multi-dwelling residential apartment complex generally located at 28401 Los Alisos Blvd, Mission Viejo, California 92692.

www. The APARTMENT COMPLEX doing business as "Magnolia Villas," a multi-dwelling residential apartment complex generally located at 5250 Harmony Avenue #106, North Hollywood, California 91601.

xxx. The APARTMENT COMPLEX doing business as "Mcinnis Park," a multi-dwelling residential apartment complex generally located at 10-90 North Avenue, San Rafael, California 94903.

FOURTH AMENDED CLASS ACTION COMPLAINT SEEKING DECLARATIVE RELIEF, DAMAGES, INJUNCTIVE RELIEF AND RESTITUTION

yyy. The APARTMENT COMPLEX doing business as "Meadowood," a multi-dwelling residential apartment complex generally located at 788 Springwood Street, Corona, California 92882.

zzz. The APARTMENT COMPLEX doing business as "Mendocino," a multi-dwelling residential apartment complex generally located at 1521 Mendocino Dr, Concord, California 94521.

aaaa. The APARTMENT COMPLEX doing business as "Millennium South Bay," a multi-dwelling residential apartment complex generally located at 12530 Crenshaw Blvd, Hawthorne, California 90250.

bbbb. The APARTMENT COMPLEX doing business as "Miramonte and Trovas," a multi-dwelling residential apartment complex generally located at 4850 Natomas Blvd, Sacramento, California 95835.

cccc. The APARTMENT COMPLEX doing business as "Mission 1," a multi-dwelling residential apartment complex generally located at 5530 Mission Street, San Francisco, California 94112.

dddd. The APARTMENT COMPLEX doing business as "Montery Station Apartments," a multi-dwelling residential apartment complex generally located at 180 Monterey Ave, Pomona, California 91767.

eeee. The APARTMENT COMPLEX doing business as "Nantucket," a multi-dwelling residential apartment complex generally located at 1600 Nantucket Circle, Santa Clara, California 95054.

ffff. The APARTMENT COMPLEX doing business as "Natomas Park," a multi-dwelling residential apartment complex generally located at 1850 Club Center Drive, Sacramento, California 95835.

gggg. The APARTMENT COMPLEX doing business as "Nob Hill Place," a multi-dwelling residential apartment complex generally located at 1155 Jones Street, San Francisco, California 94109.

hhhh. The APARTMENT COMPLEX doing business as "Oasis Anaheim," a multi-dwelling residential apartment complex generally located at 3530 E La Palma Avenue, Anaheim, California 92806.

iiii. The APARTMENT COMPLEX doing business as "Ome Apartments," a multi-dwelling residential apartment complex generally located at 663 Clementina Street, San Francisco, California 94103.

jjjj. The APARTMENT COMPLEX doing business as "Pacific Pines," a multi-dwelling residential apartment complex generally located at 930 Casanova Ave, Monterey,

California 93940.

kkkk. The APARTMENT COMPLEX doing business as "Pacific Place Apartments," a multi-dwelling residential apartment complex generally located at 2665 Geneva Ave, Daly City, California 94014.

llll. The APARTMENT COMPLEX doing business as "Palisades at Sierra Del Oro," a multi-dwelling residential apartment complex generally located at 2300 Palisades Drive, Corona, California 92882.

mmmm.  The APARTMENT COMPLEX doing business as "Palmdale Desert Club," a multi-dwelling residential apartment complex generally located at 37902 20th Street East, Palmdale, California 93550.

nnnn. The APARTMENT COMPLEX doing business as "Panomar," a multi-dwelling residential apartment complex generally located at 1100 Pacific Marina, Alameda, California 94501.

oooo. The APARTMENT COMPLEX doing business as "Parc Claremont," a multi-dwelling residential apartment complex generally located at 1826 W Arrow Route, Upland, California 91786.

pppp. The APARTMENT COMPLEX doing business as "Parcwood," a multi-dwelling residential apartment complex generally located at 1700 Via Pacifica, Corona, California 92882.

qqqq. The APARTMENT COMPLEX doing business as "Park Hacienda," a multi-dwelling residential apartment complex generally located at 5650 Owens Drive, Pleasanton, California 94588.

rrrr. The APARTMENT COMPLEX doing business as "Park Hill," a multi-dwelling residential apartment complex generally located at 1747 Lincoln Avenue, San Rafael, California 94901.

ssss.  The APARTMENT COMPLEX doing business as "Park Tower," a multi-dwelling residential apartment complex generally located at 20353 Park Way, Castro Valley, California 94546.

tttt. The APARTMENT COMPLEX doing business as "Parkside Commons," a multi-dwelling residential apartment complex generally located at 900 143rd Avenue, San Leandro, California 94578.

uuuu. The APARTMENT COMPLEX doing business as "Parkside Villa," a multi-dwelling residential apartment complex generally located at 1650 Park Lane, Fairfield, California 94533.

FOURTH AMENDED CLASS ACTION COMPLAINT SEEKING DECLARATIVE RELIEF, DAMAGES, INJUNCTIVE RELIEF AND RESTITUTION

vvvv. The APARTMENT COMPLEX doing business as "Parkwood," a multi-dwelling residential apartment complex generally located at 2450 Peach Tree Dr, Fairfield, California 94533.

wwww. The APARTMENT COMPLEX doing business as "Portola Redlands," a multi-dwelling residential apartment complex generally located at 1250 N University St., Redlands, California 92374.

xxxx. The APARTMENT COMPLEX doing business as "Premier," a multi-dwelling residential apartment complex generally located at 44150 35th Street West, Lancaster, California 93536.

yyyy. The APARTMENT COMPLEX doing business as "Radford," a multi-dwelling residential apartment complex generally located at 5330 Radford Ave, Valley Village, California 91607.

zzzz. The APARTMENT COMPLEX doing business as "Rio Vista," a multi-dwelling residential apartment complex generally located at 1190 West San Ysidro Boulevard, San Diego, California 92173.

aaaaa. The APARTMENT COMPLEX doing business as "Ritch Street," a multi-dwelling residential apartment complex generally located at 246 Ritch Street, San Francisco, California 94107.

bbbbb. The APARTMENT COMPLEX doing business as "River Bank," a multi-dwelling residential apartment complex generally located at 4433 Continental Way, Stockton, California 95207.

ccccc. The APARTMENT COMPLEX doing business as "Rockwell Manor," a multi-dwelling residential apartment complex generally located at 693 E. Tabor Ave, Fairfield, California 94533.

ddddd. The APARTMENT COMPLEX doing business as "Roscoe," a multi-dwelling residential apartment complex generally located at 20234 Roscoe Blvd, Winnetka, California 91306.

eeeee. The APARTMENT COMPLEX doing business as "Rosenberg," a multi-dwelling residential apartment complex generally located at 306 Mendocino Ave, Santa Rosa, California 95401.

fffff. The APARTMENT COMPLEX doing business as "Sagebrush 1," a multi-dwelling residential apartment complex generally located at 715 W. Milling Street, Lancaster, California 93534.

ggggg. The APARTMENT COMPLEX doing business as "San Clemente Beachwalk," a multi-dwelling residential apartment complex generally located at 211 W Marquita,

FOURTH AMENDED CLASS ACTION COMPLAINT SEEKING DECLARATORY RELIEF, DAMAGES, INJUNCTIVE RELIEF AND RESTITUTION

1

San Clemente, California 92672.

2

hhhhh. The APARTMENT COMPLEX doing business as "Sanbreeze Apartment," a

3

multi-dwelling residential apartment complex generally located at 1881 Baker St., Seaside, California 93955.

4

iiiii. The APARTMENT COMPLEX doing business as "Seapointe," a multi-dwelling

5

residential apartment complex generally located at 1380 Village Way, Costa Mesa, California 92626.

6

7

jjjjj. The APARTMENT COMPLEX doing business as "Serra Monte Ridge," a multi-

8

dwelling residential apartment complex generally located at 862 Campus Drive, Daly City, California 94015.

9

kkkkk. The APARTMENT COMPLEX doing business as "Serrano," a multi-dwelling

10

residential apartment complex generally located at 1536 N. Serrano Ave, Los Angeles, California 90027.

11

12

lllll. The APARTMENT COMPLEX doing business as "Shadow Ridge," a multi-dwelling

13

residential apartment complex generally located at 3699 Barnard Dr, Oceanside, California 92056.

14

mmmmm. The APARTMENT COMPLEX doing business as "Sierra Del Oro," a multi-

15

dwelling residential apartment complex generally located at 1456 Serfas Club Drive, Corona, California 92882.

16

nnnnn. The APARTMENT COMPLEX doing business as "Solis Garden," a multi-

17

dwelling residential apartment complex generally located at 145 Lund Avenue, Hayward, California 94544.

18

19

ooooo. The APARTMENT COMPLEX doing business as "Solstice," a multi-dwelling

20

residential apartment complex generally located at 27467 Manon Avenue, Hayward, California 94544.

21

ppppp. The APARTMENT COMPLEX doing business as "Sommerset," a multi-dwelling

22

residential apartment complex generally located at 591 Peabody Road, Vacaville, California 95687.

23

24

qqqqq. The APARTMENT COMPLEX doing business as "Stevenson Manor," a multi-

25

dwelling residential apartment complex generally located at 1230 N Cole Avenue #119, Los Angeles, California 90038.

26

rrrrr. The APARTMENT COMPLEX doing business as "Studio Arnaz," a multi-dwelling

27

residential apartment complex generally located at 320 S. Arnaz Dr., Los Angeles, California 90048.

28

FOURTH AMENDED CLASS ACTION COMPLAINT SEEKING DECLARATORY RELIEF, DAMAGES, INJUNCTIVE RELIEF AND RESTITUTION

sssss. The APARTMENT COMPLEX doing business as "Studio City Hills," a multi-dwelling residential apartment complex generally located at 10913 Fruitland Dr, Studio City, California 91604.

ttttt. The APARTMENT COMPLEX doing business as "Studio City Midrise," a multi-dwelling residential apartment complex generally located at 4176 Arch Dr, Studio City, California 91604.

uuuuu. The APARTMENT COMPLEX doing business as "Summerwood," a multi-dwelling residential apartment complex generally located at 21701 Foothill Blvd, Hayward, California 94514.

vvvvv.  The APARTMENT COMPLEX doing business as "Sun Valley," a multi-dwelling residential apartment complex generally located at 1400 Contra Costa Blvd, Pleasant Hill, California 94523.

wwwww.  The APARTMENT COMPLEX doing business as "Sunrose," a multi-dwelling residential apartment complex generally located at 1325 Santa Rita E, Chula Vista, California 91913.

xxxxx. The APARTMENT COMPLEX doing business as "Sunset Pines," a multi-dwelling residential apartment complex generally located at 1770 Adelaide St., Concord, California 94520.

yyyyy. The APARTMENT COMPLEX doing business as "Sur Apartments," a multi-dwelling residential apartment complex generally located at 2927 Marconi Avenue, Sacramento, California 95821.

zzzzz. The APARTMENT COMPLEX doing business as "Tempo At Riverapark," a multi-dwelling residential apartment complex generally located at 450 Forest Park Blvd, Oxnard, California 93036.

aaaaaa.  The APARTMENT COMPLEX doing business as "Terra Nova," a multi-dwelling residential apartment complex generally located at 440 East H Street, Chula Vista, California 91910.

bbbbbb. The APARTMENT COMPLEX doing business as "The Atrium," a multi-dwelling residential apartment complex generally located at 3733 Gibson Rd, El Monte, California 91731.

cccccc. The APARTMENT COMPLEX doing business as "The Bluffs," a multi-dwelling residential apartment complex generally located at 10801 Lemon Ave, Rancho Cucamonga, California 91737.

dddddd. The APARTMENT COMPLEX doing business as "The Boulevard," a multi-dwelling residential apartment complex generally located at 20600 Ventura

FOURTH AMENDED CLASS ACTION COMPLAINT SEEKING DECLARATORY RELIEF, DAMAGES, INJUNCTIVE RELIEF AND RESTITUTION

1    Boulevard, Los Angeles, California 91364.

2    eeeee.  THE APARTMENT COMPLEX doing business as "The Cape," a multi-dwelling
3    residential apartment complex generally located at 250 E Ave R, Palmdale, California
     93550.

4    fffff.  THE APARTMENT COMPLEX doing business as "The Carlyle," a multi-dwelling
5    residential apartment complex generally located at 4500 Carlyle Street, Santa Clara,
     California 95054.
6
7    gggggg. THE APARTMENT COMPLEX doing business as "The Charleston," a multi-
     dwelling residential apartment complex generally located at 4337 Norwood Ave,
8    Sacramento, California 95838.

9    hhhhh. THE APARTMENT COMPLEX doing business as "The Crescent At West
10   Hollywood," a multi-dwelling residential apartment complex generally located at 1274
     N Crescent Heights Blvd, West Hollywood, California 90046.
11
12   iiiiii.  THE APARTMENT COMPLEX doing business as "The Grand at 5746," a multi-
     dwelling residential apartment complex generally located at 5746 Burchard Ave, Los
13   Angeles, California 90034.

14   jjjjjj.  THE APARTMENT COMPLEX doing business as "The Heights On Superior," a
15   multi-dwelling residential apartment complex generally located at 9710 Zelzah
     Avenue, Los Angeles, California 91325.
16
17   kkkkkk. THE APARTMENT COMPLEX doing business as "The Kodo," a multi-dwelling
     residential apartment complex generally located at 2867 Sunset Place, Los Angeles,
18   California 90005.

19   llllll.  THE APARTMENT COMPLEX doing business as "The Link," a multi-dwelling
20   residential apartment complex generally located at 3909 San Fernando Road,
     Glendale, California 91204.
21
22   mmmmmm.   THE APARTMENT COMPLEX doing business as "The Parc at 1300," a
     multi-dwelling residential apartment complex generally located at 1300 Delaware
23   Street, Berkeley, California 94702.

24   nnnnnn.    THE APARTMENT COMPLEX doing business as "The Parker," a multi-
25   dwelling residential apartment complex generally located at 4640 Arden Way, El
     Monte, California 91731.
26
     oooooo.    THE APARTMENT COMPLEX doing business as "The Pinnacle At Nob
27   Hill," a multi-dwelling residential apartment complex generally located at 899 Pine
     Street, San Francisco, California 94108.
28

- 15 -

FOURTH AMENDED CLASS ACTION COMPLAINT SEEKING DECLARATORY RELIEF, DAMAGES,
INJUNCTIVE RELIEF AND RESTITUTION

ppppppp.    The APARTMENT COMPLEX doing business as "The Reniassance At City Center," a multi-dwelling residential apartment complex generally located at 21800 S Avalon Blvd, Carson, California 90745.

qqqqqqq.    The APARTMENT COMPLEX doing business as "The Ridge At San Diego," a multi-dwelling residential apartment complex generally located at 4665 Home Ave, San Diego, California 92105.

rrrrrr.  The APARTMENT COMPLEX doing business as "The Springs," a multi-dwelling residential apartment complex generally located at 7511 N. First Street, Fresno, California 93720.

ssssss.  The APARTMENT COMPLEX doing business as "The Square," a multi-dwelling residential apartment complex generally located at 12535 Brookshire Ave, Downey, California 90242.

tttttt.  The APARTMENT COMPLEX doing business as "The Timbers," a multi-dwelling residential apartment complex generally located at 25200 Santa Clara Street, Hayward, California 94544.

uuuuuu. The APARTMENT COMPLEX doing business as "The Villas At Rowland Heights," a multi-dwelling residential apartment complex generally located at 18600 Colima Road, Rowland Heights, California 91748.

vvvvvv.  The APARTMENT COMPLEX doing business as "The Woodlands," a multi-dwelling residential apartment complex generally located at 2025 W El Camino Avenue, Sacramento, California 95833.

wwwwww.   The APARTMENT COMPLEX doing business as "Tribeca," a multi-dwelling residential apartment complex generally located at 3201 Yorba Linda Boulevard, Fullerton, California 92831.

xxxxxx.  The APARTMENT COMPLEX doing business as "Truckee's Coburn Crossing," a multi-dwelling residential apartment complex generally located at 10551 East Jibboom Street, Unit 108, Truckee, California 96161.

yyyyyy. The APARTMENT COMPLEX doing business as "Tuscany Village," a multi-dwelling residential apartment complex generally located at 1701 East D Street, Ontario, California 91764.

zzzzzz.  The APARTMENT COMPLEX doing business as "UCA," a multi-dwelling residential apartment complex generally located at 2404 Nutwood Avenue, Fullerton, California 92831.

aaaaaaa. The APARTMENT COMPLEX doing business as "UCE," a multi-dwelling residential apartment complex generally located at 600 Langsdorf Drive, Fullerton,

California 92831.

bbbbbbb. The APARTMENT COMPLEX doing business as "Union South Bay," a multi-dwelling residential apartment complex generally located at 615 E Carson Street, Carson, California 90745.

ccccccc.    The APARTMENT COMPLEX doing business as "Verdugo Mesa," a multi-dwelling residential apartment complex generally located at 4269 Verdugo Road, Los Angeles, California 90065.

ddddddd.   The APARTMENT COMPLEX doing business as "Villa De Guadalupe," a multi-dwelling residential apartment complex generally located at 2151 Plaza De Guadalupe, San Jose, California 95116.

eeeeeee.   The APARTMENT COMPLEX doing business as "Villa Hermosa," a multi-dwelling residential apartment complex generally located at 1608 W Jefferson Blvd, Los Angeles, California 90018.

fffffff.  The APARTMENT COMPLEX doing business as "Villa La Jolla," a multi-dwelling residential apartment complex generally located at 734 La Jolla St, Placentia, California 92870.

ggggggg.   The APARTMENT COMPLEX doing business as "Villa Raymond," a multi-dwelling residential apartment complex generally located at 455 N. Raymond Avenue #101, Pasadena, California 91103.

hhhhhhh.   The APARTMENT COMPLEX doing business as "Village Green," a multi-dwelling residential apartment complex generally located at 2122 W Chestnut Street, San Bernardino, California 92410.

iiiiiii. The APARTMENT COMPLEX doing business as "Village Oaks CA," a multi-dwelling residential apartment complex generally located at 15773 High Knoll Drive, Chino Hills, California 91709.

jjjjjjj. The APARTMENT COMPLEX doing business as "Villas At Anaheim Villas," a multi-dwelling residential apartment complex generally located at 124 N. Tustin Ave, Anaheim, California 92807.

kkkkkkk. The APARTMENT COMPLEX doing business as "Villas At Parkside," a multi-dwelling residential apartment complex generally located at 381 West Hawkeye Avenue, Turlock, California 95380.

lllllll.The APARTMENT COMPLEX doing business as "Vista La Rosa," a multi-dwelling residential apartment complex generally located at 2002 Rimbey Avenue, San Diego, California 92154.

FOURTH AMENDED CLASS ACTION COMPLAINT SEEKING DECLARATORY RELIEF, DAMAGES, INJUNCTIVE RELIEF AND RESTITUTION

mmmmmmm. The APARTMENT COMPLEX doing business as "Vivante," a multi-dwelling residential apartment complex generally located at 26609 Gading Road, Hayward, California 94544.

nnnnnnn.   The APARTMENT COMPLEX doing business as "Volta On Pine," a multi-dwelling residential apartment complex generally located at 635 Pine Avenue, Long Beach, California 90802.

ooooooo.   The APARTMENT COMPLEX doing business as "Weddington Mid-Rise," a multi-dwelling residential apartment complex generally located at 11911 Weddington Street, Valley Village, California 91607.

ppppppp.   The APARTMENT COMPLEX doing business as "Woodside Place," a multi-dwelling residential apartment complex generally located at 2033 Latham Street, Mountain View, California 94040.

qqqqqqq.   The APARTMENT COMPLEX doing business as "Wyandotte," a multi-dwelling residential apartment complex generally located at 14630 Wyandotte St, Van Nuys, California 91405.

13.     AMC and the DOE defendants are collectively referred to herein as "Defendants."

14.     Upon information and belief, all putative plaintiffs resided in California at the time their cause of action accrued, more than two-thirds of putative plaintiffs continue to reside in California, all injuries complained of herein occurred within California, and all defendants are headquartered in California, own property in California and or primarily do business within California.

15.     Upon information and belief, each defendant herein has uniformity of employees, offices, officers, management, ownership, and legal representation with each other defendant, such that Defendants operated a joint and integrated enterprise.

16.     Plaintiffs  are informed and believe, and thereupon aver, that Defendants are closely held companies or partnerships that commingle their funds and other assets with all other Defendants; do not maintain formal, adequate, discrete corporate records in distinction from all other Defendants; have identical or overlapping officers and directors as all other Defendants; use the same offices and business locations as all other Defendants; employ the same employees and attorneys as all other Defendants; lack adequate separate capitalization; are in the same business and venture, for the benefit of the same ultimate shareholders and members, as all other Defendants; do not maintain

- 18 -

arm's-length relationships with all other Defendants; and share and provide labor, services, capital, revenue, real estate and/or management services with/for all other Defendants.

17.    Plaintiffs  are informed and believe and thereupon aver that DOES 1 through 100 are other natural persons, corporations, limited-liability companies, general partnerships, limited partnerships, limited-liability partnerships, trusts, unincorporated associations, and/or other entities of any kind or character who have incurred liability to Plaintiffs  (and/or to one or more members of the Plaintiff Class) in relation to the transactions and/or occurrences that are the subject of this Complaint, or who have any interest in the subject of this Complaint.

18.    Except as may be described here, Plaintiffs are yet uninformed of the true names, capacities and nature and extent of participation in the course of conduct alleged here of the persons sued as DOES 1 through 100 inclusive.  Plaintiffs are yet uninformed of the nature and extent of any interest that the persons sued as DOES 1 through 100 inclusive may have in the subject of the Complaint. Plaintiffs therefore sue these defendants by fictitious names. Plaintiffs will amend this Complaint to allege the true names and capacities of the DOE defendants when ascertained.

19.    Upon information and belief, each of the Defendants named here, including DOES 1–100 and their alter egos, are joint tortfeasors, in joint enterprise, co-conspirators, and acting within the scope of their agency and their actual and apparent authority to conduct themselves in the manner herein complained.

20.    Upon information and belief, each of the Defendants named here, including DOES 1–100 and their alter egos, acted as an owner, principal, agent, employer, employee, joint employer, joint venturer, franchisor, franchisee, shareholder, director, member, co-conspirator, shell, conduit, master, or partner of each other, and at all times were acting within the scope and course and in pursuance of their or its agency, employment, joint employment, joint venture, franchise, partnership, common and joint enterprise, or actual or apparent authority in concert with each other.

21.    Upon information and belief, each of the Defendants named here, including DOES 1–100 and their alter egos, are individually, jointly and severally liable to Plaintiffs and the Plaintiff class because each Defendant directly or indirectly, or through an agent or employee, actually, proximately and vicariously caused injury to Plaintiffs  as described here.

22.     Upon information and belief, the acts and omissions of each Defendant named herein, including DOES 1–100 and their alter egos, contributed to the acts and omissions of every other Defendant in proximately causing the complaints, injuries, and damages alleged.  Defendants approved of, condoned, and/or otherwise ratified each of the acts or omissions complained of.  Defendants aided and abetted the acts and omissions of each other Defendant, including DOES 1–100 and their alter egos, in proximately causing the complaints, injuries, and damages alleged.

## GENERAL ALLEGATIONS

23.     AMC is a real estate property management company that manages an expansive empire of residential apartment complexes in California.  As ultimate beneficiary of a significant percentage of the rents collected from residential tenants at the approximately 174 APARTMENT COMPLEXES it manages in California, AMC not only realizes rental income from tens of thousands of residential tenants, but also from AMC's standard operating procedures, practices and policies of charging tenants unlawful late fees and unlawfully retaining the security deposits of its current and former tenants in bad faith, by fraudulently overcharging tenants amounts against their security deposits for unsubstantiated, unnecessary, or unperformed work, including work which is either not supported by statutorily required documentation or not the obligation of the departing tenant under California law.  AMC received immediate monetary benefit from these unlawful practices and gained ongoing and future monetary benefit in the form of client acquisition and client retention as a result of AMC's unlawful policies and practices as described herein.

24.     As the sixth largest apartment complex property management company in the United States, AMC directly manages, controls, and oversees all aspects of the income and expenses generated at each of the APARTMENT COMPLEXES, including the security deposits and late fees.  According to AMC's own publication, in order to manage all aspects of these APARTMENT COMPLEXES, including administration of late fees and retention of security deposits, AMC employs numerous regional managers who directly supervise on-site property managers concerning every aspect of property performance, from market rents to expense control.

25.     AMC has a property inspection protocol that includes monthly and quarterly exterior inspections of each of the APARTMENT COMPLEXES by AMC's assigned and controlled Manager

and Maintenance Supervisor.  Per AMC's uniform policies, these inspections document any deficiencies, which are in turn noted and addressed. Additionally, AMC inspects all individual units at each APARTMENT COMPLEX on at least a bi-annual basis. AMC's inspections include preventative maintenance. The general condition of the unit is noted by AMC, and notices are sent by AMC to tenants if any housekeeping or lease violation issues are noted.

26.    AMC's controlled Managers and Service Managers also inspect all units at the APARTMENT COMPLEXES before tenants move in and move out, reporting all findings to AMC's Regional Managers.  Additionally, AMC's Regional Property Managers themselves are required to directly inspect any unit at the APARTMENT COMPLEXES vacant longer than thirty days, in addition to random weekly inspections.  AMC uniformly and systematically audits all aspects of property management at the APARTMENT COMPLEXES.

27.    AMC's Regional Property Managers also conduct several audits per year to ensure consistent handling of resident files and resident accounts — including late fee and security deposit administration.   AMC monitors all risk management logs including unit turn tracking. These audits are done on a monthly and quarterly basis.  AMC's accounting department also performs monthly audits of a random assortment of invoices for uniformity in all areas, including vendor names, vendor compliance, invoice numbers, invoice totals, and invoice coding.

28.    To uniformly manage all APARTMENT COMPLEXES, AMC also utilizes uniform on-site property management software programs including AIM, Yardi and ResMan.  These software programs provide AMC with comprehensive databases of relevant information, including prospect tracking, resident demographics, payment history, accounts receivable and accounts payable detail, budget control and maintenance issues, and property financial results. AIM, ResMan and Yardi have been uniformly interfaced with AMC's customized accounting system to provide AMC with the most current financial and resident data available across the APARTMENT COMPLEXES.

29.    All resident rental receipt processing is accomplished exclusively by AMC through AIM, Yardi, ResMan or other specified on-site property management software programs implemented and controlled by AMC.  Information, including all resident transactions, move-in and move-out statements and data, resident demographics and security deposit refunds, are initially

processed by each of AMC's controlled and supervised on-site managers and instantaneously made visible to AMC's Regional Managers and accounting through a uniform comprehensive reporting system within the AIM, Yardi or ResMan systems.  The flexibility of these standardized AMC systems allows AMC to track revenues, expenses, security deposits and late fees, and provides significant history detail for AMC's review and audit purposes.  Additionally, AMC directly collects all rent payments and late fees from tenants at its APARTMENT COMPLEXES through AMC's uniform online portal at www.amcrentpay.com.

**Unlawful Security Deposit Retention:**

30.     The Civil Code sets forth requirements for the treatment of security deposits upon termination of a residential lease. Section 1950.5(b) provides that a landlord may only use a security deposit to satisfy charges against a former tenant for: (1) rent in arrears; (2) repairs exclusive of wear and tear; (3) cleaning required to bring the leasehold back to the condition it was in when the tenant accepted the tenancy; and (4) "to remedy future defaults by the tenant in any obligation under the rental agreement to restore, replace, or return personal property or appurtenances" if provided for in the lease.

31.     Section 1950.5(g)(1) requires that the balance of security deposits and an itemization of their disposition must be provided to the departing tenant within 21 days of vacating the leasehold. More specifically, section 1950.5(g)(1) provides that, no later than 21 calendar days after the tenant vacates the premises, the landlord "shall furnish the tenant, by personal delivery or by first-class mail, postage prepaid, a copy of an itemized statement indicating the basis for, and the amount of, any security received and the disposition of the security, and shall return any remaining portion of the security to the tenant."

32.     Section 1950.5(g)(2) describes the substantiation required to be sent to former tenants for charges levied against security deposits – a reasonable description of work performed by employees including hours worked and hourly rate charged; and, for work by vendors, copies of invoices and receipts from the vendors who performed work.

33.     Civil Code section 1950.5(g)(2)(B) provides that the landlord must also include copies

FOURTH AMENDED CLASS ACTION COMPLAINT SEEKING DECLARATORY RELIEF, DAMAGES, INJUNCTIVE RELIEF AND RESTITUTION

of documents substantiating the charges incurred and deducted by the landlord to repair or clean the premises; specifically, the "landlord shall provide the tenant a copy of the bill, invoice, or receipt supplied by the person or entity performing the work."[1]

34.    Civil Code section 1950.5(g)(2)(A) provides: "If the landlord or landlord's employee did the work, the itemized statement shall reasonably describe the work performed.  The itemized statement shall include the time spent and the reasonable hourly rate charged."  AMC's itemizations and other documentation sent to former tenants, commonly referred to as "Move-out Statements," by universal, standard operating procedure and policy do not satisfy any of the requirements as set forth in section 1950.5(g)(2).

35.    Section 1950.5(m) provides that no portion of a security deposit may be deemed non-refundable by operation of the lease.

36.    Defendants in this action systematically, uniformly, and in bad faith have violated the Civil Code to the detriment of thousands of Californians over many years by charging for repairs, replacement, and cleaning that were never done; a practice obscured by intentionally failing to itemize and substantiate repairs, replacement and cleaning by code, if they were done.  As such, these former California tenants of Defendants have each been deprived of some or all of their security deposits which Defendants were legally obligated to return to its tenants at the conclusion of their respective leases.

37.    AMC directs all tenants of the APARTMENT COMPLEXES to send their complaints, concerns, rent checks and security deposits to AMC, its employees, agents, and/or co-conspirators. Defendants unlawfully retain former tenants' security deposits via AMC's standardized practice and policy of billing former tenants for normal wear and tear; and, charging former tenants fees for labor and services that were not performed, not required, and moreover not substantiated by documentation as required under California law.  These excessive, unsubstantiated, unwarranted, unenforceable, unlawful and/or fraudulent charges, and the subsequent withholding of security deposits from these

---

[1]    The "receipt requirement" of Civ. Code § 1950.5(g)(2) is excepted only when deductions for cleaning and repairs combined do not exceed $125.

FOURTH AMENDED CLASS ACTION COMPLAINT SEEKING DECLARATORY RELIEF, DAMAGES, INJUNCTIVE RELIEF AND RESTITUTION

former tenants and the efforts to collect these charges over and above the security deposits, form the gravamen of this Complaint.

38.    Defendants' unreasonable, excessive, unlawful, unenforceable and/or unsubstantiated charges made against former tenants' security deposits often exceed the amount of the deposit held by Defendants.  When this occurs, Defendants cause a bill, and sometimes a collections notice, to be sent to former tenants, knowing that the monies claimed are based upon fraudulent, unreasonable, excessive, unlawful, unenforceable and/or unsubstantiated move-out charges.  Additionally, Defendants apply these same standardized processes to avoid repayment of some or all of the former tenants' security deposit and/or retaining some or all of the former tenants' security deposit beyond the 21-day period mandated by California law.  This conduct has resulted in damages to Plaintiffs and other former tenants of the APARTMENT COMPLEXES both through the nonpayment of full security deposit amounts owed to tenants within 21-days of move-out and through the collection of such amounts and by the reporting of such alleged debts to third-parties, defaming former tenants, damaging their credit and impairing their ability to rent other apartments.

39.    AMC's standard operating procedures for the administration of its former tenants' security deposits uniformly and systematically violates Civil Code sections 1950.5(g)(1) and (g)(2). AMC, as a matter of standard policy and practice, does not send bills, receipts, or invoices from the third-party vendors it alleges performed work on the vacated premises.  AMC, as a matter of standard policy and practice, does not describe the work allegedly performed on the leasehold in the manner required by code.  Instead, it fails to provide statements and uses unlawfully vague descriptions —a uniform practice designed to obfuscate the work, if any, performed on a leasehold, who performed the work, and the cost and/or labor of the work with the intention of wrongfully maximizing security deposit retention.  By uniform and standard operating procedure, it is impossible to determine, in contravention of law, if the work AMC allegedly performed or paid to be performed on the leasehold was actually performed — either by a vendor or an in-house employee.  AMC's practices also make it impossible for the former tenants, including Plaintiffs, to tell what amounts, if any, were lawfully withheld from their security deposit.

40.    Worse still, pursuant to AMC's uniform standard operating procedure, when certain

uniform predetermined circumstances exist, AMC does not even provide its former tenants at the APARTMENT COMPLEXES a legally compliant Move-out Statement.  AMC does not provide them any itemized statement indicating what amount and scope of deductions were made from the former tenant's security deposit, does not provide any receipts, invoices or bills supporting any deductions, and does not return the full security deposit to the former tenant within 21 days of move-out, less lawful substantiated deductions.

**Unlawful Late Fees:**

41.     In addition to the forgoing, Defendants systematically, uniformly, and in bad faith have violated the Civil Code to the detriment of thousands of Californians over many years by creating and maintaining a uniform late rent fee policy and practice across all of their California residential rental properties.  Defendants' policy and practice is to charge tenants a late fee for the payment of any portion of rent that is late – even if Defendants incurred no damages (other than, potentially, a few cents of lost interest) as a result of the late payment. (Defendants' late fee penalties are hereinafter referred to as the "Excessive Late Fee(s).")  Defendant has never substantiated the amount of fees it charges.  As such, these Excessive Late Fees bare no reasonable relation to the damages actually incurred, are usurious, violate the civil code, and are otherwise unlawful and unenforceable under California law.  Defendants' Excessive Late Fee Policy forms the basis of the Excessive Late Fee Class.

42.     As such, Defendants charged an unreasonable penalty that is void under California law. The unreasonableness of the late fee penalty is further demonstrated by the fact that Defendants charge these same fees whether the rent is one day late or two weeks late and whether the outstanding balance is $25 or $2,000.  Defendants' policy and practice of charging Excessive Late Fees violates Civil Code § 1671(d), and it is additionally an unlawful business act or practice which causes Plaintiffs and other tenants' financial injury, and is therefore prohibited by California's Unfair Competition Law, Business and Professions Code § 17200, et seq. (hereinafter referred to as the "UCL"). It is also an unfair business act or practice in violation of the UCL. Plaintiffs bring this action to challenge Defendants' Excessive Late Fee policy and practice on behalf of themselves and

all other similarly situated residents of Defendants' residential rental properties in California.

43.    California law establishes a presumption that "the detriment caused by the breach of an obligation to pay money only, is deemed to be the amount due by the terms of the obligation, with interest thereon." Cal. Civ. Code § 3302. Defendants' Excessive Late Fees represent exorbitant interest rates for tenants' failure to pay the amount of rent or other charges due. Defendants' late fees exceed any reasonable measure of Defendants' actual damages sustained as a result of their tenants' late rent payments, the maximum extent of which is interest, and the pro rata administrative costs related to collecting and accounting for late payments. In order to be valid under California law, the amount of late fees in a residential lease must represent the result of a reasonable endeavor by the parties to estimate a fair average compensation for any loss that may be sustained only upon the showing that the amount of actual damages sustained is impractical or extremely difficult to fix. Absent these elements, the late fees provision is void. *Orozco v. Casimiro* (2004) 121 Cal. App. 4th Supp. 7. 31.  Defendants' late fee is an arbitrary amount which functions as a penalty.  Any marginal interest accumulated or other damages that Defendants' sustain due to the delay in rent payments are definite and easily ascertainable. On information and belief, Defendants' have never made a reasonable endeavor to estimate a fair average compensation for the losses sustained when a tenant pays rent late, as required for a liquidated damages provision under California Civil Code § 1671(d) to be enforceable.

**Plaintiff Rosa Navarro:**

44.    Plaintiff ROSA NAVARRO is a former tenant of Defendants, formerly residing at the following APARTMENT COMPLEX: The Bay Vista Apartments, at 470 Central Avenue, Alameda, CA 94501, unit number 18.  Ms. NAVARRO leased the apartment from Defendants beginning in or about May 2021.  Ms. NAVARRO's lease with Defendants required a security deposit and other charges of approximately more than $2,000 when she moved in on or about May 2021.

45.    Ms. NAVARRO vacated her leased premises at the Bay Vista Apartments on or about May 22, 2022.  She never received any statutorily required Move-out Statement, notice or itemized statement regarding the disposition of her security deposit at that time, nor did she receive any bills, receipts, invoices, or other documentation from any third-party vendor who may have allegedly performed any repairs, cleaning or replacements to the unit Ms. NAVARRO vacated.  In fact, no

such notice, statement, invoice, bill, or other document evidencing any amounts that were deducted from Ms. NAVARO's security deposit were ever sent to Ms. NAVARRO within 21 days after vacating her unit at Bay Vista Apartments.

46.     Not only did Ms. NAVARRO not receive any statutorily required notice, itemized statement, invoices, bills, receipts, or other documents related to the disposition of her security deposit within 21 days upon vacating, to date she still has never received any such records.  And, to date, Defendants have retained Ms. NAVARRO's entire security deposit, despite her numerous efforts to receive repayment of her security deposit, as described in greater detail below.

47.     On or about May 22, 2022, Ms. NAVARRO vacated the premises.  On or about June 1, 2022, Ms. NAVARRO called and texted AMC's manager to inquire about the status of her security deposit.  AMC informed Ms. NAVARRO that its manager was unavailable but would call her back later.  AMC's manager did not return Ms. NAVARRO's call.

48.     On or about June 10, 2022, Ms. NAVARRO called again.  She also emailed AMC management about the estimated arrival time for her security deposit check, stating: "I am reaching out because I have not heard back regarding my deposit."  Later that day, Ms. NAVARRO texted AMC's manager, stating that she just sent another short email "because I have not heard back.  Please look into [this].  Thanks."  AMC's manager confirmed via text AMC's receipt of her emails and promised to respond by the following day.  AMC's manager did not respond.

49.     On June 14, 2022, Ms. NAVARRO again called AMC inquiring about her security deposit and reminding AMC that it still had not responded to her prior texts and emails.  AMC finally responded, stating, "Can you please provide us with your new address so we can mail you the deposit."  That same date, Ms. NAVARRO emailed AMC her address in Oakland, California, where the security deposit should be mailed.

50.     On June 15, 2022, Ms. NAVARRO emailed AMC's her mailing address a second time.  Afterwards, she called AMC's manager.  He refused to take her call and texted that he was unavailable.

51.     On June 22, 2022, approximately 30 days after she had vacated the premises, Ms. NAVARRO followed up with AMC's manager via text: "checking on update of deposit[.] was that

FOURTH AMENDED CLASS ACTION COMPLAINT SEEKING DECLARATORY RELIEF, DAMAGES, INJUNCTIVE RELIEF AND RESTITUTION

mailed out."

52.     On June 23, 2022, after hearing nothing from AMC, Ms. NAVARRO asked AMC again via email whether the deposit had yet been forwarded to her Oakland, California address that she had previously provided AMC twice before.  In response, AMC feigned ignorance: "thank you for your new address."  AMC stated it would reach out to its accounting department to "inquire about [her] deposit."  AMC further stated, "We will update you tomorrow when we hear back from them." Unsurprisingly, the following day came and went, but still AMC provided Ms. NAVARRO with no update.

53.     On June 29, 2022, Ms. NAVARRO followed up again: "I am emailing once more I have not heard from you about the deposit."

54.     On June 30, 2022, about 38 days after vacating the premises, after receiving no updates from AMC for over a week, Ms. NAVARRO again texted AMC's manager: "regarding the deposit have not heard from the office can you please check for me thanks."  AMC's manager gave another excuse: "I will check your mail box today incase the check was mailed to your unit at bay vista."  In reality, AMC had no reason to believe that a security deposit check was ever mailed to Ms. NAVARRO's Bay Vista apartment because she had not lived there in over a month; AMC used this as an excuse to further delay payment and thwart Ms. NAVARRO'S recovery of her security deposit. AMC continued to provide Ms. NAVARRO with no update regarding the whereabouts of her security deposit.

55.     On July 2, 2022, Ms. NAVARRO again emailed AMC to inform it that "it has now been past the 21 days after I moved out and I have not been forwarded my deposit."  In this email, Ms. NAVARRO also reaffirmed her Oakland, California address (for a fourth time), and asked for AMC to call her regarding her security deposit "as soon as possible."

56.     On July 5, 2022, 44 days after Ms. NAVARRO had vacated her unit at Bay Vista Apartments, she again texted AMC to inquire about her security deposit: "Hello again, sorry to bother you but can I get the main office number so I can contact them directly. I feel awful that I keep texting you about the matter. But still nothing yet."  In response, AMC dodged Ms. NAVARRO's request by stating, "I'll contact our accountant to see what's going on."

- 28 -

57.    On July 6, 2022, Ms. NAVARRO again called and texted AMC's management asking for an update.  She was again told AMC would call her back.  AMC did not.

58.    On July 12, 2022, Ms. NAVARRO again followed up with AMC regarding the status of her deposit check.  This time, AMC told her that according to AMC's accounting department "the check wasn't cashed so [they] reissued a new check for you on Friday [July 8, 2022]."

59.    On July 26, 2022, Ms. NAVARRO again called and texted AMC, stating "reaching out to you regarding my deposit.  I need [you] to provide me with information.  I was told it would be forwarded many times and till today I have not heard from your office.  I have a legal right to know. I need an answer."  That same date, Ms. Navarro also emailed AMC, stating that she had emailed and called multiple times about her deposit, and that AMC told her that it would be forwarded to her Oakland, California address, but that she still has not received it.  She further requested "an explanation and honest response" from AMC.  However, in response, AMC again claimed that its accountant reissued the security deposit check and mailed it to Ms. NAVARRO at her Oakland, California address.  AMC stated Ms. NAVARRO should expect to finally receive the check at the end of the week.  AMC never mailed the check.  AMC never sent her any lawful itemized statement either.

60.    As of the time of the filing of this civil Complaint, more than 198 days have passed since Ms. NAVARRO vacated her apartment at Bay Vista Apartments.  AMC still has not returned to Ms. NAVARRO her security deposit, nor any portion thereof.  Nor has AMC sent Ms. NAVARRO any itemized statement, invoice, receipt or bill of any kind for any deduction from her security deposit.

61.    In addition to the forgoing, pursuant to AMC's Excessive Late Fee Policy, on information and belief, Ms. NAVARRO was charged by Defendants late fee in the same amount for each instance when her rent was paid late, regardless of the amount or number of days late.  Defendants never waived nor refunded any of the late fees Defendants charged Plaintiff pursuant to its uniform Excessive Late Fee Policy.

62.    Attached hereto and incorporated herein is what is reasonably believed to be a copy of Ms. NAVARRO's Residential Lease Agreement ("Agreement") with Defendants.  This is the same

- 29 -

Agreement that Defendants themselves previously verified as true and correct and filed with the United States District Court for the Northern District of California in this same case on February 20, 2024. (*See*, Case 3:24-cv-00856-AMO, at Doc. 5-3 [Defendants' Declaration of Michelle Grgurevic, attaching thereto as Exhibit 1 this same Agreement.)

**Plaintiff Nihla Olsem:**

63.    Plaintiff NIHLA OLSEM is a former tenant of Defendants, formerly residing at the following APARTMENT COMPLEX: The Amber Grove Apartments, at 4031 Marconi Ave #98, Sacramento, CA 95821.  Ms. OLSEM leased the apartment from Defendants beginning on or around March 11, 2022.  Ms. OLSEM's lease with Defendants required a security deposit of $900.00 when she moved in on or around March 11, 2022.

64.    Ms. OLSEM vacated her leased premises at the Amber Gove Apartments in early July of 2023.  She never received any statutorily required Move-out Statement, notice or itemized statement regarding the disposition of her security deposit at that time, nor did she receive any bills, receipts, invoices, or other documentation from any third-party vendor who may have allegedly performed any repairs, cleaning or replacements to the unit Ms. OLSEM vacated.  In fact, no such notice, statement, invoice, bill, or other document evidencing any amounts that were deducted from Ms. OLSEM's security deposit were ever sent to Ms. OLSEM within 21 days after vacating her unit at the Amber Grove Apartments.

65.    Not only did Ms. OLSEM not receive any statutorily required notice, itemized statement, invoices, bills, receipts, or other documents related to the disposition of her security deposit within 21 days upon vacating, but to date she still has never received any such records, despite her numerous efforts to receive such documents.  And, to date, Defendants have still retained Ms. OLSEM's entire security deposit.

66.    In around early July of 2023, Ms. OLSEM vacated the premises.  Shortly after vacating, Ms. OLSEM was concerned that she would not receive her security deposit back, so she made numerous attempts to call the Amber Grove Apartments' office.  However, Ms. OLSEM's call were never answered, nor returned.

FOURTH AMENDED CLASS ACTION COMPLAINT SEEKING DECLARATIVE RELIEF, DAMAGES, INJUNCTIVE RELIEF AND RESTITUTION

67.     On July 21, after still not hearing back from Defendants, Ms. OLSEM emailed Defendants at amgmgr@amgllc.net stating: "*I moved out on 7/1/23 of unit 98. Still haven't heard anything about my deposit and you guys don't answer calls. You can email me an itemized list of any charges and receipts. I'm sure you guys have my number from the numerous attempts I've made to contact anyone in the office but it's 916-307-3295 if you need it again.*"

68.     On July 24, 2023, Ashley Taylor, Community Director, amgmgr@amcllc.net, emailed Ms. OLSEM back, stating "*Hello, Were still working on the unit and will give you a breakdown of any charges etc by the end of this week! Thank you for your patience. Have a great day!*"

69.     After not hearing back from anyone for an additional two weeks, Ms. OLSEM emailed Ashley Taylor again on August 4, 2023, asking: "*Hi, any updates on this?*" Ms. OLSEM received no response.

70.     On August 8, 2023, Ms. OLSEM emailed Ashley Taylor again, asking: "*Any updates.*" Again, Ms. OLSEM received no response.

71.     On August 29, 2023, two months after Ms. OLSEM moved out, she emailed Ashely Taylor, stating: "*Hi its nihla from the unit 98, can you send me a complete ledger for the time I lived at Amber Grove from 3/2022-7/2023.*" That same day, Ashley Taylor emailed Ms. OLSEM back with just Ms. OLSEM's "ACCOUNT LEDGER" attached. Attached hereto and incorporated herein is a copy of the "ACCOUNT LEDGER" that was sent to Ms. OLSEM.

72.     Ms. OLSEM continued to attempt to call Defendants, but her calls were never answered or returned.

73.     As of the time of the filing of this Third Amended Complaint, more than a year has passed since Ms. OLSEM vacated her apartment at the Amber Grove Apartments. AMC still has not returned to Ms. OLSEM any portion of her security deposit. Nor has AMC sent Ms. OLSEM any statutorily compliant itemized statement, invoice, receipt or bill of any kind for any deduction from her security deposit.

74.     In addition to the foregoing, Ms. OLSEM was charged by Defendants late fees in the same amount of $50.00 for each instance when her rent was paid late, regardless of the amount or number of days late.

1    75.    Attached hereto and incorporated herein is a copy of Ms. OLSEM's Residential Lease

2    Agreement ("Agreement") with Defendants.

3

4    **CLASS ACTION ALLEGATIONS:**

5    76.    Plaintiffs re-allege and incorporate by reference the allegations of all preceding

6    paragraphs.

7    77.    Plaintiffs  bring this action as a class action pursuant to California Civil Code of

8    Procedure § 382 on behalf of themselves and all other similarly situated persons in the subclasses,

9    which are composed of and defined as follows, excepting only individuals against whom or in whose

10   favor a final judgment has already been rendered with respect to the defendant(s):

11           a.   **Unsubstantiated-Charges Class:**  All former residents of Defendants' California

12                properties whose leaseholds terminated between December 9, 2018 to the date of tiral,

13                and who had at least $125 of their security deposit retained for, inter alia, cleaning,

14                repairs and/or replacements combined (the "Plaintiff Class.").

15           b.   **Excessive Late Fee Class:**  All current and former residents of Defendants' California

16                Properties who were subject to Defendants' Excessive Late Fee policy at any time

17                between December 9, 2018 and the date of trial.

18   78.    The above-two subclasses together shall collectively be referred to herein as the

19   "Plaintiff Class".  Plaintiffs reserve the right to amend this Class and to add or amend any number of

20   subclasses.  Nothing in the forgoing subclass definitions is intended to allege or imply that all

21   putative members of the Plaintiff Class incurred the same amount of monetary damages.  For

22   example, some members of the Unsubstantiated-Charges Class may have incurred $125 in damages,

23   while others incurred more as a result of Defendant's security deposit policies and practices.

24   Similarly, some members of the Excessive Late Fee Class may have incurred one late fee, while

25   others may have incurred multiple late fees.  The Court should permit this action to be maintained as

26   a class action pursuant to California Code of Civil Procedure section 382 because:

27           a.   <u>**Numerosity:**</u> The entire Plaintiff Class is so numerous that the individual joinder of all

28                members is impracticable.  Plaintiffs are informed and believe that there are thousands

- 32 -

of Plaintiff Class members in total, and a sufficiently numerous amount in each of the proposed subclasses.

b. **<u>Common Questions Predominate:</u>** Common questions of law and fact exist as to all members of the class that predominate over any questions that affect only individual members.  These common questions of law and fact include:

i. Whether Defendants enacted policies or engaged in a pattern and practice in violation of Civil Code section 1950.5(g)(1) of failing to return any remaining portion of the security deposits to the respective former tenants within 21 calendar days after the tenant vacates the premises.

ii. Whether Defendants enacted policies or engaged in a pattern and practice in violation of Civil Code section 1950.5(g)(1) of failing to provide itemized statements detailing charges for repairs or cleaning deducted from security deposits of its former tenants within 21 days of move out.

iii. Whether Defendants enacted policies or engaged in a pattern and practice of failing to provide copies of vendor-supplied bills, receipts or invoices for repairs or cleaning deducted from security deposits of its former tenants within 21 days of move out.

iv. Whether Defendants' uniform security deposit itemizations satisfy the requirements for any alleged "employee performed work" on vacated leaseholds under Civil Code section 1950.5(g)(2)(A).

v. Whether Defendants' uniform security deposit itemizations satisfy the requirements for any alleged "vendor performed work" on vacated leaseholds under Civil Code section 1950.5(g)(2).

vi. Whether Defendants, by operation of law, are barred from seeking recovery for amounts which could legitimately have been charged at move out due to their systematic and bad faith violation of Civil Code section 1950.5 and other equitable or statutory provisions of law.

vii. Whether any and all Defendants are liable to each former tenant who is a class

FOURTH AMENDED CLASS ACTION COMPLAINT SEEKING DECLARATORY RELIEF, DAMAGES, INJUNCTIVE RELIEF AND RESTITUTION

member for punitive and/or treble damages for bad-faith retention of security deposits under Civil Code section 1950.5(l).

    viii.  Whether *Granberry v. Islay Investments* 9 Cal. 4th 738 mandates that the Defendant return all of the security deposit retained from the Plaintiff Class for its uniform violation of Civil Code section 1950.5.

    ix.  Whether Defendants' policy and practice of charging a late fee resulted in Defendants' charging a late fee that was excessive.

    x.  Whether Defendants late fee policy was ever validated by engaging in a reasonable endeavor to estimate a fair average compensation for any substantiated loss by showing that the amount of actual damages sustained is impractical or extremely difficult to fix.

    xi.  The appropriate measure of class-wide legal and/or equitable relief.

c.  **Typicality:** Plaintiffs' claims are typical of those of the Plaintiff Class. Plaintiffs and all Plaintiff Class members sustained injuries and damages arising from Defendants' common policies, practices and course of conduct, and those injuries and damages were caused directly by the Defendants' wrongful conduct in violation of law as alleged.

d.  **Adequacy of Representation:** Plaintiffs will fairly and adequately protect the interest of the members of the Plaintiff Class. Plaintiffs have no interests adverse to the interests of absent class members. Plaintiffs have retained counsel adequate to prosecute the case for the entire class.

e.  **Superiority:** A class action is superior to other available means for the fair and efficient adjudication of this controversy since individual joinder of all members of the class is impracticable; class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. Furthermore, because Defendants are expected to contend that any individual's damages may be relatively small, the

expense and burden of individual litigation make it difficult or impossible for individual class members to redress the wrongs done to them, while an important public interest will be served by addressing the matter as a class action. The cost to the judicial system of individual adjudication would be substantial and present the potential for inconsistent or contradictory judgments.  In addition, individual actions give Defendants too many opportunities to take advantage of unrepresented tenants at a summary proceeding without access to substantial discovery, as discovery is not available in small claims court.

79.    Plaintiffs are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## FIRST CLAIM FOR RELIEF

**Unlawful Retention of Residential Security Deposits**

**(California Civil Code § 1950.5)**

**(Against all Defendants)**

80.     Plaintiffs re-allege and incorporate by reference the allegations of all preceding paragraphs.

81.    This cause of action is brought against Defendants on behalf of Plaintiffs and the Plaintiff Class.

82.    Defendants charged unsubstantiated cleaning, repair, replacement, and/or painting fees to Plaintiffs and the Plaintiff Class upon the termination of their leasehold and deducted these charges from their security deposits.

83.    Defendants did not provide a copy of an itemized statement indicating the basis for, and the amount of, any security received and the disposition of the security within 21 days of Plaintiffs' and the Plaintiff Class' vacating the respective leased premises owned and managed by Defendants.

84.    Defendants did not provide the requisite substantiation of the charges against Plaintiffs' and the Plaintiff Class' security deposits as required under Civil Code section 1950.5(g)(2).

85.     Defendants, as a result of these charges, unlawfully retained some or all of Plaintiffs' and the Plaintiff Class' security deposits.

86.     Defendants further retained some or all of the Plaintiffs' and the Plaintiff Class' security deposit beyond 21 calendar days after vacating the premises.

87.     Defendants engaged in the above-described misconduct in bad faith.

88.     As a direct and proximate cause of Defendants' conduct, Plaintiffs and the Plaintiff Class suffered damages.

## SECOND CLAIM FOR RELIEF

**Unlawful Liquidated Damages**

**(California Civil Code § 1671)**

**(Against all Defendants)**

89.     Plaintiffs re-allege and incorporate by reference the allegations of all preceding paragraphs.

90.     Defendants rented real property to Plaintiffs and Class Members for use as dwellings by Plaintiffs  and Class Members subject to California Civil Code § 1671(c)(2).

91.     California Civil Code § 1671(d) provides that "a provision in a contract liquidating damages for the breach of the contract is void except that the parties to such a contract may agree therein upon an amount which shall be presumed to be the amount of damage sustained by a breach thereof, when, from the nature of the case, it would be impracticable or extremely difficult to fix the actual damage."

92.     Any damages Defendants' sustained as a result of Plaintiffs' and Class Members' late payment of rent is neither impracticable nor extremely difficult to fix. Neither is Defendant's late rent fee the result of a reasonable effort to estimate fair compensation for Defendants' actual damages sustained due to their late receipt of rent from Plaintiffs or Class Members.  Defendants' late rent fee is usurious, unreasonable, excessive, and voidable under California law.

93.     Defendants' Excessive Late Fees are accordingly unlawful pursuant to California Civil Code § 1671(d). Plaintiffs and Class Members are entitled to restitution of all fees Defendants have collected from tenants for the late payment of rent or other outstanding balances, as well as interest

1  and other relief as specifically prayed for herein.

2      94.    As a direct and proximate cause of Defendants' conduct, Plaintiffs suffered damages.

3  ///

4                    **THIRD CLAIM FOR RELIEF**

5              **Restitution as a Remedy for "Unfair Competition"**

6        **(California Business and Professions Code §§ 17200, *et seq*.)**

7                      **(Against All Defendants)**

8      95.    Plaintiffs re-allege and incorporate by reference the allegations of all preceding

9  paragraphs.  All factual allegations in the preceding paragraphs are expressly incorporated herein and

10  form the factual bases for this section 17200 claim.

11      96.    This cause of action is brought against Defendants on behalf of Plaintiffs and the

12  Plaintiff Class.

13      97.    Pursuant to section 17200 of the California Business and Professions Code, "any

14  unlawful, unfair or fraudulent business act or practice" constitutes "unfair competition."  In addition

15  to the *unfair* business practices alleged in detail above, Plaintiffs' section 17200 claim is also

16  premised on the *unlawful* business practices described in detail above – all of which are expressly

17  incorporated herein -  including, without limitation, the allegations concerning Defendants' violation

18  of: (i) California Civil Code § 1950.5 (unlawful retention of residential security deposits); (ii)

19  California Civil Code § 1671 (charging excessive late fees); and (iii) California Civil Code § 3302

20  Defendants' Excessive Late Fees constituting exorbitant interest rates). All of these statutory

21  violation by Defendant form the bases for Plaintiffs' claim that Defendants are liable under section

22  17200 of the California Business and Professions Code.

23      98.    The violations of the California Civil Code and other wrongdoing alleged herein

24  constitute unlawful, unfair and/or fraudulent business acts and practices, and therefore "unfair

25  competition," for the purposes of section 17200 of the California Business and Professions Code.

26  Among other violations, Defendants' collections and attempted collections of amounts over and

27  above a retained security deposit are unlawful, all entitling Plaintiffs and the Plaintiff Class to

28  restitution under the UCL.

99.     Likewise, Defendants' deduction from the Plaintiffs' and the Plaintiff Class' respective security deposits without timely providing Plaintiffs and the Class legally competent itemized descriptions of the repairs, replacement or cleaning purportedly performed by Defendants constitutes an unlawful, unfair and/or fraudulent business practice.  Similarly, Defendants' failure to furnish the statutorily required itemized statement, receipts, invoices, bills and other substantiating records within 21 days, and Defendants' failure to return any remaining portion of the security deposits to the Plaintiffs and Plaintiff Class within 21 calendar days after the tenant vacates the premises was unfair and unlawful.  Defendants' deduction from the Plaintiffs' and the Plaintiff Class' respective security deposits without timely providing Plaintiffs and the Class third-party vendor invoices for all repairs, replacement, and/or cleaning purportedly performed by third party vendors constitutes an unlawful, unfair and/or fraudulent business practice.

100.     Defendants' policy and practice of charging unsubstantiated late fees without first engaging in a reasonable endeavor to estimate a fair average compensation for any substantiated loss by showing that the amount of actual damages sustained is impractical or extremely difficult to fix render the late fee charges unfair and unlawful.  Defendants' late fee charges to Plaintiffs and the Plaintiff Class were arbitrary, excessive, and unreasonable charges in violation of statute and, therefore, are unfair and unlawful.

101.     Plaintiffs and the Plaintiff Class have suffered financial injury in fact and have lost money and/or property as a result of such unfair competition.

102.     The facts set forth establish that the Plaintiffs and the members of the Plaintiff Class are entitled to judgment over and against Defendants and all of them, jointly and severally, awarding restitution to the Plaintiffs and the Plaintiff Class of all monies acquired by means of the described unfair competition, including wrongfully withheld security deposits and associated penalties, and wrongfully charged unlawful and unfair late fees.

103.     Plaintiffs and the Plaintiff Class are further entitled to declaratory and injunctive relief determining the rights and obligations in dispute among the Parties and an order mandating Defendants adhere to the mandates of law with respect to their security deposit accounting practices.

**PRAYER FOR RELIEF**

FOURTH AMENDED CLASS ACTION COMPLAINT SEEKING DECLARATORY RELIEF, DAMAGES, INJUNCTIVE RELIEF AND RESTITUTION

WHEREFORE, Plaintiffs, on behalf of themselves and other members of Plaintiff Class, pray:

104.    For actual damages sustained by Plaintiffs and the Plaintiff Class members, including but not limited to, unlawfully retained security deposits; any amounts paid to Defendants over and above what was retained of their respective security deposits for unreasonable and unsubstantiated charges at move-out; plus any other amounts collected from Class members in connection with their leasehold termination for purported repairs, replacements, painting, carpet replacement or cleaning, accelerated rent, rental concession charge-backs, and any other charges collected in violation of law.

105.    For return of the entirety of all Plaintiffs' and the Plaintiff Class' security deposits retained by Defendants;

106.    For return of the entirety of all Plaintiffs' and the Plaintiff Class' late fees paid to Defendants;

107.    For penalties available pursuant to Civil Code section 1950.5 *et seq*.;

108.    For penalties available pursuant to Civil Code section 3345;

109.    For restitution for violation of Business and Professions Code sections 17200 *et seq*.;

110.    For pre-judgment interest;

111.    For attorney's fees and expenses recoverable under law, including, without limitation, Code of Civil Procedure 1021.5;

112.    For costs, including class action notice and administration expenses;

113.    For injunctive relief against Defendants' conduct, including an injunction:

    a.  Requiring Defendants to issue proper itemizations of security deposits as required by Civil Code section 1950.5 within the time prescribed by law.

    b.   Requiring Defendants to provide a third-party documentation for every cleaning, replacement, and repair charges consistent with the provisions of Civil Code § 1950.5(g)(2);

    c.  Prohibiting Defendants from charging any fees against residential security deposits other than the charges specifically authorized by Civil Code section 1950.5(b); and

    d.  To declare all alleged outstanding balances owed by class members invalid and prohibit collection thereupon.

114.    For declaratory relief, declaring that outstanding balances alleged owed by the Plaintiff Class members are extinguished by operation of this suit;

115.    For all other appropriate declaratory and equitable relief; and

116.    Any other relief that this Court deems just.

Dated:  January 27, 2025                    **HOGUE & BELONG**

                                   By:___*Tyler J. Belong*___
                                        JEFFREY L. HOGUE, ESQ.
                                        TYLER J. BELONG, ESQ.
                                        Attorneys for Plaintiffs

FOURTH AMENDED CLASS ACTION COMPLAINT SEEKING DECLARATIVE RELIEF, DAMAGES, INJUNCTIVE RELIEF AND RESTITUTION

1

## **JURY DEMAND**

2

3        Plaintiffs and ROES 1 through 100, individually and on behalf of the other members of the

4   Plaintiff Class, hereby demand trial by jury of all issues triable by a jury, pursuant to applicable law,

5   including, but not necessarily limited to Article I, ¶ 16 of the California Constitution, and/or § 592 of

6   the California Code of Civil Procedure.

7

8   Dated:  January 27, 2025              **HOGUE & BELONG**

9                                        By:  *Tyler J. Belong*
                                              _____
10                                             JEFFREY L. HOGUE, ESQ.
                                              TYLER J. BELONG, ESQ.
11                                             RAE-ANNA M. SOLLESTRE, ESQ.
                                              Attorneys for Plaintiff

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 41 -

Rosa Navarro's Lease Agreement

# RESIDENTIAL LEASE/RENTAL AGREEMENT

DATED: **SEPTEMBER 28, 2021**

## A. VARIABLE LEASE TERMS:

### RESIDENCE DESCRIPTION:

❏ *(If checked)* A single family residence.

☒ *(If checked)* Part of a multi-family residential complex known as **Bay Vista**

| UNIT NUMBER: | UNIT TYPE: | UNIT ADDRESS: | |
|---|---|---|---|
| 18 | 2x1 | 470 Central Avenue | |
| COUNTY: | CITY: | STATE: | ZIP: |
| Alameda | Alameda | CA | 94501 |

### TERM:

| | | | |
|---|---|---|---|
| **COMMENCEMENT DATE:** 5/17/2021 <br><br> **TERMINATION DATE:** 5/31/2022 | ☒ *(If checked)* Resident has been granted an **EARLY TERMINATION OPTION.** To exercise this option, Resident must pay an Early Termination Option Fee of **$4,130.00** and give notice of Resident's election to exercise the option at least and give notice of Resident's election to exercise the option at least **Sixty (60)** days before the Early Termination Date. The Early Termination Date must be between **5/17/2021** and **5/31/2022.** Landlord may require Resident to sign additional documentation if Resident elects to exercise Resident's early termination option. | | ❏ *(If checked)* After the Termination Date, this Agreement will continue on a month-to-month basis until terminated as specified elsewhere in this Agreement. |

### RESIDENT(S):

| NAME (First, Middle Initial, Last): | NAME (First, Middle Initial, Last): | NAME (First, Middle Initial, Last): |
|---|---|---|
| Rosa E. Navarro | | |

LIST OF ALL **OCCUPANTS** (Do not list any Residents from above):

GUARANTOR(S):

LANDLORD NAME:

Bayview

| PROPERTY MANAGER: | Name, address and telephone number: | | |
|---|---|---|---|
| AMC | Ruben Campos   470 Central Avenue, Alameda, CA  94501 | | (510) 200-7370 |

### MONTHLY RENT AND OTHER OPTIONAL CHARGES:

| Base Rent ("Rent"): | ❏ *(If checked)* LICENSE FOR **GARAGE/PARKING SPACE NO.:** MONTHLY GARAGE/PARKING CHARGE: | ❏ *(If checked)* LICENSE FOR **STORAGE SPACE NO.:** MONTHLY STORAGE SPACE CHARGE: MONTHLY PARKING CHARGE: **$0.00** | ❏ *(If checked)* MONTH-TO-MONTH FEE: **$100.00** ☒ MONTHLY WASHER/DRYER CHARGE: **$0.00** | ❏ *(If checked)* MONTHLY PET CHARGE: | ❏ DAMAGE LOSS WAIVER PROGRAM CHARGE: | TOTAL MONTHLY RENT AND OPTIONAL CHARGES |
|---|---|---|---|---|---|---|
| **$2,065.00** | | | | | | **$2,065.00** |

❏ *(If checked)* **RENT CONCESSIONS:** The monthly Rent identified above is the amount due before application of the rent concession.

| LATE CHARGE (Applied if payments have not been received within **3** days of their due date): | SECURITY DEPOSIT: |
|---|---|
| **$25.00** | **$1,000.00** |

### PAYMENT INSTRUCTIONS:

| | | |
|---|---|---|
| ☒ *(If checked)* All amounts due to Landlord are payable to **Bayview, 470 Central Avenue, Alameda, CA  94501, (510) 200-7370.** Payment must be made by: ☒ Money Order  ☒ Cashier's Check  ☒ Personal Check  - No personal checks will be accepted after the **3rd** day of the month or in response to a notice to pay rent or quit or a notice to perform covenant or quit requiring payment. No Third Party Checks are accepted. The normal hours available to make payments in person are **Monday-Friday, 9:00 am-6:00 pm; Saturday 9:00am-6:00pm; closed Sunday,** for all non-holidays ☒ Weekdays, **9:00am-6:00pm** on Saturdays, and **n/a** on Sundays. <br><br> ❏ *(If checked)* A twenty-four hour, seven days a week rent payment drop box is available at the address above. | ❏ *(If checked)* All amounts due Landlord must be deposited by Resident in Landlord's account at <br><br> Account No. _____ | ☒ *(If checked)* Landlord may, but is not required, to accept payments electronically or by credit card, either directly or through a third party payment service system. Residents interested in these payment methods should request information about Landlord's current electronic and credit card payment acceptance policy from the management office. See the Payment Detail section below. |

Kimball, Tirey & St. John California Residential Lease/Rental Agreement

© 2003-2020 Kimball, Tirey & St. John. All rights reserved.

This lease may not be duplicated in any way without the express written consent of Kimball, Tirey & St. John LLP.

Licensed for use on properties owned or managed by AMC.



**MISCELLANEOUS INFORMATION:**

PETS: ☒ are not authorized. ☐ *(If checked)* The following pets are authorized: **None**

| ☒ *(If checked)* ATTORNEY'S FEE CAP: $94,544.00 | LANDSCAPE WATERING by: ☒ Landlord ☐ Resident | LANDSCAPE MAINTENANCE by: ☒ Landlord ☐ Resident |
|---|---|---|

| **ACCESS CONTROL DEVICES:** | **HOMEOWNERS ASSOCIATION:** |
|---|---|
| _____ Mailbox No. <br> **1** Key to the mail facilities. Rekeyed? ☒ Yes ☐ No <br> **2** Keys to the Residence. Rekeyed? ☒ Yes ☐ No <br> **0** Garage/gate openers. Codes reset? ☐ Yes ☒ No <br> **1** Key/opener to common area(s). Other: <br> _____ | ☐ *(If checked)* The Residence is a unit in development governed by a homeowner's association. <br> Name of HOA: _____ <br> ☐ *(If checked)* Copies of HOA rules and regulations are available for Resident's review at _____ <br> ☐ *(If checked)* Copies of HOA rules and regulations have been provided to Resident. |

| **AUTOMOBILES** ☐ may ☒ may not be washed on the Property. **OIL CHANGING AND AUTOMOBILE REPAIRS** ☐ are ☒ are not allowed on the Property. **BAR-B-QUE GRILLS** ☐ are ☒ are not allowed. | ☒ *(If checked)* You are required to obtain and maintain **RENTER'S INSURANCE** with minimum liability of **$100,000.00** per occurrence and a maximum deductible of **$500.00.** | **MARIJUANA:** ☒ *(If checked)* Unless otherwise specified below, you may not possess, plant, cultivate, harvest, transport, dry or process, marijuana or processed cannabis products in the Residence or Property. ☐ *(If checked)* You may possess processed marijuana and cannabis products (ready for immediate consumption), but only as allowed by law. | **DESIGNATED SMOKE-FREE AREAS:** ☒ All Common Areas |
|---|---|---|---|

**DISCLOSURES AND PROPERTY INFORMATION:**

☒ *(If checked)* **LEAD DISCLOSURES APPLY:** If indicated, the Residence was built before 1978 when lead based paint was still in use. The Lead Based Paint Disclosure section of this Agreement will apply, and a copy of the pamphlet *Protect Your Family From Lead In Your Home* has been provided to Resident.

Landlord knowledge of lead-based paint and/or lead-based paint hazards in the Residence or Property:

☒ *(If checked)* Landlord has no knowledge of any lead-based paint and/or lead-based paint hazards in the Residence or Property.

☐ *(If checked)* Landlord is aware of the following lead-based paint and/or lead-based paint hazards in the Residence or Property:
_____ .

Reports or records pertaining to lead-based paint and/or lead-based paint hazards in the Residence or Property:

☒ *(If checked)* Landlord has no reports or records pertaining to lead-based paint and/or lead-based paint hazards in the Residence or Property.

☐ *(If checked)* Available reports or records pertaining to lead-based paint and/or lead-based paint hazards in the Residence or Property are as follows: _____ .

Copies of the reports or records identified are available for Resident's review at: **470 Central Avenue, Alameda, CA 94501.**

☒ *(If checked)* **ASBESTOS DISCLOSURES APPLY:** If indicated, the Residence was built before 1981 when asbestos was still used in construction, and the Asbestos section of this Agreement will apply.

Landlord knowledge of asbestos hazards in the Residence or Property:

☒ *(If checked)* Landlord has no knowledge of any asbestos hazards in the Residence or Property, but because of the age of the Property, Resident should review the asbestos section of this Agreement.

☐ *(If checked)* Landlord is aware of the following asbestos hazards in the Residence or Property: **Drywall mud, ceiling, floor tiles.**

Reports or records pertaining to asbestos hazards in the Residence or Property:

☒ *(If checked)* Landlord is not aware of any reports or records pertaining to asbestos hazards in the Residence or Property.

☐ *(If checked)* Available reports or records pertaining to asbestos hazards in the Residence or Property are as follows:
_____ .

Copies of the reports or records identified are available for Resident's review at: **470 Central Avenue, Alameda, CA 94501**.

Resident may obtain information about hazards, including flood hazards, that may affect the Property from the Office of Emergency Services at **http://myhazards.caloes.ca.gov/.** Landlord's owner's insurance does not cover the loss of Resident's personal possessions and it is recommended that Resident consider purchasing renter's insurance and flood insurance to insure Resident's possessions from loss due to fire, flood, or other risk of loss.

☐ *(If checked)* **FLOOD DISCLOSURES APPLY:** If indicated, the Residence is located in a special flood hazard area or an area of potential flooding. Landlord is not required to provide additional information concerning the flood hazards to the property and the information provided in this section is deemed adequate to inform Resident.



**RENT CONTROL AND JUST CAUSE:** If Civil Code §1946.2 or 1947.12 apply to this tenancy: California law limits the amount your rent can be increased. See Section 1947.12 of the Civil Code for more information. California law also provides that after all of the tenants have continuously and lawfully occupied the property for 12 months or more or at least one of the tenants has continuously and lawfully occupied the property for 24 months or more, a landlord must provide a statement of cause in any notice to terminate a tenancy. See Section 1946.2 of the Civil Code for more information.

Landlord may terminate Resident's tenancy after expiration of any term if Landlord, or their spouse, domestic partner, children, grandchildren, parents, or grandparents, unilaterally decides to occupy the Premises.

☒ (If checked) This property is not subject to the rent limits imposed by Section 1947.12 of the Civil Code and is not subject to the just cause requirements of Section 1946.2 of the Civil Code. This property meets the requirements of Sections 1947.12 (d)(5) and 1946.2 (e)(8) of the Civil Code and the owner is not any of the following: (1) a real estate investment trust, as defined by Section 856 of the Internal Revenue Code; (2) a corporation; or (3) a limited liability company in which at least one member is a corporation.

**PEST CONTROL:** ☐ (If checked) Pesticides are periodically applied to ☐ the Residence ☐ units near the Residence ☐ common areas They are applied by ☒ a registered structural pest control company ☐ Landlord or Landlord's agents.

The products used by the pest control company are meant to control the following pest(s): _____ . The approximate date, time and frequency of the pesticide treatment is **Weekly**. The approximate date, time and frequency of the pesticide application is subject to change. The pesticide(s) name, brand and active ingredient: **N/A** or ☐ as specified in a separate pesticide notice.

State law requires that you be given the following information. CAUTION - PESTICIDES ARE TOXIC CHEMICALS.

Structural Pest Control Companies are registered and regulated by the Structural Pest Control Board, and apply pesticides which are registered and approved for use by the California Department of Pesticide Regulation and the United States Environmental Protection Agency. Registration is granted when the state finds that based on existing scientific evidence there are no appreciable risks if proper use conditions are followed or that the risks are outweighed by the benefits.

The California Department of Pesticide Regulation and the United States Environmental Protection Agency allow the unlicensed use of certain pesticides based on existing scientific evidence that there are no appreciable risks if proper use conditions are followed or that the risks are outweighed by the benefits.

The degree of risk depends upon the degree of exposure, so exposure should be minimized.

If within 24 hours following application, you experience symptoms similar to common seasonal illness comparable to the flu, immediately contact:
- your physician or the California Poison Control System (1-800-222-1222), and
- if the pesticide was applied by a pest control company, also contact the pest control company.

For further information, contact any of the following:
- (if pesticide is applied by a pest control company) the pest control company, telephone number: **N/A** or ☐ as specified in a separate pesticide notice.
- for Health Questions - the County Health Department, telephone number: **N/A** or ☐ as specified in a separate pesticide notice.
- for Application Information - the County Agricultural Commissioner, telephone number: **N/A** or ☐ as specified in a separate pesticide notice.
- for Regulatory Information:
  - the Structural Pest Control Board, **N/A** (if pesticide is applied by a pest control company).
  - the Department of Pesticide Regulation (916-324-4100) (if the pesticide is not applied by a pest control company).

☒ (If checked) **ONGOING CONSTRUCTION.** If indicated, there is ongoing construction in the Property consisting of: **General renovation and community enhancement**. The **estimated** date of completion is _____ . Construction will normally be limited to the following days of the week: _____ , and the following hours: **Monday to Sunday 9:00AM to 6:00PM**.
☒ (If checked) Information provided to Resident regarding the Property may refer to amenities for which construction may not yet be completed including the following: **0**.

☐ (If checked) **CONDOMINIUM CONVERSION.** The Residence has been approved for sale to the public as a condominium project. You may be given additional documents about this.

☒ (If checked) **CENTRAL ANTENNA.** The Property has a central antenna. You may not install a satellite dish or antenna unless otherwise allowed under FCC regulations or unless we provide permission. If you are allowed to install a satellite dish or antenna, the conditions in the Satellite Dish and Antenna paragraph below will apply.

Additional notices, disclosures and terms:

**UTILITIES:**



3

**UTILITY AND SERVICES:** This is an Addendum to the Rental Agreement dated **September 28, 2021** (the "Lease"), by and between **Bayview**, solely as Agent for Owner (hereinafter "Agent") for the Owner of the Rental Community known as **Bay Vista**, and **Rosa E. Navarro** (collectively hereinafter "Resident"), for the premises known as **18**, **470 Central Avenue**, **18**, **Alameda**, **94501**, County of **Alameda**, State of California ("Premises"). To the extent that the terms of this Addendum conflict with those of the Lease, this Addendum shall control.

1. Resident shall be responsible for the payment of utility and service bills, including charges for usage, deposits, and any charges, taxes, fees, administrative fees or costs associated with the utilities and services and related billing costs or billing, and the method of billing, metering, or otherwise allocating the cost and charges to Resident for utilities and services, is indicated below (the "Allocated Utilities").

    a) Water service to Resident's apartment and costs will be paid by Resident either:
       ☐ Directly to the water service provider(s); or
       ☒ The water service provider will bill Agent, and the Agent will allocate and bill Resident based on formula: **8**

    b) Sewer/Storm Water service to Resident's apartment and costs will be paid by Resident either:
       ☐ Directly to the sewer service provider(s); or
       ☒ The sewer service provider will bill Agent, and the Agent will allocate and bill Resident based on formula: **8**

    c) Gas service to Resident's apartment and costs will be paid by Resident either:
       ☐ Directly to the gas service provider(s); or
       ☐ The gas service provider will bill Agent, and the Agent will allocate and bill Resident based on formula: _____

    d) Hot Water Energy service to Resident's apartment and costs will be paid by Resident either:
       ☐ Directly to the hot water energy service provider(s); or
       ☒ The hot water energy service provider will bill Agent, and the Agent will allocate and bill Resident based on formula: **8**

    e) Trash service to Resident's apartment and costs will be paid by Resident either:
       ☐ Directly to the trash service provider(s); or
       ☒ The trash service provider will bill Agent, and the Agent will allocate and bill Resident based on formula: **8**

    f) Common Area Gas service to Resident's apartment and costs will be paid by Resident either:
       ☐ Directly to the Common Area Gas service provider(s); or
       ☐ The Common Area Gas service provider will bill Agent, and the Agent will allocate and bill Resident based on formula: _____

    g) Common Area Electric service to Resident's apartment and costs will be paid by Resident either:
       ☐ Directly to the Common Area Electric service provider(s); or
       ☐ The Common Area Electric service provider will bill Agent, and the Agent will allocate and bill Resident based on formula:
       _____

    h) Electric service to Resident's apartment and costs will be paid by Resident either:
       ☒ Directly to the electric service provider(s); or
       ☐ The electric service provider will bill Agent, and the Agent will allocate and bill Resident based on formula: _____

    i) Water Base Fee service to Resident's apartment and costs will be paid by Resident either:
       ☐ Directly to the water service provider(s); or
       ☐ The water service provider will bill Agent, and the Agent will allocate and bill Resident based on formula: _____

    j) Pest Control service to Resident's apartment and costs will be paid by Resident either:
       ☐ Directly to the pest control service provider(s); or
       ☐ The pest control service provider will bill Agent, and the Agent will allocate and bill Resident based on formula: _____

    k) Building & Facilities service for Resident's apartment and costs will be paid by Resident:
       ☐ The Building & Facilities will be allocated and billed to Resident based on allocation method _____ .

    l) Fire service to Resident's apartment and costs will be paid by Resident either:
       ☐ Directly to the fire service provider(s); or
       ☐ The fire service provider will bill Agent, and the Agent will allocate and bill Resident based on formula: _____

    m) Cable service to Resident's apartment and costs will be paid by Resident either:
       ☐ Directly to the cable service provider(s); or
       ☐ The cable service provider will bill Agent, and the Agent will allocate and bill Resident based on formula: _____

    n) Internet service to Resident's apartment and costs will be paid by Resident either:
       ☐ Directly to the internet service provider(s); or
       ☐ The internet service provider will bill Agent, and the Agent will allocate and bill Resident based on formula: _____

FORMULAS / ALLOCATION METHOD KEY

**1 - Per Occupant**   Each Occupant is equal to 1 full occupant. 1 occupant = 1; 2 occupants = 2, 3 occupants =3. The total number of occupants in Resident's unit is divided by the total number of occupants currently residing at the community, the result is multiplied by the total bill. This result is the utility or service cost per unit. This formula does not pro-rate based on move-in date.

**2 - Additional Occupants are 70% of an Occupant**   The first occupant is equal to 1, and each additional occupant per unit is counted as 70% of an occupant. 1 occupant = 1, 2 occupants = 1.7, 3 occupants = 2.4, etc. Total costs for utilities and services is computed in accordance with Formula 1 above, except the total number of occupants per unit is computed in accordance with this paragraph. This formula does not pro-rate based on move-in date.



4

**3 - Per Unit**     Each unit is billed equally regardless of the number of occupants or square feet, this item does pro-rate based on move-in date. The total bill for the utility or service is divided by the total number of occupied units at the community, and the result is the utility or service cost per unit.

**4 - Flat Rate**     Each unit is billed an equal flat rate per month regardless of number of occupants or square feet, this item does not pro-rate based on move-in date.

**5 - Per Foot based on total occupied square feet**     The total utility or service bill is divided by the total number of occupied square feet, and the result is multiplied by the square feet of each individual unit. This result is the utility or service cost per unit. This item does pro-rate based on move-in date.

**6 - 50% Per Occupant/50% Per Foot**     The total bill for a utility or service is divided by two to get one half the total utility or service cost. One half the total cost is divided by the number of occupants at the community, the result is the per occupant cost. The per occupant cost is then multiplied by the number of occupants in Resident's unit, and the result is the 50% per occupant cost. One half the total cost is then divided by the total rentable square feet at the community, the result is then multiplied by the square feet of each individual unit, the result is the 50% square foot cost per unit. The sum of the "50% per occupant cost" and the "50% square foot cost per unit" is the total utility or service cost per unit. This formula does not pro-rate based on move-in date. For example, a $5,000 total utility or service bill for a community with 450 occupants, and 250,000 square feet would result in the following bills for a 1,000 square foot unit based on the following occupancy: 1 occupant would pay $15.56, 2 occupants would pay $21.11, and 3 occupants would pay $26.67.

**7 - Meter Reading**     Each unit is billed for the difference between the previous meter reading and the current meter reading for each units metered item.

**8 - Per Occupant 60/30**     A similar billing to Per Occupant but it takes a ratio of the occupants into account. The first occupant in any unit equals 1 occupant; the 2nd occupant in any unit counts as 0.60 of an occupant; any unit with a 3rd occupant or more, each occupant will count as 0.30 of an occupant. 1 Occ = 1 Occ - 2 Occs = 1.60 Occs - 3 Occs = 1.90 Occs - 4 Occs = 2.20 Occs - 5 Occs = 2.50 Occs - 6 Occs = 2.80 Occs - 7 Occs = 3.10 Occs



5

2. If the Premises is subject to the California Tenant Protection Act of 2019 or a local rent control jurisdiction, Resident shall receive an initial estimated bill that provides both the estimated cost for the Allocated Utilities, as well as provide a "Not to Exceed" amount for the Allocated Utilities. The Not to Exceed Amount published in the initial bill addressed to Resident shall become part of this Addendum as if attached hereto and made a part of. Agent and Resident understand and acknowledge that, for purposes of the applicable rent control law, all utilities charges required to be paid by Resident under this Addendum are considered a portion of the rent paid for the Premises and shall be considered as part of the rent when calculating allowable increases under the rent control law. The Not to Exceed Amount is the maximum utility rent to be billed to Resident by or on behalf of Landlord for all Allocated Utilities (as opposed to any utilities directly billed to Resident), as well as any monthly billing or service fees required under this Addendum, if applicable. The rent related to these utilities and services actually billed to Resident may be less than the Not to Exceed Amount in order to reward overall conservation efforts and to pass on to Resident decreases in rates from the utility providers

3. If an allocation method or flat fee is used Agent, Owner, or their billing company will calculate Resident's allocated share of the utilities and services provided and all costs in accordance with state and local statutes. Under any allocation method or flat fee, Resident may be paying for part of the utility usage in common areas or in other residential units as well as administrative fees. Both Resident, Agent, and Owner agree that using a calculation, allocation formula or flat fee as a basis for estimating total utility and service consumption is fair and reasonable, while recognizing that the allocation method may or may not accurately reflect actual total utility or service consumption for Resident. Agent may change the above methods of determining Resident's allocated share of utilities and services and all other billing methods, in Agent's sole discretion, upon providing thirty (30) days' written notice to Resident. More detailed descriptions of billing methods, calculations and allocation formulas will be provided upon request.

4. When billed by Agent or Owner directly or through Agent's or Owner's billing company, Resident's payment of utility and/or services bills must be received by the due date issued on the bill, which will be the 1st of each month, or the payment will be late. The late payment of a bill or failure to pay any utility and/or services bill is a material breach of the Lease and Agent will exercise all remedies available under the Lease, up to and including eviction for nonpayment. To the extent there is a billing fee for the production of any utility or services bill or a set-up charge or initiation fee by Agent, Owner or their billing company, Resident shall pay such billing fee in an amount not to exceed **$5.00** per billing period and such move out fee in the amount not to exceed **$10.00**.

5. Resident will be charged for the full period of time that Resident is living in, occupying, or responsible for payment of rent and utility or service charges on the apartment. If Resident breaches the Lease, Resident will be responsible for utility and service charges for the time period Resident was obligated to pay the charges under the Lease, subject to Agent and Owner's mitigation of damages. In the event Resident fails to timely establish utilities and services, Agent may charge Resident for any utilities and services billed to Agent or Owner with respect to Resident's apartment and may charge a reasonable billing fee for billing Resident for such utilities and services.

6. When Resident moves out, Resident will receive a final bill, which may be estimated by Agent based on Resident's prior utility and services usage. This bill must be paid at the time Resident moves out or it will be deducted from Resident's security deposit, as permitted by state law. Unless prohibited by law, bills may also be estimated on a temporary basis when necessary due to equipment malfunctions or other problems.

7. Agent and Owner are not liable for any losses or damages Resident incurs as a result of outages, interruptions, or fluctuations in utilities or any other services provided to the apartment unless such loss or damage was the direct result of an intentional or negligent act or omission by Agent, or Agent's employees. Resident releases Agent and Owner from any and all such claims and waives any claims for offset or reduction of rent or diminished rental value of the apartment due to such outages, interruptions, or fluctuations.

8. Resident agrees not to tamper with, adjust, or disconnect any utility or services sub-metering system or device. Violation of this provision is a material breach of Resident's Lease and may subject Resident to eviction or other remedies available to Agent under Resident's Lease and this Addendum.

9. Agent and Owner have the sole authority to select and approve all utility and services providers who may provide services to Resident(s) at the apartment community, to the extent not prohibited by law.

10. Where lawful, all utilities, charges and fees of any kind under this lease shall be considered additional rent, and if partial payments are accepted by Agent or Owner, they will be allocated first to non-rent charges and to rent last.

11. This Addendum shall be enforced to the fullest extent lawful. This Addendum is designed for use in multiple jurisdictions, and no billing method, charge, or fee mentioned herein will be used in any jurisdiction where such use would be unlawful. Any determination by a court of competent jurisdiction that a provision of this Addendum is legally invalid or unenforceable shall not diminish the validity or enforceability of the remaining provisions.

12. Special Provisions. The terms of this section supercede any other conflicting terms of this Addendum. 0



**INITIAL AMOUNTS DUE:**

The following initial amounts are due under this Agreement as specified:

| CATEGORY | TOTAL DUE | PAYMENT RECEIVED TO DATE BY LANDLORD | BALANCE DUE | BALANCE DUE DATE |
|---|---|---|---|---|
| Security Deposit | $1,000.00 | $0.00 | $1,000.00 | 5/17/2021 |
| Prorated Rent from 5/17/2021 through 5/31/2021.<br>If any concessions have been granted to Resident for any portion of this time period, the amount above is the Prorated Rent due after application of the concession amount. | $1,032.50 | $0.00 | $1,032.50 | 5/17/2021 |
| Prorated Washer/Dryer Rent | $0.00 | $0.00 | $0.00 | - |
| Application Fee Charge | $50.94 | $50.94 | $0.00 | - |
| TOTAL | $2,083.44 | $50.94 | $2,032.50 | 5/17/2021 |

The payments described above must be made by: ☒ Money Order ☒ Cashier's Check

**Prorate Payment: $1,032.50** due on **5/17/2021**, for the period of **5/17/2021** through **5/31/2021**.

**Total Rent and Other Optional Charges: $2,065.00** due in advance on the first day of each calendar month beginning **6/1/2021**.

| AGREEMENT ADDENDA AND OTHER WRITTEN MATERIALS PROVIDED TO RESIDENT: | | |
|---|---|---|
| ☒ Concession Addendum | ☒ Addendum To Lease | ☒ Damages and Cleaning Charges Addendum |
| ☒ Carbon Monoxide Alarm | ☒ Electronic Communication Authorization | ☒ Insurance Addendum - No Damage Loss |
| ☒ Lead Paint Booklet | ☒ Lease File Check List | ☒ Package Locker Addendum |
| ☒ Pesticide Disclosure | ☒ Proposition 65 Notification | ☒ Electronic Payment Addendum |
| ☒ Resident Contact Information | | |

Created on **September 28, 2021** by Leasing Agent: **Viet Tran**

## B. DEFINITIONS:

Each capitalized term in this Agreement has the definition specified below unless otherwise defined in this Agreement.

**AGREEMENT:** This Residential Lease/Rental Agreement.

**LANDLORD'S RELATED PARTIES:** The Property Manager and the respective officers, directors, members, managers, partners, shareholders, employees, affiliates, agents and representatives of both Landlord and Property Manager.

**RESIDENT'S RELATED PARTIES:** Other Co-Residents, Occupants, members of your household, your family, guests, agents and others under your control.

**RESIDENCE:** The Residence is identified in the Variable Lease Term section, and includes all appliances, furniture and fixtures that we provide to you ("Personal Property.") The appliances and furniture are described in the Inventory/Move-In Move-Out form.

**PROPERTY:** If the Residence is a unit in a multi-family complex, the Residence and the complex are collectively referred to as "the Property." If the residence is a single family residence, "the Property" refers to the Residence alone.

## C. PRIMARY AGREEMENT TERMS:

1. **PARTIES.** This Agreement is entered into between Landlord and Resident(s). Landlord may be identified in this Agreement as "we" or "us." Resident(s) may collectively be referred to in this Agreement as "you."

2. **AGREEMENT.** You rent the Residence from us.

3. **TERM.** The Agreement term will begin on the Commencement Date and continue until the Termination Date. Note that this Agreement contains provisions that could alter the Term.

   - If the Variable Lease Term section is *not* checked to indicate an automatic continuance of the Agreement on a month-to-month basis after the Termination Date, you must vacate the Residence by the Termination Date (unless you and Landlord agree in writing to extend the term, or as otherwise provided by law).

   - If the Variable Lease Term section *is* checked to indicate an automatic continuance of the Agreement on a month-to-month basis after the Termination Date, the Agreement will continue after the Termination Date until either party terminates the Agreement by giving the other party at least sixty (60) day days' written notice, or as otherwise specified by law.

   If the Variable Lease Term section is checked to indicate an automatic continuance of the Agreement on a month-to-month basis after the Termination Date, and if you would like to vacate on the Termination Date, you must give at least sixty (60)



7

day days' advance written notice of intent to terminate on the Termination Date.

## D. PAYMENTS:

4. **RENT.** You must pay us the Rent and Other Optional Charges amount specified in the Variable Lease Term section. Certain additional amounts due to us are also specified in this Agreement. We reserve our right under Civil Code §1479 to apply any payments we receive to any amounts due (whether Rent, Charges, Late Charges or any other amount) in any manner we choose, and any contrary instructions or conditions you may attempt to impose will be of no force or effect. Unless otherwise specified in this Agreement, all amounts are payable in advance, on the **first** day of each calendar month, without demand, setoff or deduction. The daily value of the Residence will be calculated based on a **30-day month**.

5. **PAYMENT DETAIL.** Payment instructions (including forms of payment accepted, to whom payments are to be made, and the address where payments are to be made), are specified in the Variable Lease Term section. Any payments made by mail or placed in a drop box are made at your risk and must be received by us by the due date. You will incur a **$35.00** for any dishonored check. After receiving any dishonored payment (whether under this Agreement or any other), we reserve the right to require all further payments made by you or on your behalf to be made by money order, certified check or cashier's check. If a third party tenders a payment on your behalf, we reserve the right to require an acknowledgment from the third party as specified in Civil Code §1947.3(a)(3).

We may, but are not required, to accept payments electronically or by credit card, either directly or through a third party payment service system. If you are interested in these payment methods, request information about our current electronic and credit card payment acceptance policy from the management office. We reserve the right at any time to change our electronic and credit card payment policies and/or procedures, the third party payment service system and/or to cease accepting electronic or credit card payments. It is your responsibility before any payment is due to verify whether we are currently accepting payments electronically or by credit card, the proper procedure, and to arrange with us or any third party payment service system to pay electronically or by credit card. A third party payment service system may charge a fee for this service to you and will have specific requirements and procedures you must follow. If any electronic or credit card payment to us or the third party payment service system is reversed, not honored, or results in a "charge back," you will be responsible for Late Charges and any additional cost to us or the payment service system, and we will retain all rights and remedies, including the right to terminate your tenancy.

If you provide a check as payment, you authorize us either to use information from the check to make a one-time electronic fund transfer from the account or to process the payment as a check transaction. When we use information from the check to make an electronic fund transfer, funds may be withdrawn from your account as soon as the same day we receive the payment, and you will not receive the check back from your financial institution.

Use of drop boxes is at your risk. You can reduce the risk of theft of your payment by using electronic payment methods (if we accept electronic payments), or by mailing or personally delivering payments as directed. All checks and money orders must be made payable as specified on the first page of this Agreement. Do not leave the name of the payee blank on checks or money orders; you will not receive a payment credit if the check or money order is stolen and cashed by another party.

6. **SECURITY DEPOSIT.** We will hold the Security Deposit in compliance with California Civil Code §1950.5. We will fully refund it to you if you comply with all of your rental obligations. Unless required by law, we will not hold the Security Deposit in trust, deposit it in a segregated account, invest it in an interest-bearing account, nor pay you any interest on the Security Deposit. If you do not comply with all of your rental obligations, we may use the security deposit to:

- Compensate us for your payment default; or breach of any other obligation under this Agreement, including the cost of recovering possession of the Residence, rental commissions, advertising expenses and other costs incurred because of your breach of the Agreement and the Rent and other amounts due through the end of the Agreement term, (including Rent due up through the date you vacate the Residence, Rent due through the date of judgment, and Rent due after the date of judgment through the end of the original Agreement term) and any other amount necessary to compensate us for your breach of the Agreement, minus amounts we reasonably could have avoided;

- Clean the Residence at the termination of the tenancy, if not returned to us at the same level of cleanliness as received;

- Remedy future defaults by you in any obligation to restore, replace or return personal property or appurtenances, exclusive of ordinary wear and tear; or

- Repair damages to the Residence and Property, exclusive of ordinary wear and tear, caused by you or your Related Parties. Damage or deterioration of the Residence is not ordinary wear and tear if it could have been prevented by good maintenance practices by you, or if you failed to notify us of a maintenance issue in a timely fashion in writing so that we could prevent the damage or deterioration.

You may not use the Security Deposit in lieu of last month's Rent or other amounts due under this Agreement. If we apply any portion of your Security Deposit to amounts due during the term of this Agreement, you must replenish the full amount applied within three days of our demand.

If we know you intend to vacate the Residence, we will give you written notice of your right to a pre-move out inspection as required by law. This inspection allows you to identify and correct any deficiencies in the Residence to avoid Security Deposit deductions. If you notify us that you want the inspection, we will inspect the Residence (no earlier than two weeks before termination of the tenancy) and provide you with an itemized statement specifying repairs or cleaning to be made at your expense. Except as otherwise specified in this Agreement, you may make these repairs yourself, or clean the Residence yourself, before you move out to avoid these deductions from your Security Deposit. You have the right to be present during the inspection.



8

Within 21 days after you return possession of the Residence to us, we will refund amounts due to you from the Security Deposit, plus an accounting of how we have used any portion of the Security Deposit that we have retained. If the Security Deposit is insufficient to satisfy the total charges, we will send to you an itemized bill payable on demand. Any Security Deposit refund may be paid by one check jointly payable to all Residents but delivered to only one Resident at the last known address of any Resident. The refund and deductions will be calculated without regard to who paid the Security Deposit or whose conduct resulted in any deductions.

7. **LATE CHARGES AND DEFAULT INTEREST.** You will be obligated to pay to us the Late Charge if you fail to pay any amount due under this Agreement within the time specified in the Variable Lease Term section. You agree it would be impractical or extremely difficult to fix the actual damage to us and that the Late Charge is a reasonable estimate of the actual damages that the parties reasonably believe would occur as a result of late payment. In addition to the Late Charge, interest will accrue on any unpaid amount at the legal rate of ten percent (10%) per year beginning on the date on which the delinquent amount was due. Late Charges and interest due are in addition to, and not in lieu of, our other remedies.

8. **FAILURE TO MAKE ALL PAYMENTS DUE BEFORE THE COMMENCEMENT DATE.** If you fail to make all payments specified in the section entitled "Initial Amounts Due" before the specified date, or if you fail to provide us with proof that required utilities have been transferred into your name, or if you fail to provide proof of renter's insurance (if required under this Agreement):

- We have no obligation to give you possession of the Residence; and
- We may rescind this Agreement and keep any portion of funds that you have paid (if any) necessary to compensate us for your breach of this Agreement.

## E. ADDITIONAL AGREEMENT TERMS:

9. **APPLIANCES.** Use all appliances in the Residence in a safe manner and only as intended. Do not overload dishwashers and use only detergents made for automatic dishwashers. Turn on cold water before starting the garbage disposal, do not overload the disposal, and do not grind bones or other hard objects, rinds, sticky or stringy foods, or put an excessive volume of material in the garbage disposal. To avoid clogs for which you will be responsible, do not put paper towels, diapers, sanitary napkins, food, baby wipes, moist towelettes or wipes (even if advertised as flushable), cotton swabs, non-flushable clumping kitty litter, or other items that are not meant to be flushed in the toilets, and do not pour grease down the drain. You will be responsible for blockages you cause. If the Residence does not have a frost free refrigerator, defrost the refrigerator when there is approximately one inch of frost. Do not use sharp objects to defrost the freezer. If the Residence is equipped with a washer/dryer, clean the lint filter after every load and periodically inspect the dryer vent duct to ensure it has not become detached, blocked, kinked, or crushed.

You must obtain our written consent before installing any air conditioning unit (including portable air conditioning units), washer, dryer, refrigerator with water dispenser or icemaker, or other appliance. If we grant consent, it may be granted conditionally. Due to concerns about energy consumption, overloading the existing electrical supply, and damage to the Property, consent for appliance installation may be granted on conditions such as: (i) your agreement to allow us to install them (and to pay us the reasonable costs of installation); (ii) the use of specific types of hoses; (iii) maintenance of renter's liability insurance with coverage amounts that we will specify; (iv) utilization of drip trays and water leak detector/alarms; (v) your agreement to compensate us for any losses related to the use or presence of the appliance; and (vi) your agreement to pay for additional utilities consumed.

10. **ASSIGNMENT, SUBLETTING AND TRANSFER BY RESIDENT.** Your interest in the Residence and this Agreement may not be assigned, sublet or otherwise transferred. You may not advertise the Residence on Airbnb, Couchsurfing, Craigslist, or any other advertisement or listing service. Any assignment, subletting or transfer (whether by your voluntary act, operation of law, or otherwise), will be void, and we may elect to treat it as a non-curable breach of this Agreement.

11. **ASSIGNMENT BY LANDLORD.** During your tenancy, we may transfer or encumber our interest in the Property. You must look solely to our transferee for performance of our obligations relating to the period after the transfer. Your obligations under this Agreement will not otherwise be affected by any transfer. Your rights in the Residence are subject to and subordinate to any existing or future recorded deed of trust, easement, lien or encumbrance. If a lender forecloses on the Property, you agree to recognize the purchaser as the landlord under this Agreement if you are requested to do so.

12. **NO DISCRIMINATION:** In leases that following language shall appear – "The lessee herein covenants by and for himself or herself, his or her heirs, executors, administrators, and assigns, and all persons claiming under or through him or her, and this lease is made and accepted upon and subject to the following conditions: That there shall be no discrimination against or segregation of any person or group of persons, on account of any basis listed in subdivision (a) or (d) of section 12955 of the Government Code, as those bases are defined in Sections 12926, 12926.1, subdivision (m) and paragraph (1) of subdivision (p) of Section 12955, and Section 12955.2 of the Government Code, in the leasing, subleasing, transferring, use, occupancy, tenure, or enjoyment of the premises here leased nor shall the lessee himself or herself, or any person claiming under or through him or her, establish or permit any such practice or practices of discrimination or segregation with reference to the selection, location, number, use, or occupancy, of tenants, lessees, sub-lessees, subtenants, or vendees in the premises herein leased."

13. **AUTOMOBILE WASH AND REPAIR.** If permitted on the Property (indicated in the Variable Lease Term section), automobile washing and oil changing may be done only in designated areas.

14. **BALCONIES, PATIOS AND WINDOWS.** Please do not shake or hang rugs, towels and clothing from windows. Do not put plants or other items on balcony or patio walls. If your balcony or patio is visible from outside your Residence, do not keep anything on it other than patio furniture. We reserve the right to prohibit, restrict and control the items on your balcony or patio.

15. **BARBEQUE GRILLS.** If allowed on the Property (indicated in the Variable Lease Term section), barbeque grills may be used only in



9

designated areas, and only in compliance with applicable laws. Cities and counties that have adopted the California Fire Code prohibit charcoal burners and other open-flame cooking devices on combustible balconies or within 10 feet of combustible construction unless (1) the Property is a single family residence or duplex, (2) the buildings, balconies and decks are protected by an automatic sprinkler system, or (3) a liquefied-petroleum LP (which includes propane) gas fueled cooking device having a LP gas container of 1 pound or less is used.

## 16. BED BUGS AND PESTS.

### Information about Bed Bugs

**Bed bug Appearance:** Bed bugs have six legs. Adult bed bugs have flat bodies about 1/4 of an inch in length. Their color can vary from red and brown to copper colored. Young bed bugs are very small. Their bodies are about 1/16 of an inch in length. They have almost no color. When a bed bug feeds, its body swells, may lengthen, and becomes bright red, sometimes making it appear to be a different insect. Bed bugs do not fly. They can either crawl or be carried from place to place on objects, people, or animals. Bed bugs can be hard to find and identify because they are tiny and try to stay hidden.

**Life Cycle and Reproduction:** An average bed bug lives for about 10 months. Female bed bugs lay one to five eggs per day. Bed bugs grow to full adulthood in about 21 days. Bed bugs can survive for months without feeding.

**Bed bug Bites:** Because bed bugs usually feed at night, most people are bitten in their sleep and do not realize they were bitten. A person's reaction to insect bites is an immune response and so varies from person to person. Sometimes the red welts caused by the bites will not be noticed until many days after a person was bitten, if at all.

#### Common signs and symptoms of a possible bed bug infestation:

- Small red to reddish brown fecal spots on mattresses, box springs, bed frames, mattresses, linens, upholstery, or walls.
- Molted bed bug skins, white, sticky eggs, or empty eggshells.
- Very heavily infested areas may have a characteristically sweet odor.
- Red, itchy bite marks, especially on the legs, arms, and other body parts exposed while sleeping. However, some people do not show bed bug lesions on their bodies even though bed bugs may have fed on them.

For more information, see the Internet Web sites of the United States Environmental Protection Agency and the National Pest Management Association.

Please report suspected bed bug infestations to us by contacting the leasing office (if any) or the property manager identified on the first page of this Agreement.

During the day, bed bugs hide in crevices such as seams in mattresses and box springs, bed frame cracks, behind picture frames, and inside furniture and upholstery.

In the past, bed bug infestations were primarily associated with crowded and dilapidated housing. However, bed bug infestations are becoming more common and can be found even in first class hotel and living accommodations. The increase may be the result of increased human travel, movement of infested luggage and items, and changes in the pesticides available to control this pest. Bed bugs are transferred to new locations on people, their clothing, furniture, bedding, and luggage.

Bed bug treatment is challenging. It requires the full cooperation of the residents in affected units, professional treatments over several weeks, and treatment and/or discarding of furniture, clothing, and personal property. Because of the difficulty of bed bug extermination, and because of the risk that bed bugs could spread into other units, you agree that if bed bugs are found, you will immediately contact us, and will not attempt to personally exterminate bed bugs without professional assistance. You may be responsible for any pest control treatment costs.

"Pests" include (but are not limited to) ants, bed bugs, cockroaches, fleas, mites, spiders, termites, mice, rats, other vermin and insects. We have inspected the Residence and are unaware of any pests in the Residence. At move-in, you will complete and sign a Move-In/Move-Out Statement documenting the condition of the Residence. If you fail to report defects in the Move-In/Move-Out Statement, it will be presumed that the Residence has been delivered in good condition and free of pests.

You agree to cooperate with our pest control efforts by:

- Keeping the Residence clean and uncluttered;
- Promptly advising us of any pest control needs, or any condition indicating a bed bug infestation in the Residence or Property (such as itchy welts on skin, bed bugs, blood spots (either brown or red) or bed bug excrement spots (brown or black) on bedding, furniture or other items, or a sweet odor). We are not responsible for any condition about which we are not aware and bed bugs require professional pest control treatment;
- Refraining from bringing bed bugs and other pests into the Residence and the Property, and inspecting all luggage, bedding, clothing, and personal property for bed bugs and other pests before move-in, returning home after traveling and/or bringing new items to the Residence. You will allow us to do the same upon request. If we have a concern about possible infestation, we may (but will not be obligated to) either prohibit you from bringing the item into the Residence and Property or require you to have the item professionally treated at your expense before the item is brought into the Residence or Property.
- Refraining from bringing into the Residence discarded furniture (found in or by a dumpster or elsewhere). Furniture may have been discarded because of a bed bug infestation;
- Providing us with access to Residence for our pest control assessments and pest control treatment;



- Cooperating with inspections to facilitate the detection and treatment of pests, including providing requested information that is necessary to facilitate the detection and treatment of pests.

- Following our instructions to prepare the Residence for pest control treatment and/or vacating the Residence when requested for our pest control efforts;

- Upon our request, promptly providing us with copies of all records, documents, sampling data and other materials relating to the condition of the Residence.

**17. BICYCLES SKATEBOARDS, SCOOTERS, ROLLERBLADES AND SKATES.** Pedestrians have the right of way on all sidewalks, walkways and other pedestrian areas throughout the Property. Bicycles, skateboards, scooters, roller blades/skates, self-balancing motorized boards, and other wheeled apparatus must be used with care, to avoid Property damage, injury and danger for others. Bicycles should be kept only in your Residence or in designated areas (if any) within the Property.

**18. COMMON AREA AMENITIES.** If the Residence is part of a multi-family residential complex, various services, equipment and facilities (**"Common Area Amenities"**) may be provided for your use at your own risk. Common Area Amenities include all areas and facilities outside of the Residence, within the Property, that are provided and designated by us for the general non-exclusive use of Property residents. Common Area Amenities may include, but are not limited to meeting rooms and clubhouses, laundry facilities, exercise facilities, storerooms, swimming pools, spas, common entrances, lobbies, hallways, staircases, public restrooms, elevators, loading areas, trash/recycling areas, roads, sidewalks, walkways, and landscaped areas. Common Area Amenities are for the exclusive use of you and other Property residents and occupants. Common Area Amenities may not be used by Resident or Resident's Related Parties for business, commercial, fee-generating or fund-raising purposes unless we otherwise agree in advance and in writing (which we may grant or withhold in our sole discretion). Use of Common Area Amenities is subject to the restrictions described in rules or instructions at the Property. You may be required to carry and display identification to enter and/or utilize Common Area Amenities. If we allow guests to utilize Common Area Amenities, you may have no more than two guests (accompanied by you) unless we agree otherwise. We may restrict Common Area Amenity usage for repairs, renovations, safety or other reasons, and if we do so, this will not give you an offset to rental obligations, or be the basis for a complaint against us for rent relief, or any other claim, right, or remedy against us, including constructive eviction, to the maximum extent allowed by law. We may restrict Common Area Amenity usage for private parties. You may not install or use any items (temporary or permanent) in common areas, including (but not limited to) cameras (still or video), drones, tents, tarps, jump houses, swimming pools, or sports equipment, unless we provide authorization. Do not leave any personal property in common areas; we may remove and dispose of any personal property left outside of the Residence. To the extent allowed by law, you agree to assume all risk of harm, and waive all claims against us and our Related Parties resulting from the Common Area Amenities, even if caused by the negligence of us or our Related Parties. To the extent allowed by law, use of the Common Area Amenities is at the sole risk of you and your Related Parties.

**19. CONDOMINIUM/PLANNED UNIT DEVELOPMENT.** If it is indicated in the Variable Lease Term section that the Residence is a unit in a development governed by a homeowner's association (**"HOA"**), you and your Related Parties must comply with all covenants, conditions and restrictions, bylaws, rules and regulations and decisions of the HOA. You must pay any fines or charges imposed by the HOA incurred because of the actions or inactions of you or your Related Parties.

**20. CONDUCT AND COMPLIANCE WITH AGREEMENT, LAW AND RULES.** You are responsible for your own actions, and the actions of your Related Parties. You and your Related Parties:

- May not create a nuisance on the Residence or Property, and may not disturb other Property residents or neighbors with excessive noise (loud televisions, stereos, voices, etc.) or otherwise;

- Must comply with all Landlord rules, regulations and instructions (including posted signs and those specified in this Agreement), and all laws, statutes, ordinances, and requirements of all city, county, state, and federal authorities. We may periodically modify the rules and regulations by delivering a copy of the modifications to you or posting the rules and regulations at the Property;

- Must notify us in writing of any dangerous condition, deterioration or damage to the Residence and Property (including Common Area Amenities) so that we may make necessary repairs;

- Are responsible for personal injury or property damage, including damage to the Residence and Property caused by the action or inaction of you and your Related Parties. You agree to indemnify, defend (with counsel of our choice), and hold us and Landlord's Related Parties (and the HOA if the unit is in a HOA) harmless for any liability, costs (including reasonable attorney fees), or claims resulting from your breach of this Agreement or the negligence, violation of law, or willful misconduct of you or your Related Parties.

You are advised to consider the current and potential exposure to noise that you may experience from activities that occur within and in the vicinity of the Property. No representations are made as to the impact of current or existing noise levels on you or your Residence. Potential sources of noise affecting you may arise from automobile traffic, entry gates, roadways, highways and toll roads, emergency facilities, construction activity, church bells or chimes, aircraft overflights, equestrian, bicycle or pedestrian walkways and other noise sources. If the Residence is a unit in a multi-family complex, be aware that multi-family housing areas often have higher densities, and greater associated inconveniences than single family residences. If you are particularly sensitive to sound, or the activities of others, you may not be comfortable in multi-family housing and you should consider alternatives. Likewise, if your activities are likely to be disturbing to nearby neighbors in a multi-family living environment, multi-family housing may not be the right choice for you and you should consider alternatives before signing this Agreement.

**21. CONSTRUCTION.** If specified above in the Variable Agreement Term section, construction is ongoing at the Property, and details are in the Variable Agreement Term section. There may be inconveniences associated with construction, and you agree that the Rent and



11

other amounts due under this Agreement are fair and reasonable while construction is ongoing. You agree that any inconvenience caused by ongoing construction will not give you an offset to rental obligations, or be the basis for a complaint against us for rent relief, or any other claim, right, or remedy against us, including constructive eviction. Although an estimated completion date may be specified, we do not guarantee the construction completion date. We will require the construction to be done in a commercially workmanlike and reasonable manner, and the general hours of construction will be specified in the Variable Lease Term section.

22. **CONTINUING LIABILITY.** If you vacate the Residence, or this Agreement is terminated, this will not relieve you of any obligation to pay or reimburse sums to us or to indemnify or hold harmless or defend us or Landlord's Related Parties from any loss or claim, where the obligation arises during the term of this Agreement or before you vacate the Residence, unless we specifically agree otherwise in writing.

23. **CRIME-FREE COMMUNITY.** You and your Related Parties:

* May not engage in criminal activity on or near your Residence or the Property;

* May not permit your Residence or the Property to be used to facilitate criminal activity, regardless of whether the individual engaging in such activity is a member of your household, or a guest;

* May not engage in the unlawful manufacturing, selling, using, storing, keeping, or giving of a controlled substance as defined in Health & Safety Code §11350, et seq., at any locations, whether on or near your Residence, the Property or otherwise;

* "Criminal activity" is any activity in violation of laws, ordinances and requirements of city, county, state and federal authorities, including: prostitution (defined in Penal Code §647(b)); criminal street gang activity, (defined in Penal Code §186.20 et seq).; assault and battery, (prohibited in Penal Code §240); burglary, (prohibited in Penal Code §459); the unlawful use and discharge of firearms, (prohibited in Penal Code §245); sexual offenses, (prohibited in Penal Code §269 and 288), drug-related criminal activity, or any breach of this Agreement that otherwise jeopardizes the health, safety and welfare of us, other residents or occupants of the Property or neighbors or involving imminent or actual serious property damage. "Drug-related criminal activity" means the illegal manufacture, sale, distribution, use, or possession with intent to manufacture, sell, distribute, or use of a controlled substance (as defined in Section 102 of the Controlled Substance Act [21 U.S.C. 802]);

A single violation of any of the provisions above will be a material and non-curable breach of this Agreement and good cause for immediate termination of your tenancy. Unless otherwise provided by law, proof of violation will not require criminal conviction, but will be by a preponderance of the evidence.

24. **DAMAGE TO RESIDENCE.** If the Residence is significantly damaged or destroyed by fire, earthquake, accident or other casualty that renders the Residence uninhabitable for more than one week, may terminate this Agreement by giving written notice of our election to terminate. If the Agreement is not terminated, we will promptly repair the damage, and Rent will be reduced based on the extent to which the damage interferes with your use of Residence (unless we provide alternate housing). If you or your Related Parties cause the damage, we will have the right of termination, but you will not have that right and there will be no Rent reduction and we will have no obligation to repair the damage.

25. **DELAY IN POSSESSION.** If we cannot deliver possession of the Residence to you on the Commencement Date for any reason, we will not be liable for the delay, nor will this affect this Agreement's validity, or extend the term of the Agreement. However, you will not be obligated to pay Rent or perform any other obligation under this Agreement (other than pay the amounts due specified in the Variable Lease Term section) until we tender possession of the Residence to you. If we have not tendered possession of the Residence to you within three days of the Commencement Date, you may cancel this Agreement any time before we tender possession of the Residence to you.

26. **DISABILITIES - REASONABLE ACCOMMODATION/MODIFICATION.** Notwithstanding any other provision under this Agreement, upon prior written permission, we agree (1) to allow you to make reasonable modifications to the Residence and/or Common Area Amenities as required by law for people with disabilities; and (2) to provide reasonable accommodation as required by law to people with disabilities, including but not limited to (a) making changes or exceptions to rules, policies procedures, or services and (b) allowing assistance animals. We reserve the right to seek verification of disability and disability-related need for any requested modification or accommodation.

27. **EARLY TERMINATION OPTION.** If indicated in the Variable Lease Term section, you have the option of amending this Agreement to terminate your tenancy before the Termination Date specified in the Variable Lease Term section. To exercise your Early Termination Option, you must deliver to us (1) a written notice stating that you have elected to exercise your Early Termination Option and identifying the Early Termination Date, and (2) the Early Termination Option Fee specified in the Variable Lease Term section, and (3) all Rent and additional amounts due through the Early Termination Date. When we acknowledge receiving the written notice and payment, the Termination Date will be deemed amended to the Early Termination Date. The Early Termination Date must be a date within the parameters described in the Variable Lease Term section. The Early Termination Option may be exercised only if you are not in default under this Agreement when you give notice of your exercise of the Early Termination Option. All remaining Agreement terms will remain in full force and effect.

If you provide the notice unaccompanied by the required payments, the Termination Date will not be changed.

If you do not properly exercise the Early Termination Option by following the procedure exactly as specified above, or choose not to exercise the Early Termination Option, but vacate your Residence before the Termination Date, all Agreement terms will remain binding (including the original Termination Date), and we will retain all legal remedies for non-compliance with this Agreement. If we know you have vacated the Residence before the end of the term, we have an obligation to try to re-rent the Residence to minimize lost Rent for which you will be responsible.



**28. ENTRY.** We and our Related Parties will have the right to enter the Residence as allowed by law. Law permits entry in case of emergency, to make necessary or agreed repairs, decoration, alterations or improvements, supply necessary or agreed services, to test smoke and carbon monoxide detectors, to exhibit the Residence to prospective or actual purchasers, mortgagees, residents, workmen or contractors, to make an inspection under subdi aband water vision (f) of Civil Code §1950.5, for purposes relating to water conservation and submetered water when you have oned or surrendered the Residence and under a court order. Law also allows entry in additional situations, including (but not limited to) inspecting beds and other water-filled furniture (Civil Code §1940.5(f)); inspecting your personal agricultural areas (Civil Code §1940.10(f); inspecting balconies, decks and other exterior wood-based elevated elements, to inspect for and treat bed bugs (Civil Code §1954.604); and repairing, testing, and maintaining smok e detectors (Health & Safety Code §13113.7(d)(2)(A)) and carbon monoxide detectors (Health & Safety Code §17926.1(b)). Unless you have given us permission to enter, we will give you written notice at least 24 hours before entry unless entry is due to (1) an emergency, (2) surrender or abandonment of the Residence, or (3) we have agreed to a date and time within a one week time period when we will enter to make repairs. We are also not required to give you written notice to show the Residence to prospective or actual purchasers and instead can give you verbal 24 hour notice of entry, if within the previous 120 days from our verbal notice of entry we inform you in writing that the Property is for sale and that you may receive oral notice of our intent to enter. If we give you verbal notice of our intent to enter to show the Residence to purchasers, we will leave written evidence of our entry in the Residence.

**29. ESTOPPEL CERTIFICATES.** Within five (5) days of our written request, you must execute and deliver to us a written statement certifying that this Agreement is unmodified and in full force and effect (or if modified, describing the modification). Your statement will include any other details we request. Any prospective Property purchaser or encumbrancer may rely upon your written statement. If you fail to deliver a statement within the specified time, it will be conclusively presumed that (1) this Agreement is unmodified and in full force and effect, except as we otherwise indicate, (2) there are no uncured defaults in our performance, and (3) any other details specified by us originally requested of you.

**30. FURNITURE MOVING.** We may designate times and methods for moving furniture, and other household goods to or from the Residence. We will not be liable for any loss resulting from the unavailability of elevator service to move furniture or other household goods, or otherwise to move into or out of the Residence.

**31. GARBAGE.** You must dispose of all garbage, waste and recyclable materials in designated containers and/or designated areas and in accordance with applicable law and our instructions. Unless we indicate otherwise, you may not dispose of large items in Property garbage containers and/or areas. All boxes must be broken down and crushed before placing them in the appropriate container. You may not dispose of hazardous waste in Property garbage containers or on the Property. Information about disposal and recycling options for household hazardous waste is available at: http://www.dtsc.ca.gov/HazardousWaste/UniversalWaste/HHW.cfm.

**32. GUESTS.** You may have overnight guests for no more than 7 nights in any month, and no more than two overnight guests at a time unless we provide specific approval. You must obtain our prior written consent to change Residents or add additional Occupants within the Residence.

**33. HARASSMENT.** Resident and Resident's Related Parties may not abuse, harass (sexually or otherwise) or threaten Landlord or Landlord's Related Parties, and others at the Property. Resident and Resident's Related Parties may not unreasonably interfere with management functions.

**34. INSURANCE: LANDLORD AND LANDLORD'S RELATED PARTIES DO NOT INSURE YOUR PERSONAL PROPERTY.** If indicated in the Variable Lease Term section, you are required to maintain a renter's insurance policy throughout your tenancy. Even if you are not required to maintain renter's insurance, we strongly recommend that you purchase a renter's insurance policy to protect yourself against personal injury and property damage, including losses from theft, fire, smoke, water damage, and vandalism.

**If renter's insurance is required** (as specified in the Variable Lease Term section) you must maintain a renter's insurance policy (at your cost) protecting you against claims for bodily injury, personal injury and property damage arising out of your use, occupancy or maintenance of the Residence, including liability to Landlord for damage to Landlord's property for the following causes of loss: fire, smoke, explosion, backup or overflow of sewer, drain or sump, and water damage. You may not do anything or allow any action that invalidates the policy. The renter's insurance may be issued by any company of your choice, provided that the carrier is licensed or admitted to transact business in California, and maintains during the policy term a "General Policyholders Rating" of at least a B+, V, in the most current issue of "Best's Insurance Guide." We must be listed as an "additional insured"(if this type of coverage is available from the insurance company) or as an "interested party" (if your insurance company will not name us as an "additional insured") under the insurance policy. Before the Commencement Date, you must deliver to us a certified copy of the insurance policy or certificates of insurance evidencing the existence and amounts of the required insurance. No policy may be canceled or modified except after thirty days prior written notice to us (ten days for nonpayment). At least thirty days before the expiration of the policy, you must furnish us with evidence of renewal. The policy must be on an occurrence basis and have personal liability coverage in an amount specified in the Variable Lease Term section, with a deductible of no more than the amount specified in the Variable Lease Term section. You will be liable for the deductible amount if an insured loss occurs. The policy must contain a waiver of subrogation. The policy may not contain any intra-insured exclusions as between insured persons or organizations. The policy limits will not limit your liability. Any insurance maintained by us and our Related Parties is only for the benefit of us and our Related Parties and you will not be named as an additional insured. You must pay any increase in insurance premiums held by us and our Related Parties for the Property resulting from the actions, omissions, use or occupancy of the Residence by you and your Related Parties. This insurance is meant to protect both you and us, by potentially providing you with a potential recovery source (other than us) if you suffer a loss, and by potentially providing us with a recovery source if you damage the Residence and/or Property. Therefore, your failure to maintain renters insurance is a material breach of this Agreement.



13

**35. KEYS AND OPENING DEVICES.** Because we may need access to the Residence in case of an emergency, you may not change any locks or install additional security devices in the Residence without our consent. If permission is granted, you may not later remove locks or the additional security devices without our consent. You may not duplicate keys or access devices marked "Do Not Duplicate" or "Unlawful to Duplicate".

**36. LANDSCAPING.** Landscaping will be maintained and watered by the parties as specified in the Variable Lease Term section.

**37. LAUNDRY FACILITIES.** If laundry facilities are available at the Property, the laundry facilities are for the exclusive use by Property residents. Clothes, laundry baskets, and detergents should not be left unattended in the laundry areas. Remove laundry as soon as the machine shuts off and dispose of lint, empty containers, and softening sheets in a trash can. No dye or flammable solutions are permitted.

**38. LIABILITY.** We will not be liable for any damage or injury to you or others, or to any property, occurring on the Property, except as otherwise provided by law. See the "Common Area Amenities" paragraph above regarding liability for Common Area Amenities. We and our Related Parties do not insure your personal property. Even if renter's insurance is not required, we strongly recommend that you purchase a renter's insurance policy to protect against personal injury and property damage, including losses from theft, fire, smoke, water damage, and vandalism. To the greatest extent allowed by law, you (on behalf of yourself and the Resident Related Parties) assume all risk of harm or damage to any person or property, and waive all claims against us and the Landlord Related Parties relating to participation in activities, events, services and programs offered or sponsored by us or the Landlord Related Parties.

**39. MAINTENANCE, ALTERATIONS, AND RESIDENCE CONDITION.** At the beginning of the tenancy, the parties will complete and sign an Inventory/Move In/Move Out form documenting the condition of the Residence and an inventory of appliances, furniture, and furnishings. If you fail to report any defects on the Inventory/Move In/Move Out form, it will be conclusively presumed that the Residence and Personal Property are in good condition. You must maintain the Residence in a clean, healthy, safe and sanitary condition. Excessive items may not be stored or accumulate inside the Residence. Don't block windows or doors; they must be able to be fully opened. Maintain clear pathways into and through every room in the Residence. Do not place combustible materials near combustion sources such as the stove, oven, heater and/or water heater. Kitchen appliances and fixtures, bathroom fixtures, and every room in the Residence must be able to be used for their intended purposes. You may not paint, wall paper, add adhesive shelf liner or other adhesive materials, or use screws or nails or other materials to penetrate any wall, floor or other surface, or make other alterations to the Residence without our prior written consent. We will supply the Residence with functioning light bulbs before you take possession of the Residence. You must replace nonfunctional light bulbs at your expense. You acknowledge that we have not made any promises to make any changes to the Property except as specified in this Agreement. You must maintain a temperature of at least 55°F in the Residence to prevent the pipes from freezing. We reserve the right to prohibit or restrict items visible from the exterior of the Residence (e.g. in your windows, window sills, doors, and on your balcony or patio) for safety purposes and to ensure a first class appearance.

**40. MAINTENANCE REQUEST.** You must report any maintenance problems (plumbing, electrical, heating, mold, etc.) directly to us immediately. Leaking faucets or toilets, and blocked toilets, should be reported to us immediately. The cost of any damages incurred due to Resident's failure to report any maintenance problem in a timely manner to us may be assessed to you. Except in cases of emergency, all requests for repairs, and all notices regarding the condition of the Property must be made to us in writing. This will ensure that we receive and properly process your request or notice. Notations on the Inventory/Move In/Move Out form documenting the condition of the Residence do not constitute a request for repairs; you must complete a separate written request for maintenance.

**41. MANAGEMENT.** The Property Manager identified in the Variable Lease Term section is authorized to manage the Residence on our behalf and is authorized to act on our behalf to receive service of process, notices, and demands. However, the Property Manager is not a party to this Agreement, and should not be named as a party in any action you bring alleging a breach of this Agreement.

**42. MILITARY - EARLY TERMINATION.** You may terminate this Agreement before the Termination Date specified on page 1 if:

(i) You become a member of the Armed Forces of the United States after you enter into the Agreement; or

(ii) You are or become a member of the Armed Forces of the United States and receive:

- Orders for a permanent change of station; or
- Orders to deploy for a period of at least 90 days.

You must give us written notice of termination, and the new termination date must be at least 30 days after the first date on which the next Rent payment is due. (For example, if you served the notice on September 15th, your tenancy would terminate on October 31.) You must furnish to us proof to establish you qualify for this limited exception. Proof may consist of any official military orders, or any notification, certification, or verification from the service member's commanding officer regarding the service member's current or future military duty status. Military permission for base housing does not constitute a permanent change-of-station order.

**43. MOLD.** Mold consists of naturally occurring microscopic organisms. Mold breaks down and feeds on organic matter in the environment. When moldy materials are damaged or disturbed, mold spores and other materials may be released into the air. Exposure can occur through inhalation or direct contact. Most molds are not harmful to most people, but it is believed that certain types and amounts of mold may lead to adverse health effects in some people.

A certain amount of mold exists in every home. Controlling moisture and proper housekeeping are necessary to limit mold growth. We have inspected the Residence and are not aware of any mold problems or existing conditions that may contribute to mold growth in the Residence. You agree to maintain the Residence to prevent mold growth. You agree to:

**KEEP THE RESIDENCE CLEAN**

- Maintain good housekeeping practices and regularly dust, vacuum and mop to keep the Residence free of dirt and debris that can contribute to mold growth



14

- Use household cleaners on hard surfaces
- Remove garbage regularly and remove moldy or rotting items promptly from the Residence (whether food, wet clothing, or other materials)

## CONTROL MOISTURE IN THE RESIDENCE AND INCREASE AIR CIRCULATION

- Use hood vents when cooking
- Use exhaust fans when bathing/showering until moisture is removed from the bathroom
- Hang shower curtains inside the bathtub when showering or securely close shower doors.
- Leave bathroom and shower doors open after use
- Use air conditioning, heating and fans as necessary to keep air circulating throughout the Residence
- Water all indoor plants outdoors
- Close windows and doors (when appropriate) to prevent rain and other outdoor water from coming inside the Residence
- Open windows when appropriate to increase air circulation
- Wipe up visible moisture
- If there is a washer in the Residence, periodically check the washer hose.
- If a dryer is installed in the Residence, ensure that the vent is properly connected and clear of any obstructions and clean the lint screen regularly
- Ensure good air circulation in closets, cupboards and shelves by periodically keeping them open, not stacking items tightly, and/or using products to control moisture
- Report leaks, water stains or other indications of moisture in the Residence as well as in any storage room, garage, or other common area, to the management office. Immediately report any indication of mold or mildew growth to the management office.

## PERIODICALLY INSPECT THE RESIDENCE FOR MOISTURE AND MOLD

The most reliable methods for identifying elevated amounts of mold are (1) smell and (2) routine visual inspections for mold or signs of moisture and water damage. You agree to inspect the property (both visually and by smell) for mold growth inside the Residence at least once per month. The inspection will include but is not limited to:

- Window frames, baseboards, walls and carpets
- The ceiling
- Any damp material made of cellulose (such as wallpaper, books, papers, and newspapers)
- Appliances (including washers/dryers/dishwashers and refrigerators)
- Around all plumbing fixtures (toilets, bathtubs, showers, sinks and below sinks)
- Areas with limited air circulation such as closets, shelves and cupboards
- Personal property

## YOU AGREE TO PROMPTLY REPORT TO US IN WRITING:

- Visible or suspected mold you do not clean as explained below. Mold may range in color from orange to green, brown, and/or black. There is often a musty odor present.
- Overflows or leaks around showers/bath/sink/toilet/washers/refrigerator/air conditioners
- Plumbing problems
- Discoloration of walls, baseboards, doors, window frames, ceilings
- Loose, missing or failing grout or caulk around tubs, showers, sinks, faucets, countertops
- Clothes dryer vent leaks
- Any non-operational windows, doors, fans, heating or air conditioning units
- Any evidence of leaks or excessive moisture in the Residence or on the Property
- Any maintenance needed at the Property

## YOU AGREE THAT YOU WILL NOT:

- Bring any personal property into the Residence that may contain high levels of mold, especially "soft possessions" such as couches, chairs, mattresses, and pillows
- Stack items against walls in a manner that decreases air circulation and may lead to mold
- Maintain an excessive number of indoor plants
- Maintain a fish tank or other water filled container without our written consent

If a small amount of mold has grown on a non-porous surface such as ceramic tile, Formica, vinyl flooring, metal, or plastic, and the mold is not due to an ongoing leak or moisture problem, you agree to clean the areas with soap (or detergent) and a small amount of water, let the surface dry, and then within 24 hours apply a non-staining cleaner such as Lysol Disinfectant®, Pine-Sol Disinfectant®, Tilex Mildew Remover®, or Clorox Cleanup®. Because Tilex Mildew Remover® and Clorox Cleanup® contain bleach (which may discolor some materials), they may not be appropriate cleaners if discoloration could be a problem.

You agree to comply with all instructions and requirements necessary to prepare the Residence and/or Property for investigation and remediation, to control water intrusion, to control mold growth, or to make repairs. Storage, cleaning, removal, or replacement of



15

contaminated or potentially contaminated personal property will be your responsibility unless the elevated mold growth was the result of our negligence, intentional wrongdoing or violation of law. We are not responsible for any condition about which we are not aware. You agree to provide us with copies of all records, documents, sampling data and other material relating to any water leak, excessive moisture, mold conditions in the Residence or Property as soon as you obtain them. Violation of this section will be a material breach of this Agreement.

44. **MOVE-OUT OBLIGATIONS.**     At termination of this Agreement, you must (a) give us all of your keys and other opening devices to the Residence, including any common areas; (b) surrender the Residence to us empty of all personal property and persons; (c) vacate all parking and storage spaces, if any; (d) deliver the Residence to us in the same condition as received, reasonable wear and tear excepted; (e) clean the Residence to the level of cleanliness as received; (f) and give us written notice of your forwarding address. At termination of the tenancy, we reserve the right to remove any improvements that you installed, whether or not we authorized the improvements, at your expense. The "check-out" time on the Termination Date will be 12:00 noon, or you may be responsible for an additional day of rent; any other agreements that may be granted by us, before the Termination Date, must be in writing.

45. **MULTIPLE RESIDENTS.**     If there is more than one Resident under this Agreement, each Resident is jointly and severally liable for all rental obligations. Violation of this Agreement by any Resident or Resident's Related Parties is deemed a violation by all Residents. Requests and notices from us to any Resident will constitute notice to all Residents and Occupants. Any notices from, consents by or actions taken by any Resident may be deemed a notice from, consent by, or action of all Residents, at our sole discretion. (Alternatively, in our sole discretion, we may require all Residents to sign notices, provide consent, or act). All demonstrations, inspections and explanations made by us to one of the Residents will be binding on all Residents as if made to each of them. Any Resident or Occupant who has permanently moved out according to another Resident may, at our option and discretion, no longer be entitled to occupancy of or keys to the Residence. However, the termination of that person's right of occupancy will not release that person from any and all obligations under this Agreement or any renewal, unless we agree otherwise in writing.

46. **NO RELEASE.**     You will not be released from this Agreement on the grounds of voluntary or involuntary school withdrawal or transfer, business transfer, layoff or termination, marriage, divorce, marriage reconciliation, loss of co-Residents, or any other reason unless we agree otherwise in writing or unless the Military – Early Termination section above applies. We may grant or withhold consent to a release in our sole discretion.

47. **OCCUPANTS.**     The Residence may be occupied only by the Resident(s) and all other authorized Occupants specified above in the Variable Lease Term section.

48. **PARKING/GARAGE/VEHICLES.**     If parking spaces or garages are assigned, you may park on the Property only in the garage or parking space(s) specified in the Variable Lease Term section. Parking spaces and garages may not be used for operation of a business or as an extension of the living area of the Residence. We reserve the right to temporarily or permanently change your parking space(s) or garage and to assign another to you with 5 days' prior notice to you. We may issue parking stickers or other devices to control parking. If issued, you must use the parking control devices. If specified in the Variable Lease Term section, Garage/Parking fee is charged for this privilege. Parking spaces (if any) may be used only for parking passenger automobiles or light utility vehicles. If a parking space or garage has been assigned to you, you must park in it to maximize parking for others. If an exclusive-use garage has been designated for your use, you may use your garage secondarily for storage, but only if it doesn't interfere with your ability to park in the garage. Garage doors must be kept closed and locked unless you are entering or exiting the garage. Vehicles not kept in compliance with applicable rules, regulations and law are subject to towing at the vehicle owner's expense. A vehicle may be towed if it: (A) has flat tires or other condition rendering it inoperable; (B) is leaking fluids; (C) for non-assigned parking spaces, has not been moved in more than 96 hours; (D) takes up more than one parking space; (E) belongs to a Resident or Occupant who has surrendered or abandoned the Residence; (F) is parked in a marked accessible space without the legally required Disabled Person Plate or Placard insignia; (G) blocks another vehicle from exiting; (H) is parked in a fire lane or designated "no parking" or "restricted parking" area; (I) is parked in a space reserved for other residents; (J) is not properly parked in a designated area; (K) blocks access to a garbage area, entrance, driveway, other parking spaces, or other area; (L) cannot lawfully be operated as a vehicle on the road; (M) has a malfunctioning alarm or has an alarm which is not silenced within 10 minutes; (N) is parked in a designated visitor or office parking space; or (O) any other reason allowed by law. Gasoline, fuels or other explosive materials may not be stored anywhere on the Property. You will be responsible for oil stains and other damage caused by your vehicles and the vehicles of your Related Parties. Parking is at the risk of the vehicle owner or operator. We will have no liability for damage to or loss of any vehicle or any personal property contained within a vehicle or a garage. Parking spaces may not be available for guests or they may be limited in number and location. Tandem parking will be permitted only with our prior written consent. You may install an electric vehicle charging station only with our advanced written consent, which will be granted or withheld in our sole discretion, except as otherwise provided by law. Operate your vehicle safely and limit your vehicle's speed to 5 miles per hour within the Property. You must immediately vacate and remove all vehicles from the Property (a) if you do not pay parking or garage fees (if any) when due; (b) after service of any notice allowed by law; and (c) at the earlier of the Termination Date or the date that you vacate the Residence. Unless otherwise agreed by us, Garage/Parking Charge will be due during the entire term of your tenancy.

49. **PETS.**     You may not feed stray or wild animals. You may not have any pets at the Residence or on the Property without our prior written consent, which we may withhold in our sole discretion. This prohibition applies to all pets, including "visiting" pets. We grant you permission to keep any pets listed above in the Variable Lease Term section as an "Authorized Pet." If any pets are authorized you agree to follow the following rules for your pet(s):

- Pets may not cause any disturbance that might reasonably annoy neighbors including making noise, creating odors, or leaving waste on the Property.
- Any damage caused by a pet will be your responsibility and you will be charged to repair it. This includes (but is not limited to) window coverings, carpet cleaning or replacement, damage to walls, flooring, screens and common area landscape.



16

- Pick up after your pet(s) and properly dispose of all waste. Kitty litter must be placed in a bag before placing it in the trash.
- Use a stain and odor-removing product with enzymes (such as Nature's Miracle) as necessary, and maintain the Residence in a sanitary, odor-free condition. You can determine where the stain and odor-removing product with enzymes must be used by viewing the Residence with a black light.
- If your pet is a cat, keep a scratching post.
- Pets must be licensed and vaccinated in accordance with local laws. You must provide proof if we request it.
- Comply with all local laws and regulations relating to the pets.
- Take action to avoid pest infestations (fleas, etc.) in the Residence and Property.
- You must confine your pet if we or our Related Parties need access to the Residence.
- Pets must remain inside the Residence unless they are under direct control of a responsible person at all times. Dogs must be on a leash when outside of the Residence. You agree to defend, indemnify and save us and Landlord's Related Parties harmless from all loss, claim, damage or liability relating to your pets.
- You represent to us that the pet is housebroken, has no vicious tendencies or history of threatening or causing harm to persons by biting, scratching, chewing or otherwise.
- Pets are not allowed in pool areas, clubhouses, business office, laundry rooms, business center or fitness centers. Pets may not be bathed or groomed in the laundry room sinks, pools, or pool area.
- Permission to have a pet may be revoked at any time with three days notice for cause, or with thirty days notice without cause. You will be asked to remove any pet that bothers others or constitutes a problem (potential or actual) to neighbors or others, as determined in our sole discretion. If you fail to remove your pet after being requested to do so, this will be a material breach of the Agreement, allowing us to terminate your tenancy.

50. **POOL/SPA.** If the Property has a pool or spa, you may use them only during posted hours. Children under the age of fourteen (14) must have adult supervision in the pool and spa. You may not serve or eat food in or around the pool area at any time without our consent. Drinks must be served in unbreakable containers, and no alcoholic drinks are allowed in the pool area. For safety reasons, people should not use the pool and/or spa alone, should not dive into the pool (unless off of a diving board) or spa, and no intoxicated persons may use the pool or spa. Be considerate of others. Don't be excessively noisy or rowdy or wear excessively revealing clothing. Please shower before using the pool and spa. Do not use toys, inner tubes, rafts or any other personal items or objects in the pool if they disturb others (with the exception of personal flotation devices for persons who cannot swim). Incontinent people using the pool or spa must use waterproof pants. Use the pool safety equipment only in case of emergency. **NO LIFEGUARD WILL BE ON DUTY.** People use the pool and spa at their own risk. We will not be responsible for accident or injury, or articles that are lost, damaged or stolen.

51. **POSTED SIGNS AND INSTRUCTIONS FROM LANDLORD.** You must obey all posted signs on the Property and instructions from us.

52. **POSTING FLYERS.** Flyers may be posted only in designated areas, if any. If flyers are allowed to be posted, we may remove any commercial or offensive material, or material not in keeping with the nature of the Property, as determined in our sole discretion.

53. **REPRESENTATIONS OF RESIDENT.** You warrant that all statements in your rental application and other documents submitted by you to us (whether previously or in the future) are accurate. If they are not, this will be a non-curable breach of this Agreement and we may terminate your tenancy.

54. **SATELLITE DISHES AND ANTENNA.** You may install a satellite dish or antenna for personal, private use under the following conditions:

- It must be one meter or less in diameter;
- It may only be installed in the Residence in areas within your exclusive control. No part may extend beyond a balcony or patio railing. It may not be installed in common areas, including but not limited to the roof, outside walls, window sills, common balconies, hallways or stairways. Note that allowable locations may not provide an optimal signal, or any signal. We do not warrant that the Residence will provide a suitable location for receiving a signal.
- You may not make physical modifications to the Property and may not cause physical or structural damage to the Property. No holes may be drilled through exterior walls or the roof.
- You must install, maintain and remove it in a manner consistent with industry standards and you will be liable for any damage or injury caused by the installation, maintenance or removal.
- You must move it at your expense, upon our request, for Residence or Property maintenance or repairs.

55. **SECURITY.** The Property is not a full security property and we do not guarantee or warrant your personal security or safety. We are not responsible for obtaining criminal-history checks on any residents, occupants, guests or contractors in the Property. We have no duty to provide security services or devices other than the duty to provide (a) an operable dead bolt lock on each main swinging entry door of the Residence and (b) operable window security or locking devices for windows designed to be opened (except for louvered windows, casement windows and windows more than 12 feet vertically or 6 feet horizontally from the ground, a roof, or other platform). After you take possession of the Residence, we will have no obligation or duty to inspect, test or repair any lock or other security device unless you request us to do so in writing. Any cautionary measures that we take (whether applicant screening, security devices or courtesy patrol services) which may presently exist or later be installed on the Property are neither a guarantee nor warranty against criminal acts of others on the Property or otherwise. Your personal safety and security are your personal responsibility. If criminal activity occurs, contact the appropriate law enforcement agency. You may not install security devices (such as security cameras or video doorbells) that capture images and sounds outside the Residence without our permission (which may be granted or withheld in our sole discretion).

56. **SIGNS.** We retain the right to place For Sale/For Rent signs on the Residence.



17

**57. SMOKE AND CARBON MONOXIDE DETECTION.** The Residence is equipped with a functioning smoke detection device(s) and may be equipped with a functioning carbon monoxide detector. You must test the device(s) weekly and immediately report any repair needs to us.

**58. SMOKE FREE AREAS.** The parties want to reduce or eliminate (i) the irritation and known health effects of secondhand smoke; (ii) the increased maintenance, cleaning and redecorating costs from smoking, and (iii) the increased risk of fire and insurance costs associated with smoking. "Smoking" means inhaling, exhaling, breathing, or carrying any lighted cigar, cigarette, e-cigarette, or other similar lighted product (whether tobacco, marijuana, or any other substance) in any manner or in any form. You and your Related Parties may not smoke anywhere in the designated smoke-free areas, described in the Variable Lease Term section. You must inform your Related Parties of the no-smoking policy. Other residents of the Property are third-party beneficiaries of this Agreement provision (your smoke-free obligations and restrictions are made to benefit other Property residents as well as to us.) A resident may sue another resident for an injunction to prohibit smoking or for damages, but may not evict another resident. We will have the right, but not the obligation, to enforce your smoke-free obligations. A material breach of your smoke-free obligations will be a material breach of this Agreement and grounds for immediate termination of this Agreement and your tenancy. Neither we nor our Related Parties guarantee or warranty the smoke-free condition of the designated smoke-free areas or the health of you or your Related Parties. We make no implied or express warranties that the Residence or Property will have higher air quality standards than any other areas. The success of our efforts to make the designated areas smoke-free depend on voluntary compliance by you and others. We reserve the right to change or eliminate our smoke-free policy in the future. You acknowledge that current residents may not be under the same smoke-free restrictions.

**59. STORAGE.** If specified above in the Variable Lease Term section, a separate storage area is provided to you. If specified, Storage fee is charged for this privilege. Storage space may be used only for storage of non-perishable personal property, expressly excluding (a) any potentially dangerous, flammable, hazardous or toxic property or materials, and (b) any firearms or ammunition. We reserve the right to assign to you another storage space with 5 days' prior notice to you. You must vacate and remove stored property (a) if you do not pay storage fees (if any) when due; (b) after service of any notice allowed by law; and (c) at the earlier of the Termination Date or the date you vacate the Residence. Unless we otherwise agree, the Storage Charge will be due during the entire term of your tenancy. If you do not remove stored property from the storage space when required, the remaining stored property may be deemed abandoned and we may dispose of it as allowed by law.

**60. TELEPHONES.** We will comply with California law by providing at least one usable telephone jack and maintaining the telephone wiring inside the Residence in good working condition. There may be multiple telephone service providers in the area where the Residence is located. Providers may vary in the services provided and fees charged for connection and/or other charges in service. Some service providers may charge fees of $120.00 or more to change telephone service from another company to their own. We make no representation regarding which service provider, if any, provided service to prior tenants. Our obligation to maintain inside wiring does not include liability for fees to cross-connect to activate service. You are responsible to arrange all service connections and pay any and all fees associated with the service.

**61. TEMPORARY RELOCATION.** You agree, at our demand, to temporarily vacate the Residence for a reasonable period and for reasonable purpose, including fumigation, Residence testing/inspection, or repairs. You must comply with all instructions necessary to prepare the Residence for fumigation, testing/inspection or repair. If you must vacate, you will be entitled only to an abatement of Rent equal to the per diem Rent for the period that you are required to vacate the Residence, and only if you must vacate for more than 12 hours, and only if you did not cause or exacerbate the condition requiring you to vacate, and only if we do not provide you with alternate housing.

**62. USE.** The Residence may be used as a personal residence only and not for any business or commercial use (except child care as specified by law). However, you may maintain a personal home office if the home office use does not involve (1) people coming to the Residence for business purposes, or (2) selling goods or services from the Residence. You may not conduct any auction, garage sale, yard sale or similar activities in the Residence or in the Common Areas.

**63. UTILITIES.** Details about utilities, (including information about who is responsible for the cost of each utility), are specified in the Variable Lease Term section. If it is specified that you will contract directly with the utility provider, you must do so before move-in to avoid an interruption of services. If electricity, natural gas, water or sewer services have been discontinued, occupancy of the Residence is hazardous and will be a breach of this Agreement. Billing statements provided by us or by our billing service must be paid by the due date specified on the billing statement. If you don't pay utility-related charges when they are due, we may discontinue providing the utility to you (if allowed by law), and your failure will be a material breach of this Agreement. We reserve the right to change utility billing service providers. If we do, you will be notified in writing. You will be responsible for utilities designated as being your responsibility consumed during your occupancy beginning on the date of delivery of possession until we reacquire possession of the Residence. If you breach this Agreement by vacating the Residence before the end of the term, you will also be responsible for utility-related charges until the earlier of the Termination Date or until the Residence is re-rented. The due date for Rent and the due date for utility-related charges may not coincide. You may use only normal household amounts of any utilities that are not placed in your name, and you may not use them for business, commercial, or fee-generating purposes. You must comply with all utility conservation efforts (whether implemented by governmental agencies, water providers or us) and if you fail to do so, this will be a material violation of this Agreement allowing us to terminate your tenancy. You will be responsible for any fines or charges we incur because of your failure. You must pay charges for utilities you consume, even if they have not been invoiced before you vacate the Residence. Any obligation that remains unpaid, including amounts that have not yet been invoiced when we reacquire possession, may be deducted from your Security Deposit. If actual amounts have not been determined before we provide an accounting of your Security Deposit, we may estimate the amount until actual numbers become available. Any billings based on submeter readings will itemize the beginning and ending meter readings, the rate charged to you, and all categories of information that appear within the utility's standard billing format to us. We reserve the right to modify the method by which utilities are provided to the Residence or billed to you during your tenancy. If we are billed for utility services which are your



18

responsibility, you must repay us for the charges within 10 days of our demand for payment. You may not disturb, tamper, adjust, or disconnect any submetering device or system. We may estimate your consumption if your submeter is broken or does not transmit a meter reading or if we have not received invoices from the utility provider in time to prepare your invoice. We are not liable for claims arising from utility service outages, interruptions, or fluctuations in utilities provided to your Residence not reasonably within our control. Common area utilities are for our use only; you may not use them for your personal use.

**64. WINDOW COVERINGS.** If we provide window coverings, you must use them. If we do not provide window coverings, any window treatments you install must appear white to the outside. Do not use sheets, blankets, foil, etc., in place of draperies or blinds. Do not place objects on a window sill which are visible from the outside.

**65. WATERBEDS AND AQUARIUMS.** Waterbeds are permitted only with our written permission which will be provided in accordance with California law. Permission may be conditioned on insurance protecting us, an increase in the security deposit equal to one-half month's Base Rent, and installation and maintenance in accordance with industry standards. You must also obtain our permission to have an aquarium of more than 5 gallons.

## F. DISCLOSURES AND NOTICES:

**66. ASBESTOS.** Asbestos is known to cause cancer. Any knowledge or records we have of asbestos in the Residence or Property is specified in the Variable Lease Term section of this Agreement. Disturbing or damaging asbestos containing materials may increase the potential exposure to asbestos. Do not pierce or damage asbestos containing material. Notify us immediately in writing if there is any damage to or deterioration of the asbestos containing materials.

**67. LEAD WARNING INFORMATION.** If indicated in the Variable Lease Term section, the Residence was built prior to 1978. Housing built before 1978 may contain lead-based paint. Lead from lead-based paint, paint chips and dust can pose health hazards if not managed properly. Lead exposure is especially harmful to young children and pregnant women. Before renting pre-1978 housing, landlords must disclose the presence of known lead-based paint and/or lead-based paint hazards in the dwelling. Residents must also receive a federally approved pamphlet on lead poisoning prevention.

Knowledge we have of lead-based paint and/or lead-based paint hazards in the Residence or Property is specified in the Variable Lease Term section. Available reports or records pertaining to lead-based paint and/or lead-based paint hazards in the Residence or Property are identified. Your signature on this Agreement is your acknowledgment that you have been provided a copy of the pamphlet Protect Your Family From Lead In Your Home and that the reports or records have been made available for your review.

**68. REGISTERED SEX OFFENDERS NOTICE.** Pursuant to Section 290.46 of the Penal Code, information about specified registered sex offenders is made available to the public via an Internet Web site maintained by the Department of Justice at www.meganslaw.ca.gov. Depending on an offender's criminal history, this information will include either the address at which the offender resides or the community of residence and ZIP Code in which he or she resides.

## G. BREACHES AND REMEDIES:

**69. RESIDENT DEFAULT.** Your right to remain in possession of the Residence is conditioned on your timely and full performance of each of your obligations under this Agreement and applicable law. You will be in material default under the Agreement:

- If you abandon or vacate the Residence;
- If you fail to pay Rent, or any other charge required to be paid by you, as and when due;
- If you breach any other obligation under this Agreement or applicable law;
- If you have supplied any false or misleading information to us on a rental application or otherwise. This type of default is non-curable.

**70. REMEDIES.** If you default, we may elect to terminate your rights under this Agreement, and recover from you all damages we incur as a result of the default, including the cost of recovering possession of the Residence, rental commissions, advertising expenses and other costs incurred because of your breach of the Agreement and the Rent and other amounts due through the end of the Agreement term, (including Rent due up through the date you vacate the Residence, Rent due through the date of judgment, and Rent due after the date of judgment through the end of the original Agreement term) and any other amount necessary to compensate us for your breach of the Agreement, minus amounts we reasonably could have avoided.

**71. CUMULATIVE REMEDIES.** All remedies specified in this Agreement for noncompliance are cumulative.

**72. CREDIT.** A negative report reflecting on your credit record may be submitted to credit-reporting agencies if you fail to fulfill the terms of your obligations under this Agreement.

**73. DAMAGES FOR FAILURE TO VACATE.** If you fail to completely vacate the Residence when required, you will be liable for all resulting losses suffered by us including but not limited to, future resident losses, lost Rent and other amounts due, legal costs and other expenses.

**74. ATTORNEY FEES.** In any legal action brought by either party to enforce this Agreement or relating to the Residence, the prevailing party will be entitled to all costs incurred in connection with that action, including reasonable attorney fees, expert witness and consultant fees, and costs and expenses. If an Attorney's Fee Cap is specified in the Variable Lease Term section, attorney's fees awarded by a court may not exceed that amount. You must pay all collection-agency fees we incur if you fail to pay all sums due within 10 days after we mail you your security deposit accounting or other demand for payment.

## H. AGREEMENT INTERPRETATION:

**75. AGREEMENT.** The submission of this Agreement to you for examination and/or execution does not constitute an option or offer. This



19

Agreement will not be effective until signed and delivered by all parties or until we deliver possession of the Residence to you, whichever occurs first.

76. **AMENDMENT.** This Agreement may not be amended or altered except by a written agreement, signed by you and us.

77. **CONSTRUCTION.** The singular form will include plural, and visa versa. This Agreement will not be construed as if it had been prepared by one of the parties, but rather as if both parties have prepared it.

78. **INTEGRATION.** This Agreement and the documents referenced in it constitute the entire agreement between the parties, which supersedes all prior and contemporaneous negotiations, agreements, promises and representations.

79. **PARTIAL INVALIDITY.** If any portion of this Agreement is unenforceable or invalid, that portion will have no effect, but all the remaining provisions of this Agreement will remain in full force.

80. **SUCCESSORS AND ASSIGNS.** This Agreement is binding upon and inures to the benefit of the heirs, assigns, successors, executors, and administrators of you and us.

81. **TIME IS OF THE ESSENCE.** Time is of the essence as to each obligation to be performed under this Agreement.

82. **VERBAL REPRESENTATIONS.** You agree that we have not made any oral promises, representations, or agreements not contained within this written Agreement.

83. **WAIVER.** Our failure to enforce any term of this Agreement will not be deemed a waiver, nor will acceptance of a partial payment be deemed a waiver of our right to the full amount due. Waiver may not be established by course of conduct. No waiver will exist unless written and signed by the parties. If any invoice, ledger or accounting we prepare is inaccurate, the inaccuracy will not be a waiver, and you will be obligated to pay the amount in this Agreement.

**If the lead hazard section of this Agreement is marked as being applicable, by signing below, the parties acknowledge that they have read the lead-based paint and lead based paint hazard information in this Agreement and certify, to the best of the parties'knowledge, that the information provided is true and correct.**

**Note that this Agreement may automatically continue as a tenancy from month-to-month after the Termination Date. See paragraph C3 above.**

Rosa E. Navarro *(Resident)*     5/17/21    Date        *(Landlord)*     5/17/21    Date

Nihla Olsem's Lease Agreement

# RESIDENTIAL LEASE/RENTAL AGREEMENT

DATED: <u>MARCH 11, 2022</u>

## A. VARIABLE LEASE TERMS:

**RESIDENCE DESCRIPTION:**

☐ *(If checked)* A single family residence.

☒ *(If checked)* Part of a multi-family residential complex known as **Amber Grove Apartments**

| UNIT NUMBER: | UNIT TYPE: | UNIT ADDRESS: | |
|---|---|---|---|
| 4031-98 | 1 Bedroom, 1 Bath 721 sq ft. | 4031 Marconi Ave | |
| **COUNTY:** | **CITY:** | **STATE:** | **ZIP:** |
| Sacramento | Sacramento | CA | 95821 |

**TERM:**

| COMMENCEMENT DATE:<br>3/11/2022<br><br>TERMINATION DATE:<br>4/30/2023 | ☒ *(If checked)* Resident has been granted an **EARLY TERMINATION OPTION.** To exercise this option, Resident must pay an Early Termination Option Fee of <u>$1,475.00</u> and give notice of Resident's election to exercise the option at least and give notice of Resident's election to exercise the option at least <u>Sixty (60)</u> days before the Early Termination Date. The Early Termination Date must be between <u>3/11/2022</u> and <u>4/30/2023</u>. Landlord may require Resident to sign additional documentation if Resident elects to exercise Resident's early termination option. | ☒ *(If checked)* After the Termination Date, this Agreement will continue on a month-to-month basis until terminated as specified elsewhere in this Agreement. |
|---|---|---|

**RESIDENT(S):**

| NAME (First, Middle Initial, Last):<br>Nihla Olsem | NAME (First, Middle Initial, Last):<br>Yul Sanchez | NAME (First, Middle Initial, Last): |
|---|---|---|

LIST OF ALL **OCCUPANTS** (Do not list any Residents from above):

**GUARANTOR(S):**

**LANDLORD NAME:**

Amber Grove Apartments

| PROPERTY MANAGER:<br>AMC | Name, address and telephone number:<br>Rental Office   4009 Marconi Ave., Sacramento, CA  95821     (916) 971-0859 |
|---|---|

**MONTHLY RENT AND OTHER OPTIONAL CHARGES:**

| Base Rent ("Rent"):<br>**$1,475.00** | ☒ *(If checked)* LICENSE FOR **GARAGE/PARKING SPACE NO.: 37** MONTHLY GARAGE/PARKING CHARGE: **$0.00** | ☐ *(If checked)* LICENSE FOR **STORAGE SPACE NO.:** MONTHLY STORAGE SPACE CHARGE: | ☐ *(If checked)* MONTH-TO-MONTH FEE: **$200.00** | ☐ *(If checked)* MONTHLY PET CHARGE: | ☒ DAMAGE LOSS WAIVER PROGRAM CHARGE: **$10.00** | TOTAL MONTHLY RENT AND OPTIONAL CHARGES **$1,485.00** |
|---|---|---|---|---|---|---|

☐ *(If checked)* **RENT CONCESSIONS:** The monthly Rent identified above is the amount due before application of the rent concession.

| LATE CHARGE (Applied if payments have not been received within **3** days of their due date):<br>**$50.00** | SECURITY DEPOSIT:<br>**$900.00** |
|---|---|

**PAYMENT INSTRUCTIONS:**

| ☒ *(If checked)* All amounts due to Landlord are payable to **Amber Grove Apartments, 4009 Marconi Ave., Sacramento, CA  95821, (916) 971-0859.** Payment must be made by: ☒ Money Order  ☒ Cashier's Check  ☒ Personal Check  - No personal checks will be accepted after the **3rd** day of the month or in response to a notice to pay rent or quit or a notice to perform covenant or quit requiring payment. No Third Party Checks are accepted.<br>The normal hours available to make payments in person are , for all non-holidays ☒ Weekdays, ☒ on Saturdays, and **n/a** on Sundays.<br>☐ *(If checked)* A twenty-four hour, seven days a week rent payment drop box is available at the address above. | ☐ *(If checked)* All amounts due Landlord must be deposited by Resident in Landlord's account at<br><br>_____<br>Account No.<br>_____ | ☒ *(If checked)* Landlord may, but is not required, to accept payments electronically or by credit card, either directly or through a third party payment service system. Residents interested in these payment methods should request information about Landlord's current electronic and credit card payment acceptance policy from the management office. See the Payment Detail section below. |
|---|---|---|

Kimball, Tirey & St. John California Residential Lease/Rental Agreement

© 2003-2021 Kimball, Tirey & St. John. All rights reserved.

This lease may not be duplicated in any way without the express written consent of Kimball, Tirey & St. John LLP.

Licensed for use on properties owned or managed by AMC.



1

**MISCELLANEOUS INFORMATION:**

**PETS:** ☒ are not authorized. ❏ *(If checked)* The following pets are authorized: **None**

| ☒ *(If checked)* **ATTORNEY'S FEE CAP**: **$1,000.00** | **LANDSCAPE WATERING** by: ☒ Landlord ❏ Resident | **LANDSCAPE MAINTENANCE** by: ☒ Landlord ❏ Resident |
|---|---|---|

<table>
<tr>
<td colspan="2">

**ACCESS CONTROL DEVICES:**
**48** Mailbox No.
**1** Key to the mail facilities. Rekeyed? ❏ Yes ☒ No
**1** Key to the Residence. Rekeyed? ☒ Yes ❏ No
**0** Garage/gate openers. Codes reset? ❏ Yes ☒ No
**0** Keys/openers to common area(s). Other:
_____

</td>
<td colspan="2">

**HOMEOWNERS ASSOCIATION:**
❏ *(If checked)* The Residence is a unit in development governed by a homeowner's association.
Name of HOA: _____
❏ *(If checked)* Copies of HOA rules and regulations are available for Resident's review at _____
❏ *(If checked)* Copies of HOA rules and regulations have been provided to Resident.

</td>
</tr>
<tr>
<td>

**AUTOMOBILES** ❏ may ☒ may not be washed on the Property. **OIL CHANGING AND AUTOMOBILE REPAIRS** ❏ are ☒ are not allowed on the Property. **BAR-B-QUE GRILLS** ❏ are ☒ are not allowed.

</td>
<td>

☒ *(If checked)* You are required to obtain and maintain **RENTER'S INSURANCE** with minimum liability of **$100,000.00** per occurrence and a maximum deductible of **$500.00**.

</td>
<td>

**MARIJUANA:**
☒ *(If checked)* Unless otherwise specified below, you may not possess, plant, cultivate, harvest, transport, dry or process, marijuana or processed cannabis products in the Residence or Property.
❏ *(If checked)* You may possess processed marijuana and cannabis products (ready for immediate consumption), but only as allowed by law.

</td>
<td>

**DESIGNATED SMOKE-FREE AREAS:**
☒ All Common Areas

</td>
</tr>
</table>

**DISCLOSURES AND PROPERTY INFORMATION:**

☒ *(If checked)* **LEAD DISCLOSURES APPLY:** If indicated, the Residence was built before 1978 when lead based paint was still in use. The Lead Based Paint Disclosure section of this Agreement will apply, and a copy of the pamphlet *Protect Your Family From Lead In Your Home* has been provided to Resident.

Landlord knowledge of lead-based paint and/or lead-based paint hazards in the Residence or Property:

☒ *(If checked)* Landlord has no knowledge of any lead-based paint and/or lead-based paint hazards in the Residence or Property.

❏ *(If checked)* Landlord is aware of the following lead-based paint and/or lead-based paint hazards in the Residence or Property:
_____ .

Reports or records pertaining to lead-based paint and/or lead-based paint hazards in the Residence or Property:

☒ *(If checked)* Landlord has no reports or records pertaining to lead-based paint and/or lead-based paint hazards in the Residence or Property.

❏ *(If checked)* Available reports or records pertaining to lead-based paint and/or lead-based paint hazards in the Residence or Property are as follows: _____ .

Copies of the reports or records identified are available for Resident's review at: **4009 Marconi Ave., Sacramento, CA  95821**.

☒ *(If checked)* **ASBESTOS DISCLOSURES APPLY:** If indicated, the Residence was built before 1981 when asbestos was still used in construction, and the Asbestos section of this Agreement will apply.

Landlord knowledge of asbestos hazards in the Residence or Property:

☒ *(If checked)* Landlord has no knowledge of any asbestos hazards in the Residence or Property, but because of the age of the Property, Resident should review the asbestos section of this Agreement.

❏ *(If checked)* Landlord is aware of the following asbestos hazards in the Residence or Property: **Drywall mud, ceiling, floor tiles**.

Reports or records pertaining to asbestos hazards in the Residence or Property:

☒ *(If checked)* Landlord is not aware of any reports or records pertaining to asbestos hazards in the Residence or Property.

❏ *(If checked)* Available reports or records pertaining to asbestos hazards in the Residence or Property are as follows:
_____ .

Copies of the reports or records identified are available for Resident's review at: **4009 Marconi Ave., Sacramento, CA  95821**.

Resident may obtain information about hazards, including flood hazards, that may affect the Property from the Office of Emergency Services at **http://myhazards.caloes.ca.gov/**. Landlord's owner's insurance does not cover the loss of Resident's personal possessions and it is recommended that Resident consider purchasing renter's insurance and flood insurance to insure Resident's possessions from loss due to fire, flood, or other risk of loss.

❏ *(If checked)* **FLOOD DISCLOSURES APPLY:** If indicated, the Residence is located in a special flood hazard area or an area of potential flooding. Landlord is not required to provide additional information concerning the flood hazards to the property and the information provided in this section is deemed adequate to inform Resident.



**RENT CONTROL AND JUST CAUSE:** If Civil Code §1946.2 or 1947.12 apply to this tenancy: California law limits the amount your rent can be increased. See Section 1947.12 of the Civil Code for more information. California law also provides that after all of the tenants have continuously and lawfully occupied the property for 12 months or more or at least one of the tenants has continuously and lawfully occupied the property for 24 months or more, a landlord must provide a statement of cause in any notice to terminate a tenancy. See Section 1946.2 of the Civil Code for more information.

Landlord may terminate Resident's tenancy after expiration of any term if Landlord, or their spouse, domestic partner, children, grandchildren, parents, or grandparents, unilaterally decides to occupy the Premises.

❑ (If checked) This property is not subject to the rent limits imposed by Section 1947.12 of the Civil Code and is not subject to the just cause requirements of Section 1946.2 of the Civil Code. This property meets the requirements of Sections 1947.12 (d)(5) and 1946.2 (e)(8) of the Civil Code and the owner is not any of the following: (1) a real estate investment trust, as defined by Section 856 of the Internal Revenue Code; (2) a corporation; or (3) a limited liability company in which at least one member is a corporation.

**PEST CONTROL:** ❑ (If checked) Pesticides are periodically applied to ❑ the Residence ❑ units near the Residence ❑ common areas They are applied by ☒ a registered structural pest control company ❑ Landlord or Landlord's agents.

The products used by the pest control company are meant to control the following pest(s): _____ . The approximate date, time and frequency of the pesticide treatment is **Weekly**. The approximate date, time and frequency of the pesticide application is subject to change. The pesticide(s) name, brand and active ingredient: **N/A** or ❑ as specified in a separate pesticide notice.

State law requires that you be given the following information. CAUTION - PESTICIDES ARE TOXIC CHEMICALS.

Structural Pest Control Companies are registered and regulated by the Structural Pest Control Board, and apply pesticides which are registered and approved for use by the California Department of Pesticide Regulation and the United States Environmental Protection Agency. Registration is granted when the state finds that based on existing scientific evidence there are no appreciable risks if proper use conditions are followed or that the risks are outweighed by the benefits.

The California Department of Pesticide Regulation and the United States Environmental Protection Agency allow the unlicensed use of certain pesticides based on existing scientific evidence that there are no appreciable risks if proper use conditions are followed or that the risks are outweighed by the benefits.

The degree of risk depends upon the degree of exposure, so exposure should be minimized.

If within 24 hours following application, you experience symptoms similar to common seasonal illness comparable to the flu, immediately contact:
- your physician or the California Poison Control System (1-800-222-1222), and
- if the pesticide was applied by a pest control company, also contact the pest control company.

For further information, contact any of the following:
- (if pesticide is applied by a pest control company) the pest control company, telephone number: **N/A** or ❑ as specified in a separate pesticide notice.
- for Health Questions - the County Health Department, telephone number: **N/A** or ❑ as specified in a separate pesticide notice.
- for Application Information - the County Agricultural Commissioner, telephone number: **N/A** or ❑ as specified in a separate pesticide notice.
- for Regulatory Information:
  - the Structural Pest Control Board, **N/A** (if pesticide is applied by a pest control company).
  - the Department of Pesticide Regulation (916-324-4100) (if the pesticide is not applied by a pest control company).

☒ (If checked) **ONGOING CONSTRUCTION.** If indicated, there is ongoing construction in the Property consisting of: **general renovation and community enhancement**. The **estimated** date of completion is _____ . Construction will normally be limited to the following days of the week: _____ , and the following hours: **7am-6pm**.
☒ (If checked) Information provided to Resident regarding the Property may refer to amenities for which construction may not yet be completed including the following: **All**.

❑ (If checked) **CONDOMINIUM CONVERSION.** The Residence has been approved for sale to the public as a condominium project. You may be given additional documents about this.

☒ (If checked) **CENTRAL ANTENNA.** The Property has a central antenna. You may not install a satellite dish or antenna unless otherwise allowed under FCC regulations or unless we provide permission. If you are allowed to install a satellite dish or antenna, the conditions in the Satellite Dish and Antenna paragraph below will apply.

Additional notices, disclosures and terms:

**UTILITIES:**



**UTILITY AND SERVICES:** This is an Addendum to the Rental Agreement dated <u>March 11, 2022</u> (the "Lease"), by and between <u>**Amber Grove Apartments**</u>, solely as Agent for Owner (hereinafter "Agent") for the Owner of the Rental Community known as <u>**Amber Grove Apartments**</u>, and <u>**Nihla Olsem and Yul Sanchez**</u> (collectively hereinafter "Resident"), for the premises known as <u>**98**</u>, <u>**4031 Marconi Ave**</u>, <u>**98**</u>, <u>**Sacramento**</u>, <u>**95821**</u>, County of <u>**Sacramento**</u>, State of California ("Premises"). To the extent that the terms of this Addendum conflict with those of the Lease, this Addendum shall control.

1.  Resident shall be responsible for the payment of utility and service bills, including charges for usage, deposits, and any charges, taxes, fees, administrative fees or costs associated with the utilities and services and related billing costs or billing, and the method of billing, metering, or otherwise allocating the cost and charges to Resident for utilities and services, is indicated below (the "Allocated Utilities").

    **a)**  Water service to Resident's apartment and costs will be paid by Resident either:
    - ❏ Directly to the water service provider(s); or
    - ☒ The water service provider will bill Agent, and the Agent will allocate and bill Resident based on formula: __8__

    **b)**  Sewer/Storm Water service to Resident's apartment and costs will be paid by Resident either:
    - ❏ Directly to the sewer service provider(s); or
    - ☒ The sewer service provider will bill Agent, and the Agent will allocate and bill Resident based on formula: __3__

    **c)**  Gas service to Resident's apartment and costs will be paid by Resident either:
    - ☒ Directly to the gas service provider(s); or
    - ❏ The gas service provider will bill Agent, and the Agent will allocate and bill Resident based on formula: _____

    **d)**  Trash service to Resident's apartment and costs will be paid by Resident either:
    - ❏ Directly to the trash service provider(s); or
    - ☒ The trash service provider will bill Agent, and the Agent will allocate and bill Resident based on formula: __3__

    **e)**  Electric service to Resident's apartment and costs will be paid by Resident either:
    - ☒ Directly to the electric service provider(s); or
    - ❏ The electric service provider will bill Agent, and the Agent will allocate and bill Resident based on formula: _____

    FORMULAS / ALLOCATION METHOD KEY
    **1 - Per Occupant**  Each Occupant is equal to 1 full occupant. 1 occupant = 1; 2 occupants = 2, 3 occupants =3. The total number of occupants in Resident's unit is divided by the total number of occupants currently residing at the community, the result is multiplied by the total bill. This result is the utility or service cost per unit. This formula does not pro-rate based on move-in date.
    **2 - Additional Occupants are 70% of an Occupant**  The first occupant is equal to 1, and each additional occupant per unit is counted as 70% of an occupant. 1 occupant = 1, 2 occupants = 1.7, 3 occupants = 2.4, etc. Total costs for utilities and services is computed in accordance with Formula 1 above, except the total number of occupants per unit is computed in accordance with this paragraph. This formula does not pro-rate based on move-in date.
    **3 - Per Unit**  Each unit is billed equally regardless of the number of occupants or square feet, this item does pro-rate based on move-in date. The total bill for the utility or service is divided by the total number of occupied units at the community, and the result is the utility or service cost per unit.
    **4 - Flat Rate**  Each unit is billed an equal flat rate per month regardless of number of occupants or square feet, this item does not pro-rate based on move-in date.
    **5 - Per Foot based on total occupied square feet**  The total utility or service bill is divided by the total number of occupied square feet, and the result is multiplied by the square feet of each individual unit. This result is the utility or service cost per unit. This item does pro-rate based on move-in date.
    **6 - 50% Per Occupant/50% Per Foot**  The total bill for the utility or service is divided by two to get one half the total utility or service cost. One half the total cost is divided by the number of occupants at the community, the result is the per occupant cost. The per occupant cost is then multiplied by the number of occupants in Resident's unit, and the result is the 50% per occupant cost. One half the total cost is then divided by the total rentable square feet at the community, the result is then multiplied by the square feet of each individual unit, the result is the 50% square foot cost per unit. The sum of the "50% per occupant cost" and the "50% square foot cost per unit" is the total utility or service cost per unit. This formula does not pro-rate based on move-in date. For example, a $5,000 total utility or service bill for a community with 450 occupants, and 250,000 square feet would result in the following bills for a 1,000 square foot unit based on the following occupancy: 1 occupant would pay $15.56, 2 occupants would pay $21.11, and 3 occupants would pay $26.67.
    **7 - Meter Reading**  Each unit is billed for the difference between the previous meter reading and the current meter reading for each units metered item.
    **8 - Per Occupant 60/30**  A similar billing to Per Occupant but it takes a ratio of the occupants into account. The first occupant in any unit equals 1 occupant; the 2nd occupant in any unit counts as 0.60 of an occupant; any unit with a 3rd occupant or more, each occupant will count as 0.30 of an occupant. 1 Occ = 1 Occ - 2 Occs = 1.60 Occs - 3 Occs = 1.90 Occs - 4 Occs = 2.20 Occs - 5 Occs = 2.50 Occs - 6 Occs = 2.80 Occs - 7 Occs = 3.10 Occs



2.  If the Premises is subject to the California Tenant Protection Act of 2019 or a local rent control jurisdiction, Resident shall receive an initial estimated bill that provides both the estimated cost for the Allocated Utilities, as well as provide a "Not to Exceed" amount for the Allocated Utilities. The Not to Exceed Amount published in the initial bill addressed to Resident shall become part of this Addendum as if attached hereto and made a part of. Agent and Resident understand and acknowledge that, for purposes of the applicable rent control law, all utilities charges required to be paid by Resident under this Addendum are considered a portion of the rent paid for the Premises and shall be considered as part of the rent when calculating allowable increases under the rent control law. The Not to Exceed Amount is the maximum utility rent to be billed to Resident by or on behalf of Landlord for all Allocated Utilities (as opposed to any utilities directly billed to Resident), as well as any monthly billing or service fees required under this Addendum, if applicable. The rent related to these utilities and services actually billed to Resident may be less than the Not to Exceed Amount in order to reward overall conservation efforts and to pass on to Resident decreases in rates from the utility providers

3.  If an allocation method or flat fee is used Agent, Owner, or their billing company will calculate Resident's allocated share of the utilities and services provided and all costs in accordance with state and local statutes. Under any allocation method or flat fee, Resident may be paying for part of the utility usage in common areas or in other residential units as well as administrative fees. Both Resident, Agent, and Owner agree that using a calculation, allocation formula or flat fee as a basis for estimating total utility and service consumption is fair and reasonable, while recognizing that the allocation method may or may not accurately reflect actual total utility or service consumption for Resident. Agent may change the above methods of determining Resident's allocated share of utilities and services and all other billing methods, in Agent's sole discretion, upon providing thirty (30) days' written notice to Resident. More detailed descriptions of billing methods, calculations and allocation formulas will be provided upon request.

4.  When billed by Agent or Owner directly or through Agent's or Owner's billing company, Resident's payment of utility and/or services bills must be received by the due date issued on the bill, which will be the 1st of each month, or the payment will be late. The late payment of a bill or failure to pay any utility and/or services bill is a material breach of the Lease and Agent will exercise all remedies available under the Lease, up to and including eviction for nonpayment. To the extent there is a billing fee for the production of any utility or services bill or a set-up charge or initiation fee by Agent, Owner or their billing company, Resident shall pay such billing fee in an amount not to exceed **$3.00** per billing period and such set-up charge/initiation fee in an amount not to exceed **$15.00**.

5.  Resident will be charged for the full period of time that Resident is living in, occupying, or responsible for payment of rent and utility or service charges on the apartment. If Resident breaches the Lease, Resident will be responsible for utility and service charges for the time period Resident was obligated to pay the charges under the Lease, subject to Agent and Owner's mitigation of damages. In the event Resident fails to timely establish utilities and services, Agent may charge Resident for any utilities and services billed to Agent or Owner with respect to Resident's apartment and may charge a reasonable billing fee for billing Resident for such utilities and services.

6.  When Resident moves out, Resident will receive a final bill, which may be estimated by Agent based on Resident's prior utility and services usage. This bill must be paid at the time Resident moves out or it will be deducted from Resident's security deposit, as permitted by state law. Unless prohibited by law, bills may also be estimated on a temporary basis when necessary due to equipment malfunctions or other problems.

7.  Agent and Owner are not liable for any losses or damages Resident incurs as a result of outages, interruptions, or fluctuations in utilities or any other services provided to the apartment unless such loss or damage was the direct result of an intentional or negligent act or omission by Agent, or Agent's employees. Resident releases Agent and Owner from any and all such claims and waives any claims for offset or reduction of rent or diminished rental value of the apartment due to such outages, interruptions, or fluctuations.

8.  Resident agrees not to tamper with, adjust, or disconnect any utility or services sub-metering system or device. Violation of this provision is a material breach of Resident's Lease and may subject Resident to eviction or other remedies available to Agent under Resident's Lease and this Addendum.

9.  Agent and Owner have the sole authority to select and approve all utility and services providers who may provide services to Resident(s) at the apartment community, to the extent not prohibited by law.

10. Where lawful, all utilities, charges and fees of any kind under this lease shall be considered additional rent, and if partial payments are accepted by Agent or Owner, they will be allocated first to non-rent charges and to rent last.

11. This Addendum shall be enforced to the fullest extent lawful. This Addendum is designed for use in multiple jurisdictions, and no billing method, charge, or fee mentioned herein will be used in any jurisdiction where such use would be unlawful. Any determination by a court of competent jurisdiction that a provision of this Addendum is legally invalid or unenforceable shall not diminish the validity or enforceability of the remaining provisions.

12. Special Provisions. The terms of this section supercede any other conflicting terms of this Addendum.



**INITIAL AMOUNTS DUE:**

The following initial amounts are due under this Agreement as specified:

| CATEGORY | TOTAL DUE | PAYMENT RECEIVED TO DATE BY LANDLORD | BALANCE DUE | BALANCE DUE DATE |
|---|---|---|---|---|
| Security Deposit | $900.00 | $0.00 | $900.00 | 3/11/2022 |
| Rent from **4/1/2022** through **4/30/2022**. If any concessions have been granted to Resident for any portion of this time period, the amount above is the Rent due after application of the concession amount. | $1,475.00 | $0.00 | $1,475.00 | 3/11/2022 |
| Application Fee Charge | $92.00 | $92.00 | $0.00 | - |
| Damage Loss Waiver Program Charge | $10.00 | - | $10.00 | - |
| **TOTAL** | **$2,477.00** | **$92.00** | **$2,385.00** | **3/11/2022** |

The payments described above must be made by: ☒ Money Order  ☒ Cashier's Check

**Prorate Payment:** $1,042.50 due on **4/1/2022**, for the period of **3/11/2022** through **3/31/2022**.

**Total Rent and Other Optional Charges:** $1,485.00 due in advance on the first day of each calendar month beginning **4/1/2022**.

| **AGREEMENT ADDENDA AND OTHER WRITTEN MATERIALS PROVIDED TO RESIDENT:** | | |
|---|---|---|
| ☒ Concession Addendum | ☒ Addendum To Lease | ☒ Damages and Cleaning Charges Addendum |
| ☒ Animal Agreement | ☒ Carbon Monoxide Alarm | ☒ Electronic Communication Authorization |
| ☒ Information on Dampness and Mold for Renters in California | ☒ Insurance Addendum | ☒ Lead Paint Booklet |
| ☒ Lease File Check List | ☒ Pesticide Disclosure | ☒ Proposition 65 Notification |
| ☒ Cash Addendum | ☒ Electronic Payment Addendum | ☒ Resident Contact Information |

Created on **March 11, 2022** by Leasing Agent: **Ashley Taylor**

## B. DEFINITIONS:

Each capitalized term in this Agreement has the definition specified below unless otherwise defined in this Agreement.

**AGREEMENT:** This Residential Lease/Rental Agreement.

**LANDLORD'S RELATED PARTIES:** The Property Manager and the respective officers, directors, members, managers, partners, shareholders, employees, affiliates, agents and representatives of both Landlord and Property Manager.

**RESIDENT'S RELATED PARTIES:** Other Co-Residents, Occupants, members of your household, your family, guests, agents and others under your control.

**RESIDENCE:** The Residence is identified in the Variable Lease Term section, and includes all appliances, furniture and fixtures that we provide to you ("Personal Property.") The appliances and furniture are described in the Inventory/Move-In Move-Out form.

**PROPERTY:** If the Residence is a unit in a multi-family complex, the Residence and the complex are collectively referred to as "the Property." If the residence is a single family residence, "the Property" refers to the Residence alone.

## C. PRIMARY AGREEMENT TERMS:

1. **PARTIES.**    This Agreement is entered into between Landlord and Resident(s). Landlord may be identified in this Agreement as "we" or "us." Resident(s) may collectively be referred to in this Agreement as "you."

2. **AGREEMENT.**    You rent the Residence from us.

3. **TERM.**    The Agreement term will begin on the Commencement Date and continue until the Termination Date. Note that this Agreement contains provisions that could alter the Term.

   - If the Variable Lease Term section is *not* checked to indicate an automatic continuance of the Agreement on a month-to-month basis after the Termination Date, you must vacate the Residence by the Termination Date (unless you and Landlord agree in writing to extend the term, or as otherwise provided by law).

   - **If the Variable Lease Term section *is* checked to indicate an automatic continuance of the Agreement on a month-to-month basis after the Termination Date, the Agreement will continue after the Termination Date until either party terminates the Agreement by giving the other party at least sixty (60) day days' written notice, or as otherwise specified by law.**

     **If the Variable Lease Term section is checked to indicate an automatic continuance of the Agreement on a month-to-month basis after the Termination Date, and if you would like to vacate on the Termination Date, you must give at least sixty (60) day days' advance written notice of intent to terminate on the Termination Date.**



## D. **PAYMENTS:**

**4.    RENT.**    You must pay us the Rent and Other Optional Charges amount specified in the Variable Lease Term section. Certain additional amounts due to us are also specified in this Agreement. We reserve our right under Civil Code §1479 to apply any payments we receive to any amounts due (whether Rent, Charges, Late Charges or any other amount) in any manner we choose, and any contrary instructions or conditions you may attempt to impose will be of no force or effect. Unless otherwise specified in this Agreement, all amounts are payable in advance, on the **first** day of each calendar month, without demand, setoff or deduction. The daily value of the Residence will be calculated based on a **30-day month**.

**5.    PAYMENT DETAIL.**    Payment instructions (including forms of payment accepted, to whom payments are to be made, and the address where payments are to be made), are specified in the Variable Lease Term section. Any payments made by mail or placed in a drop box are made at your risk and must be received by us by the due date. You will incur a **$35.00** for any dishonored check. After receiving any dishonored payment (whether under this Agreement or any other), we reserve the right to require all further payments made by you or on your behalf to be made by money order, certified check or cashier's check. If a third party tenders a payment on your behalf, we reserve the right to require an acknowledgment from the third party as specified in Civil Code §1947.3(a)(3).

We may, but are not required, to accept payments electronically or by credit card, either directly or through a third party payment service system. If you are interested in these payment methods, request information about our current electronic and credit card payment acceptance policy from the management office. We reserve the right at any time to change our electronic and credit card payment policies and/or procedures, the third party payment service system and/or to cease accepting electronic or credit card payments. It is your responsibility before any payment is due to verify whether we are currently accepting payments electronically or by credit card, the proper procedure, and to arrange with us or any third party payment service system to pay electronically or by credit card. A third party payment service system may charge a fee for this service to you and will have specific requirements and procedures you must follow. If any electronic or credit card payment to us or the third party payment service system is reversed, not honored, or results in a "charge back," you will be responsible for Late Charges and any additional cost to us or the payment service system, and we will retain all rights and remedies, including the right to terminate your tenancy.

If you provide a check as payment, you authorize us either to use information from the check to make a one-time electronic fund transfer from the account or to process the payment as a check transaction. When we use information from the check to make an electronic fund transfer, funds may be withdrawn from your account as soon as the same day we receive the payment, and you will not receive the check back from your financial institution.

Use of drop boxes is at your risk. You can reduce the risk of theft of your payment by using electronic payment methods (if we accept electronic payments), or by mailing or personally delivering payments as directed. All checks and money orders must be made payable as specified on the first page of this Agreement. Do not leave the name of the payee blank on checks or money orders; you will not receive a payment credit if the check or money order is stolen and cashed by another party.

**6.    SECURITY DEPOSIT.**    We will hold the Security Deposit in compliance with California Civil Code §1950.5. We will fully refund it to you if you comply with all of your rental obligations. Unless required by law, we will not hold the Security Deposit in trust, deposit it in a segregated account, invest it in an interest-bearing account, nor pay you any interest on the Security Deposit. If you do not comply with all of your rental obligations, we may use the security deposit to:

*   Compensate us for your payment default; or breach of any other obligation under this Agreement, including the cost of recovering possession of the Residence, rental commissions, advertising expenses and other costs incurred because of your breach of the Agreement and the Rent and other amounts due through the end of the Agreement term, (including Rent due up through the date you vacate the Residence, Rent due through the date of judgment, and Rent due after the date of judgment through the end of the original Agreement term) and any other amount necessary to compensate us for your breach of the Agreement, minus amounts we reasonably could have avoided;

*   Clean the Residence at the termination of the tenancy, if not returned to us at the same level of cleanliness as received;

*   Remedy future defaults by you in any obligation to restore, replace or return personal property or appurtenances, exclusive of ordinary wear and tear; or

*   Repair damages to the Residence and Property, exclusive of ordinary wear and tear, caused by you or your Related Parties. Damage or deterioration of the Residence is not ordinary wear and tear if it could have been prevented by good maintenance practices by you, or if you failed to notify us of a maintenance issue in a timely fashion in writing so that we could prevent the damage or deterioration.

You may not use the Security Deposit in lieu of last month's Rent or other amounts due under this Agreement. If we apply any portion of your Security Deposit to amounts due during the term of this Agreement, you must replenish the full amount applied within three days of our demand.

If we know you intend to vacate the Residence, we will give you written notice of your right to a pre-move out inspection as required by law. This inspection allows you to identify and correct any deficiencies in the Residence to avoid Security Deposit deductions. If you notify us that you want the inspection, we will inspect the Residence (no earlier than two weeks before termination of the tenancy) and provide you with an itemized statement specifying repairs or cleaning to be made at your expense. Except as otherwise specified in this Agreement, you may make these repairs yourself, or clean the Residence yourself, before you move out to avoid these deductions from your Security Deposit. You have the right to be present during the inspection.

Within 21 days after you return possession of the Residence to us, we will refund amounts due to you from the Security Deposit, plus an



7

accounting of how we have used any portion of the Security Deposit that we have retained. If the Security Deposit is insufficient to satisfy the total charges, we will send to you an itemized bill payable on demand. Any Security Deposit refund may be paid by one check jointly payable to all Residents but delivered to only one Resident at the last known address of any Resident. The refund and deductions will be calculated without regard to who paid the Security Deposit or whose conduct resulted in any deductions.

7. **LATE CHARGES AND DEFAULT INTEREST.**    You will be obligated to pay to us the Late Charge if you fail to pay any amount due under this Agreement within the time specified in the Variable Lease Term section. You agree it would be impractical or extremely difficult to fix the actual damage to us and that the Late Charge is a reasonable estimate of the actual damages that the parties reasonably believe would occur as a result of late payment. In addition to the Late Charge, interest will accrue on any unpaid amount at the legal rate of ten percent (10%) per year beginning on the date on which the delinquent amount was due. Late Charges and interest due are in addition to, and not in lieu of, our other remedies.

8. **FAILURE TO MAKE ALL PAYMENTS DUE BEFORE THE COMMENCEMENT DATE.**    If you fail to make all payments specified in the section entitled "Initial Amounts Due" before the specified date, or if you fail to provide us with proof that required utilities have been transferred into your name, or if you fail to provide proof of renter's insurance (if required under this Agreement):

• We have no obligation to give you possession of the Residence; and

• We may rescind this Agreement and keep any portion of funds that you have paid (if any) necessary to compensate us for your breach of this Agreement.

## E. ADDITIONAL AGREEMENT TERMS:

9. **APPLIANCES.**    Use all appliances in the Residence in a safe manner and only as intended. Do not overload dishwashers and use only detergents made for automatic dishwashers. Turn on cold water before starting the garbage disposal, do not overload the disposal, and do not grind bones or other hard objects, rinds, sticky or stringy foods, or put an excessive volume of material in the garbage disposal. To avoid clogs for which you will be responsible, do not put paper towels, diapers, sanitary napkins, food, baby wipes, moist towelettes or wipes (even if advertised as flushable), cotton swabs, non-flushable clumping kitty litter, or other items that are not meant to be flushed in the toilets, and do not pour grease down the drain. You will be responsible for blockages you cause. If the Residence does not have a frost free refrigerator, defrost the refrigerator when there is approximately one inch of frost. Do not use sharp objects to defrost the freezer. If the Residence is equipped with a washer/dryer, clean the lint filter after every load and periodically inspect the dryer vent duct to ensure it has not become detached, blocked, kinked, or crushed.

You must obtain our written consent before installing any air conditioning unit (including portable air conditioning units), washer, dryer, refrigerator with water dispenser or icemaker, or other appliance. If we grant consent, it may be granted conditionally. Due to concerns about energy consumption, overloading the existing electrical supply, and damage to the Property, consent for appliance installation may be granted on conditions such as: (i) your agreement to allow us to install them (and to pay us the reasonable costs of installation); (ii) the use of specific types of hoses; (iii) maintenance of renter's liability insurance with coverage amounts that we will specify; (iv) utilization of drip trays and water leak detector/alarms; (v) your agreement to compensate us for any losses related to the use or presence of the appliance; and (vi) your agreement to pay for additional utilities consumed.

10. **ASSIGNMENT, SUBLETTING AND TRANSFER BY RESIDENT.**    Your interest in the Residence and this Agreement may not be assigned, sublet or otherwise transferred. You may not advertise the Residence on Airbnb, Couchsurfing, Craigslist, or any other advertisement or listing service. Any assignment, subletting or transfer (whether by your voluntary act, operation of law, or otherwise), will be void, and we may elect to treat it as a non-curable breach of this Agreement.

11. **ASSIGNMENT BY LANDLORD.**    During your tenancy, we may transfer or encumber our interest in the Property. You must look solely to our transferee for performance of our obligations relating to the period after the transfer. Your obligations under this Agreement will not otherwise be affected by any transfer. Your rights in the Residence are subject to and subordinate to any existing or future recorded deed of trust, easement, lien or encumbrance. If a lender forecloses on the Property, you agree to recognize the purchaser as the landlord under this Agreement if you are requested to do so.

12. **AUTOMOBILE WASH AND REPAIR.**    If permitted on the Property (indicated in the Variable Lease Term section), automobile washing and oil changing may be done only in designated areas.

13. **BALCONIES, PATIOS AND WINDOWS.**    Please do not shake or hang rugs, towels and clothing from windows. Do not put plants or other items on balcony or patio walls. If your balcony or patio is visible from outside your Residence, do not keep anything on it other than patio furniture. We reserve the right to prohibit, restrict and control the items on your balcony or patio.

14. **BARBEQUE GRILLS.**    If allowed on the Property (indicated in the Variable Lease Term section), barbeque grills may be used only in designated areas, and only in compliance with applicable laws. Cities and counties that have adopted the California Fire Code prohibit charcoal burners and other open-flame cooking devices on combustible balconies or within 10 feet of combustible construction unless (1) the Property is a single family residence or duplex, (2) the buildings, balconies and decks are protected by an automatic sprinkler system, or (3) a liquefied-petroleum LP (which includes propane) gas fueled cooking device having a LP gas container of 1 pound or less is used.

15. **BED BUGS AND PESTS.**

Information about Bed Bugs

**Bed bug Appearance:** Bed bugs have six legs. Adult bed bugs have flat bodies about 1/4 of an inch in length. Their color can vary from red and brown to copper colored. Young bed bugs are very small. Their bodies are about 1/16 of an inch in length. They have almost no color. When a bed bug feeds, its body swells, may lengthen, and becomes bright red, sometimes making it appear to be a different insect. Bed bugs do not fly. They can either crawl or be carried from place to place on objects, people, or animals. Bed bugs can be hard to find



and identify because they are tiny and try to stay hidden.

**Life Cycle and Reproduction:** An average bed bug lives for about 10 months. Female bed bugs lay one to five eggs per day. Bed bugs grow to full adulthood in about 21 days. Bed bugs can survive for months without feeding.

**Bed bug Bites:** Because bed bugs usually feed at night, most people are bitten in their sleep and do not realize they were bitten. A person's reaction to insect bites is an immune response and so varies from person to person. Sometimes the red welts caused by the bites will not be noticed until many days after a person was bitten, if at all.

**Common signs and symptoms of a possible bed bug infestation:**
- Small red to reddish brown fecal spots on mattresses, box springs, bed frames, mattresses, linens, upholstery, or walls.
- Molted bed bug skins, white, sticky eggs, or empty eggshells.
- Very heavily infested areas may have a characteristically sweet odor.
- Red, itchy bite marks, especially on the legs, arms, and other body parts exposed while sleeping. However, some people do not show bed bug lesions on their bodies even though bed bugs may have fed on them.

For more information, see the Internet Web sites of the United States Environmental Protection Agency and the National Pest Management Association.

Please report suspected bed bug infestations to us by contacting the leasing office (if any) or the property manager identified on the first page of this Agreement.

During the day, bed bugs hide in crevices such as seams in mattresses and box springs, bed frame cracks, behind picture frames, and inside furniture and upholstery.

In the past, bed bug infestations were primarily associated with crowded and dilapidated housing. However, bed bug infestations are becoming more common and can be found even in first class hotel and living accommodations. The increase may be the result of increased human travel, movement of infested luggage and items, and changes in the pesticides available to control this pest. Bed bugs are transferred to new locations on people, their clothing, furniture, bedding, and luggage.

Bed bug treatment is challenging. It requires the full cooperation of the residents in affected units, professional treatments over several weeks, and treatment and/or discarding of furniture, clothing, and personal property. Because of the difficulty of bed bug extermination, and because of the risk that bed bugs could spread into other units, you agree that if bed bugs are found, you will immediately contact us, and will not attempt to personally exterminate bed bugs without professional assistance. You may be responsible for any pest control treatment costs.

"Pests" include (but are not limited to) ants, bed bugs, cockroaches, fleas, mites, spiders, termites, mice, rats, other vermin and insects. We have inspected the Residence and are unaware of any pests in the Residence. At move-in, you will complete and sign a Move-In/Move-Out Statement documenting the condition of the Residence. If you fail to report defects in the Move-In/Move-Out Statement, it will be presumed that the Residence has been delivered in good condition and free of pests.

You agree to cooperate with our pest control efforts by:

- Keeping the Residence clean and uncluttered;

- Promptly advising us of any pest control needs, or any condition indicating a bed bug infestation in the Residence or Property (such as itchy welts on skin, bed bugs, blood spots (either brown or red) or bed bug excrement spots (brown or black) on bedding, furniture or other items, or a sweet odor). We are not responsible for any condition about which we are not aware and bed bugs require professional pest control treatment;

- Refraining from bringing bed bugs and other pests into the Residence and the Property, and inspecting all luggage, bedding, clothing, and personal property for bed bugs and other pests before move-in, returning home after traveling and/or bringing new items to the Residence. You will allow us to do the same upon request. If we have a concern about possible infestation, we may (but will not be obligated to) either prohibit you from bringing the item into the Residence and Property or require you to have the item professionally treated at your expense before the item is brought into the Residence or Property.

- Refraining from bringing into the Residence discarded furniture (found in or by a dumpster or elsewhere). Furniture may have been discarded because of a bed bug infestation;

- Providing us with access to Residence for our pest control assessments and pest control treatment;

- Cooperating with inspections to facilitate the detection and treatment of pests, including providing requested information that is necessary to facilitate the detection and treatment of pests.

- Following our instructions to prepare the Residence for pest control treatment and/or vacating the Residence when requested for our pest control efforts;

- Upon our request, promptly providing us with copies of all records, documents, sampling data and other materials relating to the condition of the Residence.

16. **BICYCLES SKATEBOARDS, SCOOTERS, ROLLERBLADES AND SKATES.**   Pedestrians have the right of way on all sidewalks, walkways and other pedestrian areas throughout the Property. Bicycles, skateboards, scooters, roller blades/skates, self-balancing motorized boards, and other wheeled apparatus must be used with care, to avoid Property damage, injury and danger for others. Bicycles



should be kept only in your Residence or in designated areas (if any) within the Property.

17. **COMMON AREA AMENITIES.**    If the Residence is part of a multi-family residential complex, various services, equipment and facilities (**"Common Area Amenities"**) may be provided for your use at your own risk. Common Area Amenities include all areas and facilities outside of the Residence, within the Property, that are provided and designated by us for the general non-exclusive use of Property residents. Common Area Amenities may include, but are not limited to meeting rooms and clubhouses, laundry facilities, exercise facilities, storerooms, swimming pools, spas, common entrances, lobbies, hallways, staircases, public restrooms, elevators, loading areas, trash/recycling areas, roads, sidewalks, walkways, and landscaped areas. Common Area Amenities are for the exclusive use of you and other Property residents and occupants. Common Area Amenities may not be used by Resident or Resident's Related Parties for business, commercial, fee-generating or fund-raising purposes unless we otherwise agree in advance and in writing (which we may grant or withhold in our sole discretion). Use of Common Area Amenities is subject to the restrictions described in rules or instructions at the Property. You may be required to carry and display identification to enter and/or utilize Common Area Amenities. If we allow guests to utilize Common Area Amenities, you may have no more than two guests (accompanied by you) unless we agree otherwise. We may restrict Common Area Amenity usage for repairs, renovations, safety or other reasons, and if we do so, this will not give you an offset to rental obligations, or be the basis for a complaint against us for rent relief, or any other claim, right, or remedy against us, including constructive eviction, to the maximum extent allowed by law. We may restrict Common Area Amenity usage for private parties. You may not install or use any items (temporary or permanent) in common areas, including (but not limited to) cameras (still or video), drones, tents, tarps, jump houses, swimming pools, or sports equipment, unless we provide authorization. Do not leave any personal property in common areas; we may remove and dispose of any personal property left outside of the Residence. To the extent allowed by law, you agree to assume all risk of harm, and waive all claims against us and our Related Parties resulting from the Common Area Amenities, even if caused by the negligence of us or our Related Parties. To the extent allowed by law, use of the Common Area Amenities is at the sole risk of you and your Related Parties.

18. **CONDOMINIUM/PLANNED UNIT DEVELOPMENT.**    If it is indicated in the Variable Lease Term section that the Residence is a unit in a development governed by a homeowner's association **("HOA")**, you and your Related Parties must comply with all covenants, conditions and restrictions, bylaws, rules and regulations and decisions of the HOA. You must pay any fines or charges imposed by the HOA incurred because of the actions or inactions of you or your Related Parties.

19. **CONDUCT AND COMPLIANCE WITH AGREEMENT, LAW AND RULES.**    You are responsible for your own actions, and the actions of your Related Parties. You and your Related Parties:

    • Must not create a nuisance on the Residence or Property, and may not disturb other Property residents or neighbors with excessive noise (loud televisions, stereos, voices, etc.) or otherwise;

    • Must comply with all Landlord rules, regulations and instructions (including posted signs and those specified in this Agreement), and all laws, statutes, ordinances, and requirements of all city, county, state, and federal authorities. We may periodically modify the rules and regulations by delivering a copy of the modifications to you or posting the rules and regulations at the Property;

    • Must notify us in writing of any dangerous condition, deterioration or damage to the Residence and Property (including Common Area Amenities) so that we may make necessary repairs;

    • Are responsible for personal injury or property damage, including damage to the Residence and Property caused by the action or inaction of you and your Related Parties. You agree to indemnify, defend (with counsel of our choice), and hold us and Landlord's Related Parties (and the HOA if the unit is in a HOA) harmless for any liability, costs (including reasonable attorney fees), or claims resulting from your breach of this Agreement or the negligence, violation of law, or willful misconduct of you or your Related Parties.

    You are advised to consider the current and potential exposure to noise that you may experience from activities that occur within and in the vicinity of the Property. No representations are made as to the impact of current or existing noise levels on you or your Residence. Potential sources of noise affecting you may arise from automobile traffic, entry gates, roadways, highways and toll roads, emergency facilities, construction activity, church bells or chimes, aircraft overflights, equestrian, bicycle or pedestrian walkways and other noise sources. If the Residence is a unit in a multi-family complex, be aware that multi-family housing areas often have higher densities, and greater associated inconveniences than single family residences. If you are particularly sensitive to sound, or the activities of others, you may not be comfortable in multi-family housing and you should consider alternatives. Likewise, if your activities are likely to be disturbing to nearby neighbors in a multi-family living environment, multi-family housing may not be the right choice for you and you should consider alternatives before signing this Agreement.

20. **CONSTRUCTION.**    If specified above in the Variable Agreement Term section, construction is ongoing at the Property, and details are in the Variable Agreement Term section. There may be inconveniences associated with construction, and you agree that the Rent and other amounts due under this Agreement are fair and reasonable while construction is ongoing. You agree that any inconvenience caused by ongoing construction will not give you an offset to rental obligations, or be the basis for a complaint against us for rent relief, or any other claim, right, or remedy against us, including constructive eviction. Although an estimated completion date may be specified, we do not guarantee the construction completion date. We will require the construction to be done in a commercially workmanlike and reasonable manner, and the general hours of construction will be specified in the Variable Lease Term section.

21. **CONTINUING LIABILITY.**    If you vacate the Residence, or this Agreement is terminated, this will not relieve you of any obligation to pay or reimburse sums to us or to indemnify or hold harmless or defend us or Landlord's Related Parties from any loss or claim, where the obligation arises during the term of this Agreement or before you vacate the Residence, unless we specifically agree otherwise in writing.

22. **CRIME-FREE COMMUNITY.**    You and your Related Parties:

    • May not engage in criminal activity on or near your Residence or the Property;



- May not permit your Residence or the Property to be used to facilitate criminal activity, regardless of whether the individual engaging in such activity is a member of your household, or a guest;

- May not engage in the unlawful manufacturing, selling, using, storing, keeping, or giving of a controlled substance as defined in Health & Safety Code §11350, at any locations, whether on or near your Residence, the Property or otherwise;

- "Criminal activity" is any activity in violation of laws, ordinances and requirements of city, county, state and federal authorities, including: prostitution (defined in Penal Code §647(b)); criminal street gang activity, (defined in Penal Code §186.20 et seq.).; assault and battery, (prohibited in Penal Code §240); burglary, (prohibited in Penal Code §459); the unlawful use and discharge of firearms, (prohibited in Penal Code §245); sexual offenses, (prohibited in Penal Code §269 and 288), drug-related criminal activity, or any breach of this Agreement that otherwise jeopardizes the health, safety and welfare of us, other residents or occupants of the Property or neighbors or involving imminent or actual serious property damage. "Drug-related criminal activity" means the illegal manufacture, sale, distribution, use, or possession with intent to manufacture, sell, distribute, or use of a controlled substance (as defined in Section 102 of the Controlled Substance Act [21 U.S.C. 802]);

A single violation of any of the provisions above will be a material and non-curable breach of this Agreement and good cause for immediate termination of your tenancy. Unless otherwise provided by law, proof of violation will not require criminal conviction, but will be by a preponderance of the evidence.

23. **DAMAGE TO RESIDENCE.**    If the Residence is significantly damaged or destroyed by fire, earthquake, accident or other casualty that renders the Residence uninhabitable for more than one week, may terminate this Agreement by giving written notice of our election to terminate. If the Agreement is not terminated, we will promptly repair the damage, and Rent will be reduced based on the extent to which the damage interferes with your use of Residence (unless we provide alternate housing). If you or your Related Parties cause the damage, we will have the right of termination, but you will not have that right and there will be no Rent reduction and we will have no obligation to repair the damage.

24. **DELAY IN POSSESSION.**    If we cannot deliver possession of the Residence to you on the Commencement Date for any reason, we will not be liable for the delay, nor will this affect this Agreement's validity, or extend the term of the Agreement. However, you will not be obligated to pay Rent or perform any other obligation under this Agreement (other than pay the amounts due specified in the Variable Lease Term section) until we tender possession of the Residence to you. If we have not tendered possession of the Residence to you within three days of the Commencement Date, you may cancel this Agreement any time before we tender possession of the Residence to you.

25. **DISABILITIES - REASONABLE ACCOMMODATION/MODIFICATION.**    Notwithstanding any other provision under this Agreement, upon prior written permission, we agree (1) to allow you to make reasonable modifications to the Residence and/or Common Area Amenities as required by law for people with disabilities; and (2) to provide reasonable accommodation as required by law to people with disabilities, including but not limited to (a) making changes or exceptions to rules, policies procedures, or services and (b) allowing assistance animals. We reserve the right to seek verification of disability and disability-related need for any requested modification or accommodation.

26. **EARLY TERMINATION OPTION.**    If indicated in the Variable Lease Term section, you have the option of amending this Agreement to terminate your tenancy before the Termination Date specified in the Variable Lease Term section. To exercise your Early Termination Option, you must deliver to us (1) a written notice stating that you have elected to exercise your Early Termination Option and identifying the Early Termination Date, and (2) the Early Termination Option Fee specified in the Variable Lease Term section, and (3) all Rent and additional amounts due through the Early Termination Date. When we acknowledge receiving the written notice and payment, the Termination Date will be deemed amended to the Early Termination Date. The Early Termination Date must be a date within the parameters described in the Variable Lease Term section. The Early Termination Option may be exercised only if you are not in default under this Agreement when you give notice of your exercise of the Early Termination Option. All remaining Agreement terms will remain in full force and effect.

If you provide the notice unaccompanied by the required payments, the Termination Date will not be changed.

If you do not properly exercise the Early Termination Option by following the procedure exactly as specified above, or choose not to exercise the Early Termination Option, but vacate your Residence before the Termination Date, all Agreement terms will remain binding (including the original Termination Date), and we will retain all legal remedies for non-compliance with this Agreement. If we know you have vacated the Residence before the end of the term, we have an obligation to try to re-rent the Residence to minimize lost Rent for which you will be responsible.

27. **ENTRY.**    We and our Related Parties will have the right to enter the Residence as allowed by law. Law permits entry in case of emergency, to make necessary or agreed repairs, decoration, alterations or improvements, supply necessary or agreed services, to test smoke and carbon monoxide detectors, to exhibit the Residence to prospective or actual purchasers, mortgagees, residents, workmen or contractors, to make an inspection under subdi aband water vision (f) of Civil Code §1950.5, for purposes relating to water conservation and submetered water when you have oned or surrendered the Residence and under a court order. Law also allows entry in additional situations, including (but not limited to) inspecting beds and other water-filled furniture (Civil Code §1940.5(f)); inspecting your personal agricultural areas (Civil Code §1940.10(f); inspecting balconies, decks and other exterior wood-based elevated elements, to inspect for and treat bed bugs (Civil Code §1954.604); and repairing, testing, and maintaining smok e detectors (Health & Safety Code §13113.7(d)(2)(A)) and carbon monoxide detectors (Health & Safety Code §17926.1(b)). Unless you have given us permission to enter, we will give you written notice at least 24 hours before entry unless entry is due to (1) an emergency, (2) surrender or abandonment of the Residence, or (3) we have agreed to a date and time within a one week time period when we will enter to make repairs. We are also not



required to give you written notice to show the Residence to prospective or actual purchasers and instead can give you verbal 24 hour notice of entry, if within the previous 120 days from our verbal notice of entry we inform you in writing that the Property is for sale and that you may receive oral notice of our intent to enter. If we give you verbal notice of our intent to enter to show the Residence to purchasers, we will leave written evidence of our entry in the Residence.

28. **ESTOPPEL CERTIFICATES.**    Within five (5) days of our written request, you must execute and deliver to us a written statement certifying that this Agreement is unmodified and in full force and effect (or if modified, describing the modification). Your statement will include any other details we request. Any prospective Property purchaser or encumbrancer may rely upon your written statement. If you fail to deliver a statement within the specified time, it will be conclusively presumed that (1) this Agreement is unmodified and in full force and effect, except as we otherwise indicate, (2) there are no uncured defaults in our performance, and (3) any other details specified by us originally requested of you.

29. **FURNITURE MOVING.**    We may designate times and methods for moving furniture, and other household goods to or from the Residence. We will not be liable for any loss resulting from the unavailability of elevator service to move furniture or other household goods, or otherwise to move into or out of the Residence.

30. **GARBAGE.**    You must dispose of all garbage, waste and recyclable materials in designated containers and/or designated areas and in accordance with applicable law and our instructions. Unless we indicate otherwise, you may not dispose of large items in Property garbage containers and/or areas. All boxes must be broken down and crushed before placing them in the appropriate container. You may not dispose of hazardous waste in Property garbage containers or on the Property. Information about disposal and recycling options for household hazardous waste is available at: http://www.dtsc.ca.gov/HazardousWaste/UniversalWaste/HHW.cfm.

31. **GUESTS.**    You may have overnight guests for no more than 7 nights in any month, and no more than two overnight guests at a time unless we provide specific approval. You must obtain our prior written consent to change Residents or add additional Occupants within the Residence.

32. **HARASSMENT.**    Resident and Resident's Related Parties may not abuse, harass (sexually or otherwise) or threaten Landlord or Landlord's Related Parties, and others at the Property. Resident and Resident's Related Parties may not unreasonably interfere with management functions.

33. **INSURANCE:**    **LANDLORD AND LANDLORD'S RELATED PARTIES DO NOT INSURE YOUR PERSONAL PROPERTY.** If indicated in the Variable Lease Term section, you are required to maintain a renter's insurance policy throughout your tenancy. Even if you are not required to maintain renter's insurance, we strongly recommend that you purchase a renter's insurance policy to protect yourself against personal injury and property damage, including losses from theft, fire, smoke, water damage, and vandalism.

**If renter's insurance is required** (as specified in the Variable Lease Term section) you must maintain a renter's insurance policy (at your cost) protecting you against claims for bodily injury, personal injury and property damage arising out of your use, occupancy or maintenance of the Residence, including liability to Landlord for damage to Landlord's property for the following causes of loss: fire, smoke, explosion, backup or overflow of sewer, drain or sump, and water damage. You may not do anything or allow any action that invalidates the policy. The renter's insurance may be issued by any company of your choice, provided that the carrier is licensed or admitted to transact business in California, and maintains during the policy term a "General Policyholders Rating" of at least a B+, V, in the most current issue of "Best's Insurance Guide." We must be listed as an "additional insured"(if this type of coverage is available from the insurance company) or as an "interested party" (if your insurance company will not name us as an "additional insured") under the insurance policy. Before the Commencement Date, you must deliver to us a certified copy of the insurance policy or certificates of insurance evidencing the existence and amounts of the required insurance. No policy may be canceled or modified except after thirty days prior written notice to us (ten days for nonpayment). At least thirty days before the expiration of the policy, you must furnish us with evidence of renewal. The policy must be on an occurrence basis and have personal liability coverage in an amount specified in the Variable Lease Term section, with a deductible of no more than the amount specified in the Variable Lease Term section. You will be liable for the deductible amount if an insured loss occurs. The policy must contain a waiver of subrogation. The policy may not contain any intra-insured exclusions as between insured persons or organizations. The policy limits will not limit your liability. Any insurance maintained by us and our Related Parties is only for the benefit of us and our Related Parties and you will not be named as an additional insured. You must pay any increase in insurance premiums held by us and our Related Parties for the Property resulting from the actions, omissions, use or occupancy of the Residence by you and your Related Parties. This insurance is meant to protect both you and us, by potentially providing you with a potential recovery source (other than us) if you suffer a loss, and by potentially providing us with a recovery source if you damage the Residence and/or Property. Therefore, your failure to maintain renters insurance is a material breach of this Agreement.

34. **KEYS AND OPENING DEVICES.**    Because we may need access to the Residence in case of an emergency, you may not change any locks or install additional security devices in the Residence without our consent. If permission is granted, you may not later remove locks or the additional security devices without our consent. You may not duplicate keys or access devices marked "Do Not Duplicate" or "Unlawful to Duplicate".

35. **LANDSCAPING.**    Landscaping will be maintained and watered by the parties as specified in the Variable Lease Term section.

36. **LAUNDRY FACILITIES.**    If laundry facilities are available at the Property, the laundry facilities are for the exclusive use by Property residents. Clothes, laundry baskets, and detergents should not be left unattended in the laundry areas. Remove laundry as soon as the machine shuts off and dispose of lint, empty containers, and softening sheets in a trash can. No dye or flammable solutions are permitted.

37. **LIABILITY.**    We will not be liable for any damage or injury to you or others, or to any property, occurring on the Property, except as otherwise provided by law. See the "Common Area Amenities" paragraph above regarding liability for Common Area Amenities. We and



our Related Parties do not insure your personal property. Even if renter's insurance is not required, we strongly recommend that you purchase a renter's insurance policy to protect against personal injury and property damage, including losses from theft, fire, smoke, water damage, and vandalism. To the greatest extent allowed by law, you (on behalf of yourself and the Resident Related Parties) assume all risk of harm or damage to any person or property, and waive all claims against us and the Landlord Related Parties relating to participation in activities, events, services and programs offered or sponsored by us or the Landlord Related Parties.

38. **MAINTENANCE, ALTERATIONS, AND RESIDENCE CONDITION.**    At the beginning of the tenancy, the parties will complete and sign an Inventory/Move In/Move Out form documenting the condition of the Residence and an inventory of appliances, furniture, and furnishings. If you fail to report any defects on the Inventory/Move In/Move Out form, it will be conclusively presumed that the Residence and Personal Property are in good condition. You must maintain the Residence in a clean, healthy, safe and sanitary condition. Excessive items may not be stored or accumulate inside the Residence. Don't block windows or doors; they must be able to be fully opened. Maintain clear pathways into and through every room in the Residence. Do not place combustible materials near combustion sources such as the stove, oven, heater and/or water heater. Kitchen appliances and fixtures, bathroom fixtures, and every room in the Residence must be able to be used for their intended purposes. You may not paint, wall paper, add adhesive shelf liner or other adhesive materials, or use screws or nails or other materials to penetrate any wall, floor or other surface, or make other alterations to the Residence without our prior written consent. We will supply the Residence with functioning light bulbs before you take possession of the Residence. You must replace nonfunctional light bulbs at your expense. You acknowledge that we have not made any promises to make any changes to the Property except as specified in this Agreement. You must maintain a temperature of at least 55°F in the Residence to prevent the pipes from freezing. We reserve the right to prohibit or restrict items visible from the exterior of the Residence (e.g. in your windows, window sills, doors, and on your balcony or patio) for safety purposes and to ensure a first class appearance.

39. **MAINTENANCE REQUEST.**    You must report any maintenance problems (plumbing, electrical, heating, mold, etc.) directly to us immediately. Leaking faucets or toilets, and blocked toilets, should be reported to us immediately. The cost of any damages incurred due to Resident's failure to report any maintenance problem in a timely manner to us may be assessed to you. Except in cases of emergency, all requests for repairs, and all notices regarding the condition of the Property must be made to us in writing. This will ensure that we receive and properly process your request or notice. Notations on the Inventory/Move In/Move Out form documenting the condition of the Residence do not constitute a request for repairs; you must complete a separate written request for maintenance.

40. **MANAGEMENT.**    The Property Manager identified in the Variable Lease Term section is authorized to manage the Residence on our behalf and is authorized to act on our behalf to receive service of process, notices, and demands. However, the Property Manager is not a party to this Agreement, and should not be named as a party in any action you bring alleging a breach of this Agreement.

41. **MILITARY - EARLY TERMINATION.**    You may terminate this Agreement before the Termination Date specified on page 1 if:

   **(i)**  You become a member of the Armed Forces of the United States after you enter into the Agreement; or

   **(ii)**  You are or become a member of the Armed Forces of the United States and receive:
   - Orders for a permanent change of station; or
   - Orders to deploy for a period of at least 90 days.

You must give us written notice of termination, and the new termination date must be at least 30 days after the first date on which the next Rent payment is due. (For example, if you served the notice on September 15th, your tenancy would terminate on October 31.) You must furnish to us proof to establish you qualify for this limited exception. Proof may consist of any official military orders, or any notification, certification, or verification from the service member's commanding officer regarding the service member's current or future military duty status. Military permission for base housing does not constitute a permanent change-of-station order.

42. **MOLD.**    Mold consists of naturally occurring microscopic organisms. Mold breaks down and feeds on organic matter in the environment. When moldy materials are damaged or disturbed, mold spores and other materials may be released into the air. Exposure can occur through inhalation or direct contact. Most molds are not harmful to most people, but it is believed that certain types and amounts of mold may lead to adverse health effects in some people.

A certain amount of mold exists in every home. Controlling moisture and proper housekeeping are necessary to limit mold growth. We have inspected the Residence and are not aware of any mold problems or existing conditions that may contribute to mold growth in the Residence. You agree to maintain the Residence to prevent mold growth. You agree to:

**KEEP THE RESIDENCE CLEAN**
- Maintain good housekeeping practices and regularly dust, vacuum and mop to keep the Residence free of dirt and debris that can contribute to mold growth
- Use household cleaners on hard surfaces
- Remove garbage regularly and remove moldy or rotting items promptly from the Residence (whether food, wet clothing, or other materials)

**CONTROL MOISTURE IN THE RESIDENCE AND INCREASE AIR CIRCULATION**
- Use hood vents when cooking
- Use exhaust fans when bathing/showering until moisture is removed from the bathroom
- Hang shower curtains inside the bathtub when showering or securely close shower doors.
- Leave bathroom and shower doors open after use
- Use air conditioning, heating and fans as necessary to keep air circulating throughout the Residence



- Water all indoor plants outdoors
- Close windows and doors (when appropriate) to prevent rain and other outdoor water from coming inside the Residence
- Open windows when appropriate to increase air circulation
- Wipe up visible moisture
- If there is a washer in the Residence, periodically check the washer hose.
- If a dryer is installed in the Residence, ensure that the vent is properly connected and clear of any obstructions and clean the lint screen regularly
- Ensure good air circulation in closets, cupboards and shelves by periodically keeping them open, not stacking items tightly, and/or using products to control moisture
- Report leaks, water stains or other indications of moisture in the Residence as well as in any storage room, garage, or other common area, to the management office. Immediately report any indication of mold or mildew growth to the management office.

**PERIODICALLY INSPECT THE RESIDENCE FOR MOISTURE AND MOLD**

The most reliable methods for identifying elevated amounts of mold are (1) smell and (2) routine visual inspections for mold or signs of moisture and water damage. You agree to inspect the property (both visually and by smell) for mold growth inside the Residence at least once per month. The inspection will include but is not limited to:

- Window frames, baseboards, walls and carpets
- The ceiling
- Any damp material made of cellulose (such as wallpaper, books, papers, and newspapers)
- Appliances (including washers/dryers/dishwashers and refrigerators)
- Around all plumbing fixtures (toilets, bathtubs, showers, sinks and below sinks)
- Areas with limited air circulation such as closets, shelves and cupboards
- Personal property

**YOU AGREE TO PROMPTLY REPORT TO US IN WRITING:**

- Visible or suspected mold you do not clean as explained below. Mold may range in color from orange to green, brown, and/or black. There is often a musty odor present.
- Overflows or leaks around showers/bath/sink/toilet/washers/refrigerator/air conditioners
- Plumbing problems
- Discoloration of walls, baseboards, doors, window frames, ceilings
- Loose, missing or failing grout or caulk around tubs, showers, sinks, faucets, countertops
- Clothes dryer vent leaks
- Any non-operational windows, doors, fans, heating or air conditioning units
- Any evidence of leaks or excessive moisture in the Residence or on the Property
- Any maintenance needed at the Property

**YOU AGREE THAT YOU WILL NOT:**

- Bring any personal property into the Residence that may contain high levels of mold, especially "soft possessions" such as couches, chairs, mattresses, and pillows
- Stack items against walls in a manner that decreases air circulation and may lead to mold
- Maintain an excessive number of indoor plants
- Maintain a fish tank or other water filled container without our written consent

If a small amount of mold has grown on a non-porous surface such as ceramic tile, Formica, vinyl flooring, metal, or plastic, and the mold is not due to an ongoing leak or moisture problem, you agree to clean the areas with soap (or detergent) and a small amount of water, let the surface dry, and then within 24 hours apply a non-staining cleaner such as Lysol Disinfectant®, Pine-Sol Disinfectant®, Tilex Mildew Remover®, or Clorox Cleanup®. Because Tilex Mildew Remover® and Clorox Cleanup® contain bleach (which may discolor some materials), they may not be appropriate cleaners if discoloration could be a problem.

You agree to comply with all instructions and requirements necessary to prepare the Residence and/or Property for investigation and remediation, to control water intrusion, to control mold growth, or to make repairs. Storage, cleaning, removal, or replacement of contaminated or potentially contaminated personal property will be your responsibility unless the elevated mold growth was the result of our negligence, intentional wrongdoing or violation of law. We are not responsible for any condition about which we are not aware. You agree to provide us with copies of all records, documents, sampling data and other material relating to any water leak, excessive moisture, mold conditions in the Residence or Property as soon as you obtain them. Violation of this section will be a material breach of this Agreement.

43. **MOVE-OUT OBLIGATIONS.**   At termination of this Agreement, you must (a) give us all of your keys and other opening devices to the Residence, including any common areas; (b) surrender the Residence to us empty of all personal property and persons; (c) vacate all parking and storage spaces, if any; (d) deliver the Residence to us in the same condition as received, reasonable wear and tear excepted; (e) clean the Residence to the level of cleanliness as received; (f) and give us written notice of your forwarding address. At termination of the tenancy, we reserve the right to remove any improvements that you installed, whether or not we authorized the improvements, at your



expense. The "check-out" time on the Termination Date will be 12:00 noon, or you may be responsible for an additional day of rent: any other agreements that may be granted by us, before the Termination Date, must be in writing.

**44. MULTIPLE RESIDENTS.**     If there is more than one Resident under this Agreement, each Resident is jointly and severally liable for all rental obligations. Violation of this Agreement by any Resident or Resident's Related Parties is deemed a violation by all Residents. Requests and notices from us to any Resident will constitute notice to all Residents and Occupants. Any notices from, consents by or actions taken by any Resident may be deemed a notice from, consent by, or action of all Residents, at our sole discretion. (Alternatively, in our sole discretion, we may require all Residents to sign notices, provide consent, or act). All demonstrations, inspections and explanations made by us to one of the Residents will be binding on all Residents as if made to each of them. Any Resident or Occupant who has permanently moved out according to another Resident may, at our option and discretion, no longer be entitled to occupancy of or keys to the Residence. However, the termination of that person's right of occupancy will not release that person from any and all obligations under this Agreement or any renewal, unless we agree otherwise in writing.

**45. NO RELEASE.**     You will not be released from this Agreement on the grounds of voluntary or involuntary school withdrawal or transfer, business transfer, layoff or termination, marriage, divorce, marriage reconciliation, loss of co-Residents, or any other reason unless we agree otherwise in writing or unless the Military – Early Termination section above applies. We may grant or withhold consent to a release in our sole discretion.

**46. OCCUPANTS.**     The Residence may be occupied only by the Resident(s) and all other authorized Occupants specified above in the Variable Lease Term section.

**47. PARKING/GARAGE/VEHICLES.**     If parking spaces or garages are assigned, you may park on the Property only in the garage or parking space(s) specified in the Variable Lease Term section. Parking spaces and garages may not be used for operation of a business or as an extension of the living area of the Residence. We reserve the right to temporarily or permanently change your parking space(s) or garage and to assign another to you with 5 days' prior notice to you. We may issue parking stickers or other devices to control parking. If issued, you must use the parking control devices. If specified in the Variable Lease Term section, Garage/Parking fee is charged for this privilege. Parking spaces (if any) may be used only for parking passenger automobiles or light utility vehicles. If a parking space or garage has been assigned to you, you must park in it to maximize parking for others. If an exclusive-use garage has been designated for your use, you may use your garage secondarily for storage, but only if it doesn't interfere with your ability to park in the garage. Garage doors must be kept closed and locked unless you are entering or exiting the garage. Vehicles not kept in compliance with applicable rules, regulations and law are subject to towing at the vehicle owner's expense. A vehicle may be towed if it: (A) has flat tires or other condition rendering it inoperable; (B) is leaking fluids; (C) for non-assigned parking spaces, has not been moved in more than 96 hours; (D) takes up more than one parking space; (E) belongs to a Resident or Occupant who has surrendered or abandoned the Residence; (F) is parked in a marked accessible space without the legally required Disabled Person Plate or Placard insignia; (G) blocks another vehicle from exiting; (H) is parked in a fire lane or designated "no parking" or "restricted parking" area; (I) is parked in a space reserved for other residents; (J) is not properly parked in a designated area; (K) blocks access to a garbage area, entrance, driveway, other parking spaces, or other area; (L) cannot lawfully be operated as a vehicle on the road; (M) has a malfunctioning alarm or has an alarm which is not silenced within 10 minutes; (N) is parked in a designated visitor or office parking space; or (O) any other reason allowed by law. Gasoline, fuels or other explosive materials may not be stored anywhere on the Property. You will be responsible for oil stains and other damage caused by your vehicles and the vehicles of your Related Parties. Parking is at the risk of the vehicle owner or operator. We will have no liability for damage to or loss of any vehicle or any personal property contained within a vehicle or a garage. Parking spaces may not be available for guests or they may be limited in number and location. Tandem parking will be permitted only with our prior written consent. You may install an electric vehicle charging station only with our advanced written consent, which will be granted or withheld in our sole discretion, except as otherwise provided by law. Operate your vehicle safely and limit your vehicle's speed to 5 miles per hour within the Property. You must immediately vacate and remove all vehicles from the Property (a) if you do not pay parking or garage fees (if any) when due; (b) after service of any notice allowed by law; and (c) at the earlier of the Termination Date or the date that you vacate the Residence. Unless otherwise agreed by us, Garage/Parking Charge will be due during the entire term of your tenancy.

**48. PETS.**     You may not feed stray or wild animals. You may not have any pets at the Residence or on the Property without our prior written consent, which we may withhold in our sole discretion. This prohibition applies to all pets, including "visiting" pets. We grant you permission to keep any pets listed above in the Variable Lease Term section as an "Authorized Pet." If any pets are authorized you agree to follow the following rules for your pet(s):

- Pets may not cause any disturbance that might reasonably annoy neighbors including making noise, creating odors, or leaving waste on the Property.

- Any damage caused by a pet will be your responsibility and you will be charged to repair it. This includes (but is not limited to) window coverings, carpet cleaning or replacement, damage to walls, flooring, screens and common area landscape.

- Pick up after your pet(s) and properly dispose of all waste. Kitty litter must be placed in a bag before placing it in the trash.

- Use a stain and odor-removing product with enzymes (such as Nature's Miracle) as necessary, and maintain the Residence in a sanitary, odor-free condition. You can determine where the stain and odor-removing product with enzymes must be used by viewing the Residence with a black light.

- If your pet is a cat, keep a scratching post.

- Pets must be licensed and vaccinated in accordance with local laws. You must provide proof if we request it.

- Comply with all local laws and regulations relating to the pets.

- Take action to avoid pest infestations (fleas, etc.) in the Residence and Property.

- You must confine your pet if we or our Related Parties need access to the Residence.

- Pets must remain inside the Residence unless they are under direct control of a responsible person at all times. Dogs must be on a



15

leash when outside of the Residence. You agree to defend, indemnify and save us and Landlord's Related Parties harmless from all loss, claim, damage or liability relating to your pets.

- You represent to us that the pet is housebroken, has no vicious tendencies or history of threatening or causing harm to persons by biting, scratching, chewing or otherwise.
- Pets are not allowed in pool areas, clubhouses, business office, laundry rooms, business center or fitness centers. Pets may not be bathed or groomed in the laundry room sinks, pools, or pool area.
- Permission to have a pet may be revoked at any time with three days notice for cause, or with thirty days notice without cause. You will be asked to remove any pet that bothers others or constitutes a problem (potential or actual) to neighbors or others, as determined in our sole discretion. If you fail to remove your pet after being requested to do so, this will be a material breach of the Agreement, allowing us to terminate your tenancy.

49. **POOL/SPA.**    If the Property has a pool or spa, you may use them only during posted hours. Children under the age of fourteen (14) must have adult supervision in the pool and spa. You may not serve or eat food in or around the pool area at any time without our consent. Drinks must be served in unbreakable containers, and no alcoholic drinks are allowed in the pool area. For safety reasons, people should not use the pool and/or spa alone, should not dive into the pool (unless off of a diving board) or spa, and no intoxicated persons may use the pool or spa. Be considerate of others. Don't be excessively noisy or rowdy or wear excessively revealing clothing. Please shower before using the pool and spa. Do not use toys, inner tubes, rafts or any other personal items or objects in the pool if they disturb others (with the exception of personal flotation devices for persons who cannot swim). Incontinent people using the pool or spa must use waterproof pants. Use the pool safety equipment only in case of emergency. **NO LIFEGUARD WILL BE ON DUTY**. People use the pool and spa at their own risk. We will not be responsible for accident or injury, or articles that are lost, damaged or stolen.

50. **POSTED SIGNS AND INSTRUCTIONS FROM LANDLORD.**    You must obey all posted signs on the Property and instructions from us.

51. **POSTING FLYERS.**    Flyers may be posted only in designated areas, if any. If flyers are allowed to be posted, we may remove any commercial or offensive material, or material not in keeping with the nature of the Property, as determined in our sole discretion.

52. **REPRESENTATIONS OF RESIDENT.**    You warrant that all statements in your rental application and other documents submitted by you to us (whether previously or in the future) are accurate. If they are not, this will be a non-curable breach of this Agreement and we may terminate your tenancy.

53. **SATELLITE DISHES AND ANTENNA.**    You may install a satellite dish or antenna for personal, private use under the following conditions:

- It must be one meter or less in diameter;
- It may only be installed in the Residence in areas within your exclusive control. No part may extend beyond a balcony or patio railing. It may not be installed in common areas, including but not limited to the roof, outside walls, window sills, common balconies, hallways or stairways. Note that allowable locations may not provide an optimal signal, or any signal. We do not warrant that the Residence will provide a suitable location for receiving a signal.
- You may not make physical modifications to the Property and may not cause physical or structural damage to the Property. No holes may be drilled through exterior walls or the roof.
- You must install, maintain and remove it in a manner consistent with industry standards and you will be liable for any damage or injury caused by the installation, maintenance or removal.
- You must move it at your expense, upon our request, for Residence or Property maintenance or repairs.

54. **SECURITY.**    The Property is not a full security property and we do not guarantee or warrant your personal security or safety. We are not responsible for obtaining criminal-history checks on any residents, occupants, guests or contractors in the Property. We have no duty to provide security services or devices other than the duty to provide (a) an operable dead bolt lock on each main swinging entry door of the Residence and (b) operable window security or locking devices for windows designed to be opened (except for louvered windows, casement windows and windows more than 12 feet vertically or 6 feet horizontally from the ground, a roof, or other platform). After you take possession of the Residence, we will have no obligation or duty to inspect, test or repair any lock or other security device unless you request us to do so in writing. Any cautionary measures that we take (whether applicant screening, security devices or courtesy patrol services) which may presently exist or later be installed on the Property are neither a guarantee nor warranty against criminal acts of others on the Property or otherwise. Your personal safety and security are your personal responsibility. If criminal activity occurs, contact the appropriate law enforcement agency. You may not install security devices (such as security cameras or video doorbells) that capture images and sounds outside the Residence without our permission (which may be granted or withheld in our sole discretion).

55. **SIGNS.**    We retain the right to place For Sale/For Rent signs on the Residence.

56. **SMOKE AND CARBON MONOXIDE DETECTION.**    The Residence is equipped with a functioning smoke detection device(s) and may be equipped with a functioning carbon monoxide detector. You must test the device(s) weekly and immediately report any repair needs to us.

57. **SMOKE FREE AREAS.**    The parties want to reduce or eliminate (i) the irritation and known health effects of secondhand smoke; (ii) the increased maintenance, cleaning and redecorating costs from smoking, and (iii) the increased risk of fire and insurance costs associated with smoking. "Smoking" means inhaling, exhaling, breathing, or carrying any lighted cigar, cigarette, e-cigarette, or other similar lighted product (whether tobacco, marijuana, or any other substance) in any manner or in any form. You and your Related Parties may not smoke anywhere in the designated smoke-free areas, described in the Variable Lease Term section. You must inform your Related Parties of the no-smoking policy. Other residents of the Property are third-party beneficiaries of this Agreement provision (your smoke-free obligations and restrictions are made to benefit other Property residents as well as to us.) A resident may sue another resident for an injunction to



prohibit smoking or for damages, but may not evict another resident. We will have the right, but not the obligation, to enforce your smoke-free obligations. A material breach of your smoke-free obligations will be a material breach of this Agreement and grounds for immediate termination of this Agreement and your tenancy. Neither we nor our Related Parties guarantee or warranty the smoke-free condition of the designated smoke-free areas or the health of you or your Related Parties. We make no implied or express warranties that the Residence or Property will have higher air quality standards than any other areas. The success of our efforts to make the designated areas smoke-free depend on voluntary compliance by you and others. We reserve the right to change or eliminate our smoke-free policy in the future. You acknowledge that current residents may not be under the same smoke-free restrictions.

**58. STORAGE.**    If specified above in the Variable Lease Term section, a separate storage area is provided to you. If specified, Storage fee is charged for this privilege. Storage space may be used only for storage of non-perishable personal property, expressly excluding (a) any potentially dangerous, flammable, hazardous or toxic property or materials, and (b) any firearms or ammunition. We reserve the right to assign to you another storage space with 5 days' prior notice to you. You must vacate and remove stored property (a) if you do not pay storage fees (if any) when due; (b) after service of any notice allowed by law; and (c) at the earlier of the Termination Date or the date you vacate the Residence. Unless we otherwise agree, the Storage Charge will be due during the entire term of your tenancy. If you do not remove stored property from the storage space when required, the remaining stored property may be deemed abandoned and we may dispose of it as allowed by law.

**59. TELEPHONES.**    We will comply with California law by providing at least one usable telephone jack and maintaining the telephone wiring inside the Residence in good working condition. There may be multiple telephone service providers in the area where the Residence is located. Providers may vary in the services provided and fees charged for connection and/or other charges in service. Some service providers may charge fees of $120.00 or more to change telephone service from another company to their own. We make no representation regarding which service provider, if any, provided service to prior tenants. Our obligation to maintain inside wiring does not include liability for fees to cross-connect to activate service. You are responsible to arrange all service connections and pay any and all fees associated with the service.

**60. TEMPORARY RELOCATION.**    You agree, at our demand, to temporarily vacate the Residence for a reasonable period and for reasonable purpose, including fumigation, Residence testing/inspection, or repairs. You must comply with all instructions necessary to prepare the Residence for fumigation, testing/inspection or repair. If you must vacate, you will be entitled only to an abatement of Rent equal to the per diem Rent for the period that you are required to vacate the Residence, and only if you must vacate for more than 12 hours, and only if you did not cause or exacerbate the condition requiring you to vacate, and only if we do not provide you with alternate housing.

**61. USE.**    The Residence may be used as a personal residence only and not for any business or commercial use (except child care as specified by law). However, you may maintain a personal home office if the home office use does not involve (1) people coming to the Residence for business purposes, or (2) selling goods or services from the Residence. You may not conduct any auction, garage sale, yard sale or similar activities in the Residence or in the Common Areas.

**62. UTILITIES.**    Details about utilities, (including information about who is responsible for the cost of each utility), are specified in the Variable Lease Term section. If it is specified that you will contract directly with the utility provider, you must do so before move-in to avoid an interruption of services. If electricity, natural gas, water or sewer services have been discontinued, occupancy of the Residence is hazardous and will be a breach of this Agreement. Billing statements provided by us or by our billing service must be paid by the due date specified on the billing statement. If you don't pay utility-related charges when they are due, we may discontinue providing the utility to you (if allowed by law), and your failure will be a material breach of this Agreement. We reserve the right to change utility billing service providers. If we do, you will be notified in writing. You will be responsible for utilities designated as being your responsibility consumed during your occupancy beginning on the date of delivery of possession until we reacquire possession of the Residence. If you breach this Agreement by vacating the Residence before the end of the term, you will also be responsible for utility-related charges until the earlier of the Termination Date or until the Residence is re-rented. The due date for Rent and the due date for utility-related charges may not coincide. You may use only normal household amounts of any utilities that are not placed in your name, and you may not use them for business, commercial, or fee-generating purposes. You must comply with all utility conservation efforts (whether implemented by governmental agencies, water providers or us) and if you fail to do so, this will be a material violation of this Agreement allowing us to terminate your tenancy. You will be responsible for any fines or charges we incur because of your failure. You must pay charges for utilities you consume, even if they have not been invoiced before you vacate the Residence. Any obligation that remains unpaid, including amounts that have not yet been invoiced when we reacquire possession, may be deducted from your Security Deposit. If actual amounts have not been determined before we provide an accounting of your Security Deposit, we may estimate the amount until actual numbers become available. Any billings based on submeter readings will itemize the beginning and ending meter readings, the rate charged to you, and all categories of information that appear within the utility's standard billing format to us. We reserve the right to modify the method by which utilities are provided to the Residence or billed to you during your tenancy. If we are billed for utility services which are your responsibility, you must repay us for the charges within 10 days of our demand for payment. You may not disturb, tamper, adjust, or disconnect any submetering device or system. We may estimate your consumption if your submeter is broken or does not transmit a meter reading or if we have not received invoices from the utility provider in time to prepare your invoice. We are not liable for claims arising from utility service outages, interruptions, or fluctuations in utilities provided to your Residence not reasonably within our control. Common area utilities are for our use only; you may not use them for your personal use.

**63. WINDOW COVERINGS.**    If we provide window coverings, you must use them. If we do not provide window coverings, any window treatments you install must appear white to the outside. Do not use sheets, blankets, foil, etc., in place of draperies or blinds. Do not place objects on a window sill which are visible from the outside.

**64. WATERBEDS AND AQUARIUMS.**    Waterbeds are permitted only with our written permission which will be provided in accordance with California law. Permission may be conditioned on insurance protecting us, an increase in the security deposit equal to one-half month's



17

Base Rent, and installation and maintenance in accordance with industry standards. You must also obtain our permission to have an aquarium of more than 5 gallons.

## F. DISCLOSURES AND NOTICES:

**65. ASBESTOS.**   Asbestos is known to cause cancer. Any knowledge or records we have of asbestos in the Residence or Property is specified in the Variable Lease Term section of this Agreement. Disturbing or damaging asbestos containing materials may increase the potential exposure to asbestos. Do not pierce or damage asbestos containing material. Notify us immediately in writing if there is any damage to or deterioration of the asbestos containing materials.

**66. LEAD WARNING INFORMATION.**   If indicated in the Variable Lease Term section, the Residence was built prior to 1978. Housing built before 1978 may contain lead-based paint. Lead from lead-based paint, paint chips and dust can pose health hazards if not managed properly. Lead exposure is especially harmful to young children and pregnant women. Before renting pre-1978 housing, landlords must disclose the presence of known lead-based paint and/or lead-based paint hazards in the dwelling. Residents must also receive a federally approved pamphlet on lead poisoning prevention.

Knowledge we have of lead-based paint and/or lead-based paint hazards in the Residence or Property is specified in the Variable Lease Term section. Available reports or records pertaining to lead-based paint and/or lead-based paint hazards in the Residence or Property are identified. Your signature on this Agreement is your acknowledgment that you have been provided a copy of the pamphlet Protect Your Family From Lead In Your Home and that the reports or records have been made available for your review.

**67. REGISTERED SEX OFFENDERS NOTICE.**   Pursuant to Section 290.46 of the Penal Code, information about specified registered sex offenders is made available to the public via an Internet Web site maintained by the Department of Justice at www.meganslaw.ca.gov. Depending on an offender's criminal history, this information will include either the address at which the offender resides or the community of residence and ZIP Code in which he or she resides.

## G. BREACHES AND REMEDIES:

**68. RESIDENT DEFAULT.**   Your right to remain in possession of the Residence is conditioned on your timely and full performance of each of your obligations under this Agreement and applicable law. You will be in material default under the Agreement:

- • If you abandon or vacate the Residence;
- • If you fail to pay Rent, or any other charge required to be paid by you, as and when due;
- • If you breach any other obligation under this Agreement or applicable law;
- • If you have supplied any false or misleading information to us on a rental application or otherwise. This type of default is non-curable.

**69. REMEDIES.**   If you default, we may elect to terminate your rights under this Agreement, and recover from you all damages we incur as a result of the default, including the cost of recovering possession of the Residence, rental commissions, advertising expenses and other costs incurred because of your breach of the Agreement and the Rent and other amounts due through the end of the Agreement term, (including Rent due up through the date you vacate the Residence, Rent due through the date of judgment, and Rent due after the date of judgment through the end of the original Agreement term) and any other amount necessary to compensate us for your breach of the Agreement, minus amounts we reasonably could have avoided.

**70. CUMULATIVE REMEDIES.**   All remedies specified in this Agreement for noncompliance are cumulative.

**71. CREDIT.**   A negative report reflecting on your credit record may be submitted to credit-reporting agencies if you fail to fulfill the terms of your obligations under this Agreement.

**72. DAMAGES FOR FAILURE TO VACATE.**   If you fail to completely vacate the Residence when required, you will be liable for all resulting losses suffered by us including but not limited to, future resident losses, lost Rent and other amounts due, legal costs and other expenses.

**73. ATTORNEY FEES.**   In any legal action brought by either party to enforce this Agreement or relating to the Residence, the prevailing party will be entitled to all costs incurred in connection with that action, including reasonable attorney fees, expert witness and consultant fees, and costs and expenses. If an Attorney's Fee Cap is specified in the Variable Lease Term section, attorney's fees awarded by a court may not exceed that amount. You must pay all collection-agency fees we incur if you fail to pay all sums due within 10 days after we mail you your security deposit accounting or other demand for payment.

## H. AGREEMENT INTERPRETATION:

**74. AGREEMENT.**   The submission of this Agreement to you for examination and/or execution does not constitute an option or offer. This Agreement will not be effective until signed and delivered by all parties or until we deliver possession of the Residence to you, whichever occurs first.

**75. AMENDMENT.**   This Agreement may not be amended or altered except by a written agreement, signed by you and us.

**76. CONSTRUCTION.**   The singular form will include plural, and visa versa. This Agreement will not be construed as if it had been prepared by one of the parties, but rather as if both parties have prepared it.

**77. INTEGRATION.**   This Agreement and the documents referenced in it constitute the entire agreement between the parties, which supersedes all prior and contemporaneous negotiations, agreements, promises and representations.

**78. PARTIAL INVALIDITY.**   If any portion of this Agreement is unenforceable or invalid, that portion will have no effect, but all the remaining provisions of this Agreement will remain in full force.



79. **SUCCESSORS AND ASSIGNS.**    This Agreement is binding upon and inures to the benefit of the heirs, assigns, successors, executors, and administrators of you and us.

80. **TIME IS OF THE ESSENCE.**    Time is of the essence as to each obligation to be performed under this Agreement.

81. **VERBAL REPRESENTATIONS.**    You agree that we have not made any oral promises, representations, or agreements not contained within this written Agreement.

82. **WAIVER.**    Our failure to enforce any term of this Agreement will not be deemed a waiver, nor will acceptance of a partial payment be deemed a waiver of our right to the full amount due. Waiver may not be established by course of conduct. No waiver will exist unless written and signed by the parties. If any invoice, ledger or accounting we prepare is inaccurate, the inaccuracy will not be a waiver, and you will be obligated to pay the amount in this Agreement.

**If the lead hazard section of this Agreement is marked as being applicable, by signing below, the parties acknowledge that they have read the lead-based paint and lead based paint hazard information in this Agreement and certify, to the best of the parties'knowledge, that the information provided is true and correct.**

**Note that this Agreement may automatically continue as a tenancy from month-to-month after the Termination Date. See paragraph C3 above.**

| | 3/11/2022 11:32 AM PST | | | 3/11/2022 11:49 AM PST |
|---|---|---|---|---|
| Nihla Olsem *(Resident)* | *Date* | | Yul Sanchez *(Resident)* | *Date* |

Signed by Ashley Taylor
Fri Mar 11 2022 11:29:23 AM PST
Key: 3CFC2235; IP Address: 104.176.35.56

*(Landlord)*                                                                 *Date*



# CONCESSION ADDENDUM

Resident acknowledges that the concessions listed below are subject to the completion of the lease term. In the event that the Resident fails to complete the entire term (regardless of the reason, even eviction by Owner) or violates any other term of the agreement, Owner shall be entitled to recover the amounts stated below that were discounted to Resident.

| | |
|---|---|
| Pro-Rated Concession | $0.00 |
| Move-In Concession off the rent for March, 2022. | $0.00 |
| Monthly Concession of **$0.00** | $0.00 |
| Total Concession | $0.00 |

_____     3/11/2022
Nihla Olsem *(Resident)*          11:32 AM PST                    Date

**Signed by Ashley Taylor**
Fri Mar 11 2022 11:29:27 AM PST
Key: 3CFC2235; IP Address: 104.176.35.56

*(Owner or Owner's Representative)*          Date

_____     3/11/2022
Yul Sanchez *(Resident)*          11:49 AM PST                    Date



20

# CASH ADDENDUM

This Addendum shall be attached to and for the purposes made part of the Residential Lease Agreement between Owner and the undersigned Resident(s).

Resident agrees that at no time during the term of the lease agreement shall Resident tender cash to Owner for payment of rents or any other fees. Cash will not be accepted by Owner. Should Resident be asked to tender cash for any rental payments, Resident agrees it shall contact Apartment Management Consultants immediately at:

Apartment Management Consultants

(801) 565-7430 or info@amcllc.net

Resident should have ready the name of the community, and the name of the member of management that requested a cash payment.

Resident hereby agrees that should Resident tender a cash payment for any obligations under the Residential Rental Agreement, that it will not be deemed accepted and such payment shall be deemed as unpaid.

| | 3/11/2022 11:33 AM PST | | | 3/11/2022 11:49 AM PST |
|---|---|---|---|---|
| Nihla Olsem *(Resident)* | Date | | Yul Sanchez *(Resident)* | Date |

**Signed by Ashley Taylor**
Fri Mar 11 2022 11:29:33 AM PST
Key: 3CFC2235; IP Address: 104.176.35.56

*(Owner/Agent)*                                    Date



21

# DAMAGE & CLEANING CHARGES ADDENDUM

This document is incorporated and shall be come part of the lease agreement between **Amber Grove Apartments** and **Nihla Olsem and Yul Sanchez** (Residents).

**4031 Marconi Ave #98, Sacramento, CA  95821**

Upon move-out, if damages or cleaning charges are above normal wear and tear, the following fees will apply:

a.  Provided the Resident occupies the apartment for AT LEAST **twenty-four (24) months**, management shall assess NO CHARGES against the security deposit for painting.

b.  Should the Resident occupy the apartment for LESS THAN **twenty-four (24) months**, a pro-rated charge will be assessed for the painting. Proration will be based on the following charges:

| 1-12 months Full Cost | 13-17 months 75% | 18 months 50% |
|---|---|---|
| 19 months 40% | 20 months 30% | 21 months 20% |
| 22 months 10% | 23 months 5% | 24 months no charge |

## SUMMARY OF DEDUCTIONS (Minimum Charge)

| Turnover Cost | 1x1 | 2x2 | | |
|---|---|---|---|---|
| Item #1 | $0.00 | $0.00 | $0.00 | $0.00 |
| Item #2 | $0.00 | $0.00 | $0.00 | $0.00 |
| Item #3 | $0.00 | $0.00 | $0.00 | $0.00 |

## REPLACEMENT CHARGES (Minimum)

| Item | Cost | Item | Cost |
|---|---|---|---|
| Broiler Pans | $23.00 each | Window Glass | $65.00 - $120.00 each |
| Patio Door Glass | $195.00 - $450.00 each | Window Screens | $10.00 - $35.00 each |
| Patio Screens | $30.00 - $65.00 each | Mailbox keys | $15.00 per key |
| Door keys | $15.00 per key | Crisper Covers | $35.00 - $75.00 |
| Refrigerator shelves/racks | $15.00-$30.00 | Disposal | $100.00 - $125.00 |
| Bathroom Mirrors | $20.00 - $60.00 | Doors | $35.00 - $100.00 |
| Light Fixtures | $15.00 - $125.00 | Countertops | $220.00 - $800.00 |
| Porcelain repair | $25.00 - $150.00 | | |

| _____ | 3/11/2022 11:33 AM PST | _____ | 3/11/2022 11:49 AM PST |
|---|---|---|---|
| Nihla Olsem *(Resident)* | *Date* | Yul Sanchez *(Resident)* | *Date* |



22

# ANIMAL AGREEMENT

This Animal Agreement is entered into the date below and shall be considered an addendum to the Residential Rental Agreement between the parties signed below. This agreement is for the below described animal residing in the Premises located at: **4031 Marconi Ave #98, Sacramento, CA  95821**

In consideration of their mutual promises, Owner and Resident agree as follows:

Animal Deposit: **$0.00**                                          Monthly Animal Rent: **$0.00**

**a.** **Animal Fees:**    Resident shall pay to Owner an additional Deposit as stated above. Such deposit amount to be treated as any other deposit of Resident according to the terms of the Residential Rental Agreement. Resident shall pay additional monthly rent as stated herein so long as this agreement/ addendum shall remain in effect. Upon removal of the animal from the premises, Resident may terminate this agreement at the end of the current lease. However, the additional security deposit shall remain until Residents vacate the premises.

**b.** **Description of Animal:**       The Residential Rental Agreement covering the Premises provides that no animals are permitted on or about the Premises without Owner's prior written consent. No other animal (including any offspring) shall be permitted by Residents in the Premises at any time. Residents are hereby permitted to have only the following described Animal, subject to the terms and conditions of this Animal Agreement (additional animals require separate Animal Addendums, fees, deposits and rent):

> No pets have been authorized at this time.

**c.** **Residents agree to abide by the following rules and those others as may be promulgated by Owner as part of the Rules and Regulations:**

   **1.** Nuisance. The Animal may not cause any damage to the premises. Nor may the Animal cause any discomfort, annoyance, or nuisance to any other resident or to Owner. Determination of what is a nuisance shall be at the sole discretion and opinion of Owner.

   **2.** Sanitary Problems. All dogs and cats must be housebroken. The Animal may not be fed or given water, or allowed to urinate or defecate, on any unprotected floor covering inside the dwelling unit. Residents shall immediately remove and properly dispose of all Animal waste on the grounds. Resident agrees to pay a fee of **$0.00** each time it is determined that Resident (or the animal described herein) fails to properly remove and dispose of animal waste on the premises. Such shall also be grounds for termination of Resident's being able to have an animal.

   **3.** Prohibited Areas. The Animal shall not be permitted in the laundry room, pool area, clubhouse, or other recreational facilities or areas. In open common areas all animals must be on a leash. Any animal may be restricted by Owner from any area for any reason.

   **4.** Abandonment. Residents may not abandon the Animal, leave it for any extended period without food or water, or fail to care for it if it is sick. The Animal may not be left in the premises while Resident has left for more than 10 hours. Leaving the animal for any period of time may be a violation if the animal becomes a nuisance while unsupervised. Owner may remove the animal and have it placed with the appropriate governmental agency or with the humane society if the animal is abandoned, creating a nuisance, violating the community regulations, or left in violation of this agreement.

   **5.** Compliance with Laws. Residents agree to comply with all applicable governmental laws and regulations.

   **6.** Restricted Breeds. Owner reserves the right to restrict breeds and types of animals. Currently restricted animals include all dogs that are full or partially: Pit Bull, German Shepard, Doberman, Rottweiler, Akitas, and mastiffs. Others may be added. Owner may also restrict size and weight.

**d.** Owner's remedies for violations

   **1.** Removal of Animal by Residents. If, in Owner's sole judgment, any rule or provision of this Animal Agreement is violated by Residents or their guests, Resident shall immediately and permanently remove the Animal from the premises upon written notice from Owner.

   **2.** Removal of Animal by Owner. If, in Owner's sole judgment, Residents have abandoned the Animal, left it for any extended period without food or water, the animal is creating a nuisance, the animal is violating the community regulations, Resident has failed to care for it if it is sick, or left it unattended in violation of the rules herein, then Owner may, upon written notice left in a conspicuous place, and in accordance with the terms of the Lease dealing with entry of the Premises, enter the dwelling unit to remove the Animal, and turn the Animal over to a humane society, responsible party or local authority. Owner shall not be liable for loss, harm, sickness, or death of the Animal unless due to Owner's gross negligence. Owner shall not be liable for any costs associated with the animal due to its removal.



Owner has no lien on the Animal for any purposes, but Residents shall pay for reasonable care and kenneling charges if the Animal is removed in accordance with this paragraph.

3. Cleaning and repairs. Residents shall be jointly and severally liable for the entire amount of all damages caused by the Animal. If any item cannot be satisfactorily cleaned or repaired, Residents must pay for complete replacement of such item. It is agreed that Resident shall be liable for replacement cost.

4. Injuries. Residents shall be strictly liable for the entire amount of any injury to any person or property caused by the Animal, and shall indemnify Owner for all costs of litigation and attorney's fees resulting from same.

5. Move-out. After Residents vacate the Premises, they shall reimburse Owner for the cost of de-fleeing, deodorizing, and shampooing necessary to protect future residents from possible health hazards.

6. Other remedies. This Animal Agreement is an Addendum to the Lease Agreement between Owner and Residents. If any rule or provision of this Animal Agreement is violated, Owner shall in addition to the foregoing, have all rights and remedies set forth in the Lease Agreement for violations thereof, including but not limited to eviction, damages, costs and attorney's fees.

The terms and conditions of this agreement are agreed to and acknowledged to become part of the Residential Rental Agreement. The Undersigned Resident agrees to allow Owner or its agents to take the above animal to the named veterinarian for any medical purpose or if found unauthorized within the community. The undersigned Resident agrees to pay all costs relating to medical care for the animal or shelter for the animal and to indemnify Owner from all liability and costs relating to the animal. Resident agrees to abide by any and all Rules and Regulations as may be promulgated from time to time by Owner and to those Rules and Regulations that now exist.

| | 3/11/2022 11:33 AM PST | | | 3/11/2022 11:49 AM PST |
|---|---|---|---|---|
| Nihla Olsem *(Resident)* | *Date* | | Yul Sanchez *(Resident)* | *Date* |

**Signed by Ashley Taylor**
Fri Mar 11 2022 11:29:43 AM PST
Key: 3CFC2235; IP Address: 104.176.35.56

*(Owner/Agent)*                                    *Date*



# CARBON MONOXIDE ALARM ADDENDUM

THIS CARBON MONOXIDE ALARM ADDENDUM (this "**Addendum**") to the Residential Rental Agreement dated **March 11, 2022** (the "**Lease**"), by and between Owner or Owner's representative ("**Landlord**") and Resident, is incorporated and made an integral part of the Lease. Any word with its initial letter capitalized and not defined in this Addendum shall have the meaning given to it in the Lease.

**A.** Carbon Monoxide Alarm Deposit: **$0.00**

## RESIDENT AND LANDLORD AGREE AS FOLLOWS:

1. **Carbon Monoxide Alarm.**      Resident acknowledges that installed in the Premises is/are one or more operational carbon monoxide alarm(s).

2. **Maintenance.**      Resident agrees to keep, test, and maintain all carbon monoxide alarms in good repair. Resident shall not remove batteries from, or in any way render inoperable, a carbon monoxide alarm, except as part of a process to inspect, maintain, repair, or replace the alarm or replace the batteries in the alarm.

3. **Repair.**      Resident agrees to notify the Landlord in writing if the batteries of any carbon monoxide alarms need to be replaced. Resident agrees to notify the Landlord in writing if any carbon monoxide alarm is stolen, removed, found missing or found not operational during the Resident's occupancy of the Premises. Resident agrees to notify the Landlord in writing of any deficiency in any carbon monoxide alarm that the Resident cannot correct. Upon said written notification from the Resident, Landlord will replace any carbon monoxide alarm that was stolen, removed, found missing, or found not operational during the Resident's occupancy or fix any deficiency in a carbon monoxide alarm. Otherwise the Landlord is not responsible for the maintenance repair, or replacement of a carbon monoxide alarm or the care and replacement of batteries for such an alarm.

4. **Disclaimer.**      No person shall have a claim for relief against Landlord or Landlord's employees for any damages resulting from the operation, maintenance, or effectiveness of a carbon monoxide alarm if the Landlord installs a carbon monoxide alarm in accordance with the manufacturer's published instructions and the provisions of Title 38, Article 45 of the Colorado Revised Statute. Landlord is not the operator, manufacturer, distributor, retailer or supplier of carbon monoxide alarms and Resident assumes full and complete responsibility for all risks and hazards attributable to, connected with or in any way related to the operation, malfunction or failure of the carbon monoxide alarm regardless as to whether such malfunction or failure is attributable to, connected with or in any way related to the use, operation, manufacture, distribution, repair, servicing or installation of said carbon monoxide alarm. Landlord or Landlord's employees have not made and expressly disclaims any representations or warranties, express or implied, with respect to the said carbon monoxide alarm, Including Merchantability and Fitness for a Particular Performance. Landlord shall not be liable for damages or losses to person or property caused by (1) Resident's failure to regularly test the carbon monoxide alarm; (2) Resident's failure to notify Landlord by writing of any problem, defect, malfunction, or failure of the carbon monoxide alarm; (3) Resident's failure to notify Landlord by writing of theft of the carbon monoxide alarm or its serviceable battery; and/or (4) false alarms produced by the carbon monoxide alarm.

5. **Carbon Monoxide Alarm Deposit.**      Resident shall pay the Carbon Monoxide Alarm Deposit to Landlord prior to taking possession of the Premises as an additional security deposit. The Carbon Monoxide Alarm Deposit is not included in any amount of security deposit described in the main body of the Lease. Landlord may use the Carbon Monoxide Alarm Deposit for any loss with respect to the Premises including without limitation: damage to the building of which the Premises is a part, common areas and buildings owned by Landlord and surrounding or adjacent to the building which the Premises is a part, furniture, fixtures, appliances, and carpet.

6. **Replacement.**      Resident agrees that in the event that the carbon monoxide alarm becomes damaged, removed or otherwise rendered inoperable then the Carbon Monoxide Alarm Deposit may be utilized by the Landlord to replace or repair the carbon monoxide alarm and the Resident must immediately replenish the Carbon Monoxide Alarm Deposit. Any damage to the carbon monoxide alarm that is caused by anything or anyone other than the Landlord is the Resident's monetary responsibility.

7. **Termination.**      This Addendum shall terminate upon termination of the Lease. The Carbon Monoxide Alarm Deposit received by Landlord from Resident pursuant to this Addendum will be held and disbursed along with Resident's Security Deposit and subject to the terms of this Addendum, Lease, and the law. This Carbon Monoxide Alarm Deposit shall be accounted for pursuant to the Lease and California Statute.



**8. General.** Except as expressly modified by this Addendum, all terms and conditions of the Lease remain unchanged, and the provisions of the Lease are applicable to the fullest extent not inconsistent with this Addendum. If a conflict between the terms of this Addendum and the Lease exists, the terms of this Addendum shall control the matters specifically governed by this Addendum. If any provision of this Addendum is invalid or unenforceable under applicable law, such provision shall be amended to comply with such law. The reformation of any provision of this Addendum shall not invalidate this Addendum or the Lease. An invalid provision that cannot be reformed shall be severed and the remaining portions of this Addendum shall be enforced. Any breach of the terms of this Addendum shall constitute a breach of the Lease to the same extent and with the same remedies to Landlord as provided in the Lease or otherwise available at law or equity. This Addendum does not limit any of Landlord's rights or remedies stated in the Lease, which are cumulative of those stated in this Addendum.

| | 3/11/2022 11:33 AM PST | | | 3/11/2022 11:49 AM PST |
|---|---|---|---|---|
| Nihla Olsem *(Resident)* | Date | | Yul Sanchez *(Resident)* | Date |

**Signed by Ashley Taylor**
Fri Mar 11 2022 11:29:52 AM PST
Key: 3CFC2235; IP Address: 104.176.35.56

*(Owner/Agent)*                                                                 *Date*



26

# ELECTRONIC COMMUNICATION AUTHORIZATION

### (E-MAIL OR TEXT COMMUNICATION)

Names: **Nihla Olsem and Yul Sanchez**

Property Address: **4009 Marconi Ave., Sacramento, CA  95821**

Community: **Amber Grove Apartments**

Landlord may (but is not required to) utilize e-mail or text to communicate with residents regarding community issues and activities, lease renewal offers, and other matters

☒ Resident would like to receive email communications from Landlord at the e-mail address below or any subsequent e-mail address provided by Resident to Landlord. If at any time Resident would like to "opt-out" of further email communication, please advise Landlord by **sending an e-mail request to the property with your name, email address, property address** to **ambergrove@amcllc.net**; include any and all email addresses that you would like to "opt-out".

Resident's E-mail Address(es): **Nihla20@gmail.com** , **Yul.sanchez98@gmail.com** .

☒ Resident would like to receive text communications from Landlord. By completing the lease agreement and providing my telephone number below, I consent to receive, on a recurring basis, marketing messages via SMS/MMS, Email, and Phone from **Amber Grove Apartments** to the telephone number(s) I have provided. I agree that such calls or messages may be placed with an automatic telephone dialing system and/or an artificial or prerecorded voice. I further warrant that I am the subscriber for any wireless number that I have provided, or am the customary user of such wireless number, and agree to promptly notify **Amber Grove Apartments** if service for any wireless number provided by me is cancelled, or if my wireless number changes. Your consent to receive text messages is not required to make a purchase. Message and data rates may apply. Text STOP to END and HELP for HELP.

Resident's Text Number(s): _____ , _____ .

Resident's stated preference above applies only to informal communications from Landlord. For any formal notices required by law, Landlord will provide the notices in a manner established by law.

| | | | |
|---|---|---|---|
| *signature* | 3/11/2022 11:33 AM PST | *Yul Sanchez* | 3/11/2022 11:49 AM PST |
| Nihla Olsem *(Resident)* | Date | Yul Sanchez *(Resident)* | Date |

**Signed by Ashley Taylor**
Fri Mar 11 2022 11:29:57 AM PST
Key: 3CFC2235; IP Address: 104.176.35.56

*(Owner/Agent)*                    Date



# REQUIRED INSURANCE ADDENDUM TO LEASE AGREEMENT

This Addendum is attached to and becomes a part of the Residential Lease Agreement. For the duration of the Lease, Lessee is required to maintain and provide the following minimum required insurance coverage:

- Lessee, at Lessee's sole cost and expense, shall at all times during the term of the Lease maintain general liability insurance coverage in the minimum amount of **$100,000.00** (on a per occurrence basis) for damage to Lessor's property for the perils of fire, smoke, explosion, water discharge and damage, and sewer backup or overflow ("Required Insurance"). Lessee may obtain the Required Insurance to fulfill the insurance obligation from any qualified insurer. The Required Insurance shall list Lessor as an "Interested Party" or "Additional Interest" on the Declarations page of the Required Insurance and provide that Lessor shall receive written notice no less than thirty (30) days prior to the expiration or termination of the Required Insurance.

In the event that Lessee fails to obtain and maintain the Required Insurance as required herein, Lessor shall have the option, to charge a non-compliance fee in the amount of **$25.00** which, if charged, shall be deemed to be additional rent under the Lease and immediately due and payable by Lessee to Lessor. Lessor reserves the right to charge this non-compliance fee at any time and any delay in charging this fee shall not waive Lessor's right to do so in the future.

In the event that Lessee is in default of this requirement at any time she/he agrees not to hold the property owner, management or employees liable for any damage to person or property.

Lessee is required to furnish Lessor with evidence of Required Insurance prior to occupancy of leased premises and at the time of each lease renewal period.

# LIABILITY WAIVER OPTION

As an alternative to your Lease requirement to acquire acceptable Required Insurance, as described above, you may elect to be included in the Property's liability waiver program and, if enrolled, be subject to additional rent of **$10.00** per month ("Liability Waiver Option"). This includes the **$7.15** that is paid to the program provider and **$2.85** administrative fee that is retained by the Property. Payment of this additional rent in accordance with the terms of your residential rental agreement waives your obligation to indemnify the property owner for accidental damages arising from fire, smoke, explosion, water discharge or sewer backup caused by your accidental acts or omissions as further described in your rental agreement up to **$100,000.00**. **THE LIABILITY WAIVER OPTION ONLY WAIVES YOUR LIABILITY TO THE PROPERTY OWNER AND DOES NOT WAIVE YOUR LIABILITY TO ANY THIRD PARTIES. THE LIABILITY WAIVER OPTION ONLY APPLIES TO ACCIDENTAL DAMAGE CAUSED BY YOUR ACCIDENTAL ACTS OR OMISSIONS AND DOES NOT APPLY TO DAMAGES CAUSED BY YOUR DELIBERATE OR INTENTIONAL ACTS OR OMISSIONS. THE LIABILITY WAIVER OPTION ONLY APPLIES UP TO $100,000.00; ANY AMOUNT IN EXCESS OF $100,000.00 REMAINS SUBJECT TO THE TERMS OF THE RENTAL AGREEMENT.** If the property damage from fire, smoke, explosion, water discharge or sewer backup result from the accidental acts or omissions of a participating resident are under **$100,000.00** affected residents may receive up to **$0.00** to replace personal belongings subject to the terms of any applicable owner insurance policy; provided that in no event shall the sum of the property owner's covered damages and all amounts paid to affected residents exceed **$100,000.00**.

**NOTICE TO RESIDENTS: THE LIABILITY WAIVER OPTION ONLY WAIVES YOUR OBLIGATION TO INDEMNIFY THE OWNER FOR ACCIDENTAL DAMAGES CAUSED BY YOUR ACCIDENTAL ACTS OR OMISSIONS AS DESCRIBED HEREIN. BY ELECTING TO PARTICIPATE IN THE LIABILITY WAIVER OPTION, YOU ARE NOT ACCEPTING, ENROLLING, OR PURCHASING AN INSURANCE POLICY NOR ARE YOU BEING LISTED AS A NAMED INSURED UNDER ANY OWNER POLICY. THE LIABILITY WAIVER OPTION IS NOT A RESIDENT'S INSURANCE POLICY NOR IS IT INTENDED TO REPLACE A RESIDENT'S PERSONAL PROPERTY OR LIABILITY INSURANCE POLICY. ALL RESIDENTS SHOULD CONSULT AN INSURANCE PROFESSIONAL TO EVALUATE AND DETERMINE PERSONAL INSURANCE NEEDS.**

If at any time during the term of the Lease, the Required Insurance that Tenant obtained should be cancelled or lapse for any reason, Landlord reserves the right to add Tenant's Premises to the Liability Waiver Option program and charge Tenant an additional Rent of **$10.00** per month. This includes the **$7.15** that is paid to the program provider and **$2.85** administrative fee that is retained by the Property. Lessor reserves the right to add Tenant's Premises to this program at any time and any delay on the part of Lessor shall not waive Lessor's right to do so in the future.



By signing below, you acknowledge that you have read and understand this entire Addendum including an understanding that the Non-Insurance Option is not an insurance policy, and agree to be legally bound hereby.

| | 3/11/2022 11:33 AM PST | | 3/11/2022 11:49 AM PST |
|---|---|---|---|
| Nihla Olsem *(Resident)* | Date | Yul Sanchez *(Resident)* | Date |

Initial here if you elect to **ENROLL IN THE PROPERTY DAMAGE LIABILITY WAIVER OPTION**



# LEASE FILE CHECK LIST

❑ Communication Log                     ❑ Lease Agreement

❑ Lease File Checklist                  ❑ Collection Policy

❑ Move-In Inspection Checklist          ❑ RUBS/PG&E

❑ Offer to Rent                         ❑ Damages & Cleaning

❑ Credit Rating                         ❑ Community Rules

❑ Rental Applications                   ❑ GYM & Pool Rules

❑ Verifications Employment/Rental       ❑ Parking Agreement

❑ Pay Stubs/Proof of Income             ❑ Pet Policy

❑ Bank Statements                       ❑ Renter's Insurance

❑ Copies of Photo I.D.                  ❑ Crime Free Addendum

❑ Money Order Copies (Dep/App Fee)

❑ Receipt for Hold Deposit/App Fee

❑ Guest Card


Leasing Consultant: _____


Moved In By: _____


| Manager Only |
| --- |

Date File Completed: _____

Verified all Rent Roll Data Entry for Accuracy: ❑ Yes    ❑ No


Manager Signature once Approved: _____



# STATE LAW REQUIRES THAT YOU BE GIVEN THE FOLLOWING INFORMATION: PESTICIDE NOTICE(SECTION 8538)

Pesticides are the products **California Professional Pest Control** uses to control pests listed in your agreement. Pesticides help control and protect our environment and health from disease carriers and wood destroying insects. When properly used, pesticides pose no problem to humans or the environment. Your **California Professional Pest Control** Technician is a State certified applicator whose knowledge is constantly being upgraded through regularly scheduled training sessions. If you have any questions, please call **California Professional Pest Control (209) 938-0531**.

**ODOR:**    In a proper chemical application, a non-toxic odor will be produced as a result of solvent evaporation. The odor will dissipate within a day or two. The odor contains no technical pesticide and is not hazardous.

**PESTICIDES:**    Abamectin, Acephate, Allethrin, Aminopyridine, Amorphous, Beniocarb, Bifenthrin, Boric Acid, Brodifacoum, Bromadiolone compounds, Bromethalin, Cabaryl, Chlorophacinone, Chlorpyrifos, Chlorfenapyr, Cholecalciferol, Contrac, Cyfluthrin, Cypermethrin, Deltamethrin, Diazinon, Diphacinone, Disodium Octabotate Tetrahydrate, Fenoxycarb, Fenvalerate, Fipronil, Hydramethlynon, Hydroprene compounds, Imidacloprid, Isovaleryl, Lambdacyhalothrin, Malathion, Metaldehyde, Methomyl, Methoprene, Orthoboric Acid, Pavalyl, Permethrin, Piperonyl Butoxide, Polybotate, Propetampos, Propoxur, Pyretbrins, Pyrethrum, Rermethrin, Sodium Salt of Diphancinone, Sodium Tetrabotate Decahydrate, Sulfuramid, Warfarin, Zinc Phosphide. **California Professional Pest Control** will not apply any compound not authorized for use in California

**CAUTION: PESTICIDES ARE TOXIC CHEMICALS.**    Structural Pest Control Operators are licensed and regulated by the Structural Pest Control Board, and apply pesticides which are registered and approved for use by the California Department of Pesticide Regulation and the United States Environmental Protection Agency. Registration is granted when the State finds that based on existing scientific evidence there are no appreciable risks if proper use conditions are followed or that the risks are outweighed by the benefits. The degree of risk depends upon the degree of exposure, so exposure should be minimized.

If within 24 hours following application you experience symptoms similar to common seasonal illness comparable to the flu, contact your physician, poison control center and your pest control operator **(209) 938-0531** immediately.

**FURTHER INFORMATION:**    Contact any of the following: Your pest control operator is **California Professional Pest Control**, **(209) 938-0531**; for Regulatory Information call the Structural Pest Control Board (916) 263-2533 or write 1418 Howe Ave., Ste. 18, Sacramento, CA 95825-3204. For your area poison control center, contact 1-800-876-4766. For answers to your health questions, call the County Health Department and for application information, contact the County Agriculture Commissioner.

| County | Health Dept. | Ag. Comm. |
|---|---|---|
| Alameda | 510-267-8010 | 510-670-5232 |
| Contra Costa | 510-646-2521 | 510-646-5250 |
| El Dorado | 530-621-6119 | 530-621-5520 |
| Monterey | 831-755-4514 | 831-755-4515 |
| Placer | 530-889-7119 | 530-889-7372 |
| Riverside | 909-358-5058 | 909-955-3045 |
| Sacramento | 916-875-5881 | 916-875-6603 |
| San Bernardino | 909-387-6219 | 909-387-2115 |
| San Joaquin | 209-468-3400 | 209-468-3300 |
| Solano | 707-784-8600 | 707-421-7465 |
| Stanislaus | 209-558-8804 | 209-525-4610 |



# DISCLOSURE TO YOUR EMPLOYEES AND TENANTS

- On the reverse side is a copy of the pesticide disclosure notice we are providing to you as required by law. California law (8538 Business & Professions Code and 1970.4 California Code of Regulations) require that we provide you with this pesticide disclosure notice prior to our initial pest control service.

- This letter is to advise you of your legal responsibility to pass this information on to your employees and tenants. The legal responsibility to notify your employees and tenants is yours, and can not be subcontracted to any other entity.

**Employees**

California law requires that all employees implement a Written Injury and Illness Prevention Program. (Senate Bill 250 in 19990 created section 3203 on the State Worker Health and Safety Codes requiring an ongoing written safety program.) The pesticide disclosure notice we have provided to you should be given to your employees as part of your Injury and Illness prevention program.

California law requires that we post a copy of this pesticide disclosure notice in a conspicuous location prior to our initial pest control service. (You then have the option to keep this notice posted, or take it down.) We strongly advise you, and ask you to keep this pesticide disclosure notice posted in a conspicuous location.

**Tenants**

California law requires that we as a pest control firm post this pesticide disclosure notice in public areas prior to our initial service, for the purpose of making this disclosure notice available to your current tenants. We will not post this disclosure notice again unless we change the pesticide used. (If we ever treat the interior of a unit, a copy will need to be signed by the tenant before any treatment is performed.)

It is your responsibility to provide this pesticide disclosure notice to any tenants who may subsequently move in. We suggest that you give a copy of this pesticide disclosure notice to all new tenants, or you may keep copies of this notice posted in conspicuous places such as laundry rooms, mail boxes and other common areas.

- If you need to know the chemical or active ingredients we will be using, the information will be given to you on the day of service, or you can call our office at **(916) 971-0859**.

- The undersigned has received, read and understands the above and is giving permission to enter and to perform pest control service on their premises: (circle one): residence, multiple family dwelling, commercial or industrial property, as per their request.

- This notification is required under Section 8538 of the Structural Pest Control Act.

BEFORE INSIDE SERVICE;

1. REMOVE ALL PETS, SHUT OFF AQUARIUM PUMP AND COVER TANK.

2. REMOVE TOYS, ALL OTHER ARTICLES FROM AREAS WHERE INSECTICIDES WILL BE APPLIED.

3. PROTECT PET FOOD AND WATER CONTAINERS.

4. REMOVE ALL ITEMS FROM CABINETS AND PANTRY AND COVER WITH TABLE CLOTH BEFORE TREATMENT OF PREMISES WHEN PESTS ARE LOCATED IN THIS AREA.

5. PLEASE BE ADVISED TO VACATE PREMISES FOR A PERIOD OF FOUR (4) HOURS AFTER APPLICATION.

6. PETS SHOULD BE TREATED ACCORDING TO A VETERINARIAN'S INSTRUCTIONS TO ENSURE THAT FLEAS AND TICKS DO NOT REINFEST THE PREMISES.

7. INSTALL NEW SHELF PAPER BEFORE REPLACING CONTENTS IN CABINETS.

| | 3/11/2022 11:34 AM PST | | 3/11/2022 11:51 AM PST |
|---|---|---|---|
| Nihla Olsem *(Resident)* | Date | Yul Sanchez *(Resident)* | Date |


**Signed by Ashley Taylor**
Fri Mar 11 2022 11:30:11 AM PST
Key: 3CFC2235; IP Address: 104.176.35.56

*(Property Manager for Landlord)*                     Date



# PROPOSITION 65 NOTIFICATION

| | |
|---|---|
| **Tenant Name:** | |
| Nihla Olsem and Yul Sanchez | |
| **Names of all other adult occupants:** | |
| | |
| **And all other Tenants and Occupants:** | |
| | |
| **Property Address:** | |
| 4031 Marconi Ave #98, Sacramento, CA  95821 | |

☒ *(If checked)* ⚠ **WARNING: Asbestos**-containing materials, including some ceiling coatings on this property can, if damaged or disturbed, expose you to asbestos, which is known to the State of California to cause cancer. Talk to your landlord or the building manager about how and when you could be exposed to this chemical in your building. For additional information go to www.P65Warnings.ca.gov/apartments.

☒ *(If checked)* ⚠ **WARNING: Building materials** containing urea-formaldehyde resins, such as insulation, pressed wood materials, finishes, or adhesives, on this property can expose you to formaldehyde, which is known to the State of California to cause cancer. Talk to your landlord or the building manager about how and when you could be exposed to this chemical in your building. For additional information go to www.P65Warnings.ca.gov/apartments.

☒ *(If checked)* ⚠ **WARNING: Fireplaces or unvented gas space heaters** on this property can expose you to carbon monoxide, which is known to the State of California to cause birth defects or other reproductive harm. Talk to your landlord or the building manager about how and when you could be exposed to this chemical in your building. For additional information go to www.P65Warnings.ca.gov/apartments.

☒ *(If checked)* ⚠ **WARNING:** Paint chips and dust from **lead-containing paint** on this property can expose you to lead, which is known to the State of California to cause cancer and birth defects or other reproductive harm. Talk to your landlord or the building manager about how and when you could be exposed to this chemical in your building. For additional information go to www.P65Warnings.ca.gov/apartments.

☒ *(If checked)* ⚠ **WARNING:** Use of **lead-containing plumbing materials** on this property can expose you to lead, which is known to the State of California to cause cancer and birth defects or other reproductive harm. Talk to your landlord or the building manager about how and when you could be exposed to this chemical in your building. For additional information go to www.P65Warnings.ca.gov/apartments.

❏ *(If checked)* ⚠ **WARNING:** Breathing the air in this property's **enclosed parking garage** can expose you to chemicals including carbon monoxide and gasoline or diesel engine exhaust, which are known to the State of California to cause cancer and birth defects or other reproductive harm. Do not stay in the property's parking garage area longer than necessary. For more information go to www.P65Warnings.ca.gov/apartments.

☒ *(If checked)* ⚠ **WARNING:** Breathing the air in this property's designated **smoking** area (and other areas where smoking occurs on the property) can expose you to chemicals including tobaccos smoke and nicotine, which are known to the State of California to cause cancer and birth defects or other reproductive harm. Do not stay in smoking areas longer than necessary. For more information go to www.P65Warnings.ca.gov/apartments.

☒ *(If checked)* ⚠ **WARNING:** Imported **vinyl miniblinds** manufactured prior to 1997 on this property can expose you to lead, which is known to the State of California to cause cancer and birth defects or other reproductive harm. Talk to your landlord or the building manager about how and when you could be exposed to this chemical in your building. For additional information go to www.P65Warnings.ca.gov/apartments.

☒ *(If checked)* ⚠ **WARNING:** Landscaping and weed control activities on this property can expose you to chemicals including **glyphosate** (also known as **Round Up**) which is known to the State of California to cause cancer. Talk to your landlord or the building owner about how and when you could be exposed to these chemicals in your building. For additional information go to www.P65Warnings.ca.gov/apartments.

❏ *(If checked) For exposure to other listed carcinogens, not specified above:*

⚠ **WARNING:** _____ on this property can expose you to chemicals including _____ which is/are known to the State of California to cause cancer. Talk to your landlord or the building owner about how and when you could be exposed to these chemicals in your building. For additional information go to www.P65Warnings.ca.gov/apartments.

Kimball, Tirey & St. John Proposition 65 Notification

© 2019 Kimball, Tirey & St. John LLP. All rights reserved.

This form may not be duplicated in any way without the express written consent of Kimball, Tirey & St. John LLP.

❏ *(If checked)* **For exposure to _other listed reproductive toxicants_, not specified above:**

⚠ **WARNING:** _____ on this property can expose you to chemicals including _____ which is/are known to the State of California to cause birth defects or other reproductive harm. Talk to your landlord or the building owner about how and when you could be exposed to these chemicals in your building. For additional information go to www.P65Warnings.ca.gov/apartments.

❏ *(If checked)* **For exposure to _other chemicals listed as both a carcinogen and a reproductive toxicant_, not specified above:**

⚠ **WARNING:** _____ on this property can expose you to _____ which is/are known to the State of California to cause cancer and birth defects or other reproductive harm. Talk to your landlord or the building owner about how and when you could be exposed to this chemical in your building. For additional information go to www.P65Warnings.ca.gov/apartments.

☒ *(If checked)* The Tenant and Occupant signers below acknowledge receipt of this Proposition 65 Notification.

| | |
|---|---|
| _(signature)_     3/11/2022 11:34 AM PST | _Yul Sanchez (signature)_     3/11/2022 11:51 AM PST |
| Nihla Olsem *(Resident)*     *Date* | Yul Sanchez *(Resident)*     *Date* |

**Signed by Ashley Taylor**
Fri Mar 11 2022 11:30:17 AM PST
Key: 3CFC2235; IP Address: 104.176.35.56

*(Owner/Agent)*     *Date*

Kimball, Tirey & St. John Proposition 65 Notification

© 2019 Kimball, Tirey & St. John LLP. All rights reserved.

This form may not be duplicated in any way without the express written consent of Kimball, Tirey & St. John LLP.

# CASH ADDENDUM

This Addendum shall be attached to and for the purposes made part of the Residential Lease Agreement between Owner and the undersigned Resident(s).

Resident agrees that at no time during the term of the lease agreement shall Resident tender cash to Owner for payment of rents or any other fees. Cash will not be accepted by Owner. Should Resident be asked to tender cash for any rental payments, Resident agrees it shall contact **Apartment Management Consultants** immediately at:

**Apartment Management Consultants**
**(801) 565-7430** or **info@amcllc.net**

Resident should have ready the name of the community, and the name of the member of management that requested a cash payment.

Resident hereby agrees that should Resident tender a cash payment for any obligations under the Residential Rental Agreement, that it will not be deemed accepted and such payment shall be deemed as unpaid.

| | 3/11/2022 11:34 AM PST | | | 3/11/2022 11:51 AM PST |
|---|---|---|---|---|
| Nihla Olsem *(Resident)* | Date | | Yul Sanchez *(Resident)* | Date |

Signed by Ashley Taylor
Fri Mar 11 2022 11:30:21 AM PST
Key: 3CFC2235; IP Address: 104.176.35.56

*(Owner/Agent)*                                                    Date

Apartment/Unit #: **4031 Marconi Ave #98, Sacramento, CA  95821**



# LEASE ADDENDUM FOR AUTOMATED ELECTRONIC PAYMENTS OF RENT AND CERTAIN OTHER ITEMS

1. **Addendum.** This is an addendum to the Residential Rental Agreement for Apartment # **98** at the premises identified below.

2. **Automated electronic payments.** "Automated electronic payments" include "Automated Clearing House" ("ACH") and "Credit and Debit Card" ("Card") transactions. ACH is the nationwide network of banking institutions that have agreed to process electronic payments automatically from Resident's bank account to Owner's bank accounts. "Card" refers to credit and debit card transactions, including those cards bearing the Visa, Mastercard, Discover and American Express logos. Collectively "automated electronic payments" are paperless transactions that occur instantly and automatically without a check being hand-processed through a local bank clearinghouse or the Federal Reserve System.

3. **Authorization to Enroll.** By executing this Lease Addendum, Resident is agreeing to be enrolled in an online payment program, and to allow Owner to create an online account for Resident. Resident is also agreeing to pay a one-time, non-refundable activation fee of **$10.00**. Resident will be given a user name and password for access to this online account where Resident may initiate and manage ACH or Card payments or rent or other property-related payments.

4. **Right to opt out.** Enrollment in the online payment program is the only way ACH or Card payment will be accepted. However, enrollment is not required and Resident has the right at any time to give written notice of Resident's decision to withdraw from the program. Should Resident choose to do so, Resident will thereafter be required to make all payments by regular check or certified check according to the terms of the Residential Rental Agreement.

5. **Delinquency.** Access to the system will be restricted if any payment is considered "late" under the Residential Rental Agreement. At Owner's sole discretion, ACH or Card Payments that are "late" will not be allowed, or will only be accepted if paid in full. Owner has the right at any time to require Resident to pay all future rent payments by regular check or certified check according to the terms of the Residential Rental Agreement, in lieu of payment through ACH or Card. Payments made through this system after service of any eviction notice must have prior written approval of management before the payment is made. Any unapproved payment made after service of an eviction notice shall be deemed rejected and shall be refunded (or otherwise retransferred) within thirty (30) days.

SIGNED AND ACKNOWLEDGED

| | |
|---|---|
| _____ | 3/11/2022 11:34 AM PST |
| Nihla Olsem *(Resident)* | Date |

| | |
|---|---|
| Yul Sanchez | 3/11/2022 11:51 AM PST |
| Yul Sanchez *(Resident)* | Date |

WAIVER - The undersigned Resident declines to enroll in the Automated Electronic Payment Program and will not be charged the activation fee.

_____
Nihla Olsem

_____
Yul Sanchez

(only sign if you are opting out)

Premises address: **4009 Marconi Ave., Sacramento, CA  95821**



# RESIDENT CONTACT INFORMATION

Apartment #:**4031-98**

| Nihla Olsem | |
|---|---|
| **Apt. Phone #:** <br> (916) 307-3295 | **Work Phone #:** |
| **Email Address:** <br> Nihla20@gmail.com | |

| Yul Sanchez | |
|---|---|
| **Apt. Phone #:** <br> (916) 955-3805 | **Work Phone #:** |
| **Email Address:** <br> Yul.sanchez98@gmail.com | |



37







# Protect Your Family From Lead In Your Home



United States Environmental Protection Agency

United States Consumer Product Safety Commission

United States Department of Housing and Urban Development

## Are You Planning To Buy, Rent, or Renovate a Home Built Before 1978?

Many houses and apartments built before 1978 have paint that contains high levels of lead (called lead-based paint). Lead from paint, chips, and dust can pose serious health hazards if not taken care of properly.

 **OWNERS, BUYERS, and RENTERS** are encouraged to check for lead (see page 6) before renting, buying, or renovating pre-1978 housing.

Federal law requires that individuals receive certain information before renting, buying, or renovating pre-1978 housing:

 **LANDLORDS** have to disclose known information on lead-based paint and lead-based paint hazards before leases take effect. Leases must include a disclosure about lead-based paint.

 **SELLERS** have to disclose known information on lead-based paint and lead-based paint hazards before selling a house. Sales contracts must include a disclosure form about lead-based paint. Buyers have up to 10 days to check for lead.

 **RENOVATORS** disturbing more than 2 square feet of painted surfaces have to give you this pamphlet before starting work.

## IMPORTANT!

### Lead From Paint, Dust, and Soil Can Be Dangerous If Not Managed Properly

**FACT:** Lead exposure can harm young children and babies even before they are born.

**FACT:** Even children who seem healthy can have high levels of lead in their bodies.

**FACT:** People can get lead in their bodies by breathing or swallowing lead dust, or by eating soil or paint chips containing lead.

**FACT:** People have many options for reducing lead hazards. In most cases, lead-based paint that is in good condition is not a hazard.

**FACT:** Removing lead-based paint improperly can increase the danger to your family.

If you think your home might have lead hazards, read this pamphlet to learn some simple steps to protect your family.

## Lead Gets in the Body in Many Ways

**Childhood lead poisoning remains a major environmental health problem in the U.S.**

*Even children who appear healthy can have dangerous levels of lead in their bodies.*

People can get lead in their body if they:
- Breathe in lead dust (especially during renovations that disturb painted surfaces).
- Put their hands or other objects covered with lead dust in their mouths.
- Eat paint chips or soil that contains lead.

Lead is even more dangerous to children under the age of 6:
- At this age children's brains and nervous systems are more sensitive to the damaging effects of lead.
- Children's growing bodies absorb more lead.
- Babies and young children often put their hands and other objects in their mouths. These objects can have lead dust on them.

 Lead is also dangerous to women of childbearing age:
- Women with a high lead level in their system prior to pregnancy would expose a fetus to lead through the placenta during fetal development.

## Lead's Effects

It is important to know that even exposure to low levels of lead can severely harm children.

### In children, lead can cause:

- Nervous system and kidney damage.
- Learning disabilities, attention deficit disorder, and decreased intelligence.
- Speech, language, and behavior problems.
- Poor muscle coordination.
- Decreased muscle and bone growth.
- Hearing damage.

While low-lead exposure is most common, exposure to high levels of lead can have devastating effects on children, including seizures, unconsciousness, and in some cases, death.

Although children are especially susceptible to lead exposure, lead can be dangerous for adults too.

### In adults, lead can cause

- Increased chance of illness during pregnancy.
- Harm to a fetus, including brain damage or death.
- Fertility problems (in men and women).
- High blood pressure.
- Digestive problems.
- Nerve disorders.
- Memory and concentration problems.
- Muscle and joint pain.



*Lead affects the body in many ways.*

## Where Lead-Based Paint Is Found

**In general, the older your home, the more likely it has lead-based paint.**

**Many homes built before 1978 have lead-based paint.** The federal government banned lead-based paint from housing in 1978. Some states stopped its use even earlier. Lead can be found:

- In homes in the city, country, or suburbs.
- In apartments, single-family homes, and both private and public housing.
- Inside and outside of the house.
- In soil around a home. (Soil can pick up lead from exterior paint or other sources such as past use of leaded gas in cars.)

## Checking Your Family for Lead

**Get your children and home tested if you think your home has high levels of lead.**

**To reduce your child's exposure to lead, get your child checked, have your home tested (especially if your home has paint in poor condition and was built before 1978), and fix any hazards you may have.**
Children's blood lead levels tend to increase rapidly from 6 to 12 months of age, and tend to peak at 18 to 24 months of age.

Consult your doctor for advice on testing your children. A simple blood test can detect high levels of lead. Blood tests are usually recommended for:

- Children at ages 1 and 2.
- Children or other family members who have been exposed to high levels of lead.
- Children who should be tested under your state or local health screening plan.

Your doctor can explain what the test results mean and if more testing will be needed.

3

4

## Identifying Lead Hazards

**Lead from paint chips, which you can see, and lead dust, which you can't always see, can both be serious hazards.**

**Lead-based paint** is usually not a hazard if it is in good condition, and it is not on an impact or friction surface, like a window. It is defined by the federal government as paint with lead levels greater than or equal to 1.0 milligram per square centimeter, or more than 0.5% by weight.

**Deteriorating lead-based paint (peeling, chipping, chalking, cracking or damaged)** is a hazard and needs immediate attention. It may also be a hazard when found on surfaces that children can chew or that get a lot of wear-and-tear, such as:

- Windows and window sills.
- Doors and door frames.
- Stairs, railings, banisters, and porches.

**Lead dust** can form when lead-based paint is scraped, sanded, or heated. Dust also forms when painted surfaces bump or rub together. Lead chips and dust can get on surfaces and objects that people touch. Settled dust can re-enter the air when people vacuum, sweep, or walk through it. The following two federal standards have been set for lead hazards in dust:

- 40 micrograms per square foot ($\mu g/ft^2$) and higher for floors, including carpeted floors.
- 250 $\mu g/ft^2$ and higher for interior window sills.

**Lead in soil** can be a hazard when children play in bare soil or when people bring soil into the house on their shoes. The following two federal standards have been set for lead hazards in residential soil:

- 400 parts per million (ppm) and higher in play areas or bare soil.
- 1,200 ppm (average) and higher in bare soil in the remainder of the yard.

The only way to find out if paint, dust and soil lead hazards exist is to test for them. The next page describes the most common methods used.

## Checking Your Home for Lead

**Just knowing that a home has lead-based paint may not tell you if there is a hazard.**

You can get your home tested for lead in several different ways:

- A paint **inspection** tells you whether your home has lead-based paint and where it is located. It won't tell you whether or not your home currently has lead hazards.
- A **risk assessment** tells you if your home currently has any lead hazards from lead in paint, dust, or soil. It also tells you what actions to take to address any hazards.
- A combination risk assessment and inspection tells you if your home has any lead hazards and if your home has any lead-based paint, and where the lead-based paint is located.

Hire a trained and certified testing professional who will use a range of reliable methods when testing your home.

- Visual inspection of paint condition and location.
- A portable x-ray fluorescence (XRF) machine.
- Lab tests of paint, dust, and soil samples.

There are state and federal programs in place to ensure that testing is done safely, reliably, and effectively. Contact your state or local agency (see bottom of page 11) for more information, or call **1-800-424-LEAD (5323)** for a list of contacts in your area.

**Home test kits for lead are available, but studies suggest that they are not always accurate.** Consumers should not rely on these tests before doing renovations or to assure safety.

5

6

## What You Can Do Now To Protect Your Family

If you suspect that your house has lead hazards, you can take some immediate steps to reduce your family's risk:

- If you rent, notify your landlord of peeling or chipping paint.
- Clean up paint chips immediately.
- Clean floors, window frames, window sills, and other surfaces weekly. Use a mop or sponge with warm water and a general all-purpose cleaner or a cleaner made specifically for lead. REMEMBER: NEVER MIX AMMONIA AND BLEACH PRODUCTS TOGETHER SINCE THEY CAN FORM A DANGEROUS GAS.
- Thoroughly rinse sponges and mop heads after cleaning dirty or dusty areas.
- Wash children's hands often, especially before they eat and before nap time and bed time.
- Keep play areas clean. Wash bottles, pacifiers, toys, and stuffed animals regularly.
- Keep children from chewing window sills or other painted surfaces.
- Clean or remove shoes before entering your home to avoid tracking in lead from soil.
- Make sure children eat nutritious, low-fat meals high in iron and calcium, such as spinach and dairy products. Children with good diets absorb less lead.






## Reducing Lead Hazards In The Home

*Removing lead improperly can increase the hazard to your family by spreading even more lead dust around the house.*

*Always use a professional who is trained to remove lead hazards safety.*



In addition to day-to-day cleaning and good nutrition:

- You can **temporarily** reduce lead hazards by taking actions such as repairing damaged painted surfaces and planting grass to cover soil with high lead levels. These actions (called "interim controls") are not permanent solutions and will need ongoing attention.
- To **permanently** remove lead hazards, you must hire a certified lead "abatement" contractor. Abatement (or permanent hazard elimination) methods include removing, sealing, or enclosing lead-based paint with special materials. Just painting over the hazard with regular paint is not permanent removal.

Always hire a person with special training for correcting lead problems-someone who knows how to do this work safely and has the proper equipment to clean up thoroughly. Certified contractors will employ qualified workers and follow strict safety rules as set by their state or by the federal government.

Once the work is completed, dust cleanup activities must be repeated until testing indicates that lead dust levels are below the following:

- 40 micrograms per square foot ($\mu g/ft^2$) for floors, including carpeted floors;
- 250 $\mu g/ft^2$ for interior windows sills; and
- 400 $\mu g/ft^2$ for window troughs.

Call your state or local agency (see bottom of page 11) for help in locating certified professionals in your area and to see if financial assistance is available.

7                                    8

## Remodeling or Renovating a Home With Lead-Based Paint

Take precautions before your contractor or you begin remodeling or renovations that disturb painted surfaces (such as scraping off paint or tearing out walls):

- Have the area tested for lead-based paint.
- Do not use a belt-sander, propane torch, heat gun, dry scraper, or dry sandpaper to remove lead-based paint. These actions create large amounts of lead dust and fumes. Lead dust can remain in your home long after the work is done.
- Temporarily move your family (especially children and pregnant women) out of the apartment or house until the work is done and the area is properly cleaned. If you can't move your family, at least completely seal off the work area.
- Follow other safety measures to reduce lead hazards. You can find out about other safety measures by calling 1-800-424-LEAD. Ask for the brochure "Reducing Lead Hazards When Remodeling Your Home." This brochure explains what to do before, during, and after renovations.

If you have already completed renovations or remodeling that could have released lead-based paint or dust, get your young children tested and follow the steps outlined in the section labeled "What you can do now to protect your family."



*If not conducted properly, certain types of renovations can release lead from paint and dust into the air.*



## Other Sources of Lead



*While paint, dust, and soil are the most common lead hazards, other lead sources also exist.*



- **Drinking water.** Your home might have plumbing with lead or lead solder. Call your local health department or water supplier to find out about testing your water. You cannot see, smell, or taste lead, and boiling your water will not get rid of lead. If you think your plumbing might have lead in it:
  - Use only cold water for drinking and cooking.
  - Run water for 15 to 30 seconds before drinking it, especially if you have not used your water for a few hours.
- **The job.** If you work with lead, you could bring it home on your hands or clothes. Shower and change clothes before coming home. Launder your work clothes separately from the rest of your family's clothes.
- Old painted **toys** and **furniture**.
- Food and liquids stored in **lead crystal** or **lead-glazed pottery** or **porcelain**.
- **Lead smelters** or other industries that release lead into the air.
- **Hobbies** that use lead, such as making pottery or stained glass, or refinishing furniture.
- **Folk remedies** that contain lead, such as "greta" and "azarcon" used to treat an upset stomach.

9                                    10

## For More Information

### The National Lead Information Center

Call **1-800-424-LEAD (424-5323)** to learn how to protect children from lead poisoning and for other information on lead hazards. To access lead information via the web, visit **www.epa.gov/lead** and **www.hud.gov/offices/lead/**.



### EPA's Safe Drinking Water Hot-line

Call **1-800-426-4791** for information about lead in drinking water.

### Consumer Product Safety Commission (CPSC) Hot-line



To request information on lead in consumer products, or to report an unsafe consumer product or a product-related injury call **1-800-638-2772** or visit CPSC's Web site at: **www.cpsc.gov**.

### Health and Environmental Agencies

Some cities and states have their own rules for lead-based paint activities. Check with your state agency to see if state or local laws apply to you. Most state agencies can also provide information on finding a lead abatement firm in your area, and on possible sources of financial aid for reducing lead hazards. Receive up-to-date address and phone information for state and local contacts on the Internet at **www.epa.gov/lead** or contact the National Lead Information Center at **1-800-424-LEAD**.

> For the hearing impaired, call the Federal Information Relay Service at **1-800-877-8339** to access any of the phone numbers in this brochure.

## EPA Regional Offices

Your Regional EPA Office can provide further information regarding regulations and lead protection programs.

### EPA Regional Offices

**Region 1** (Connecticut, Massachusetts, Maine, New Hampshire, Rhode Island, Vermont)
Regional Lead Contact
U.S. EPA Region 1
Suite I 100 (CPT)
One Congress Street
Boston, MA 02114-2023
1 (888) 372-7341

**Region 2** (New Jersey, New York, Puerto Rico, Virgin Islands)
Regional Lead Contact
U.S. EPA Region 2
2890 Woodbridge Avenue
Building 209, Mail Stop 225
Edison, NJ 08837-3679
(732) 321-6671

**Region 3** (Delaware, Washington DC, Maryland, Pennsylvania, Virginia, West Virginia)
Regional Lead Contact
U.S. EPA Region 3 (3WC33)
1650 Arch Street
Philadelphia, PA 19103
(215) 814-5000

**Region 4** (Alabama, Florida, Georgia, Kentucky, Mississippi, North Carolina, South Carolina, Tennessee)
Regional Lead Contact
U.S. EPA Region 4
61 Forsyth Street, SW
Atlanta, GA 30303
(404) 562-8998

**Region 5** (Illinois, Indiana, Michigan, Minnesota, Ohio, Wisconsin)
Regional Lead Contact
U.S. EPA Region 5 (DT-8J)
77 West Jackson Boulevard
Chicago, IL 60604-3666
(312) 886-6003

**Region 6** (Arkansas, Louisiana, New Mexico, Oklahoma, Texas)
Regional Lead Contact
U.S. EPA Region 6
1445 Ross Avenue, 12th Floor
Dallas, TX 75202-2733
(214) 665-7577

**Region 7** (Iowa, Kansas, Missouri, Nebraska)
Regional Lead Contact
U.S. EPA Region 7 (ARTD-RALI)
901 N. 5th Street
Kansas City, KS 66101
(913) 551-7020

**Region 8** (Colorado, Montana, North Dakota, South Dakota, Utah, Wyoming)
Regional Lead Contact
U.S. EPA Region 8
999 18th Street, Suite 500
Denver, CO 80202-2466
(303) 312-6021

**Region 9** (Arizona, California, Hawaii, Nevada)
Regional Lead Contact
U.S. Region 9
75 Hawthorne Street
San Francisco, CA 94105
(415) 947-4164

**Region 10** (Idaho, Oregon, Washington, Alaska)
Regional Lead Contact
U.S. EPA Region 10
Toxics Section WCM-128
1200 Sixth Avenue
Seattle, WA 98101-1128
(206) 553-1985

## CPSC Regional Offices

Your Regional CPSC Office can provide further information regarding regulations and consumer product safety.

**Eastern Regional Center**
Consumer Product Safety Commission
201 Varick Street, Room 903
New York, NY 10014
(212) 620-4120

**Central Regional Center**
Consumer Product Safety Commission
230 South Dearborn Street, Room 2944
Chicago, IL 60604
(312) 353-8260

**Western Regional Central**
Consumer Product Safety Commission
1301 Clay Street, Suite 610-N
Oakland, CA 94612
(510) 637-4050

## HUD Lead Office

Please contact HUD's Office of Lead Hazard Control for information on lead regulations, outreach efforts, and lead hazard control and research grant programs.

**U.S. Department of Housing and Urban Development**
Office of Healthy Homes and Lead Hazard Control
451 Seventh Street, SW, P-3206
Washington, DC 20410
(202) 755-1785

This document is in the public domain. It may be reproduced by an individual or organization without permission. Information provided in this booklet is based upon current scientific and technical understanding of the issues presented and is reflective of the jurisdictional boundaries established by the statutes governing the co-authoring agencies. Following the advice given will not necessarily provide complete protection in all situations or against all health hazards that can be caused by lead exposure.

U.S. EPA Washington DC 20460        EPA747-K-99-001
U.S. CPSC Washington DC 20207      June 2003
U.S. HUD Washington DC 20410

## Simple Steps To Protect Your Family From Lead Hazards

### If you think your home has high levels of lead:

- Get your young children tested for lead, even if they seem healthy.
- Wash children's hands, bottles, pacifiers, and toys often.
- Make sure children eat healthy, low-fat foods.
- Get your home checked for lead hazards.
- Regularly clean floors, window sills, and other surfaces.
- Wipe soil off shoes before entering house.
- Talk to your landlord about fixing surfaces with peeling or chipping paint.
- Take precautions to avoid exposure to lead dust when remodeling or renovating (call 1-800-424-LEAD for guidelines).
- Don't use a belt-sander, propane torch, heat gun, dry scraper, or dry sandpaper on painted surfaces that may contain lead.
- Don't try to remove lead-based paint yourself.



# Information on Dampness and Mold for Renters in California

### Main points:

- Living in damp or moldy buildings increases the chances of respiratory problems like asthma.

- The critical warning signs are visible mold, water damage, damp materials, or mold smell.

- Dampness is needed for mold to grow, so if you control the dampness, you control the mold.

- Dampness or mold indoors may make housing substandard, per the California Health & Safety Code.



Beginning January 1, 2022, residential landlords shall provide this booklet to prospective residential tenants prior to entering the rental or lease agreement, in accordance with the 2001 Toxic Mold Protection Act (HSC #26148). This booklet, which explains the potential health risks and health impacts that may result from exposure to mold, was produced by the California Department of Public Health (CDPH) in 2020, in both English and Spanish versions.

# Health Problems from Damp or Moldy Buildings

# Signs of Dampness or Mold

Living or working in damp or moldy buildings increases the risk of many harmful health problems, including:

- asthma attacks in people who already have asthma
- a new asthma diagnosis
- respiratory infections, such as bronchitis
- breathing symptoms, such as hay fever, sneezing, stuffy nose, sore throat, wheezing, breathing difficulty, or cough
- eczema or skin rash

Mold can affect people differently. How much a person is affected depends on how sensitive they are and on how much they are exposed. Damp or moldy buildings are linked to health problems in people even if they do not have allergies.

Signs of dampness or mold that may cause health problems include:

- **visible mold** (regardless of color), such as on walls or ceilings, behind furniture or appliances, under carpets, or even hidden in areas not seen in the occupied areas of homes
- **mold odor**, noticed as an earthy, musty, or moldy smell
- **visible water damage**, such as water-stains or discoloration on walls or ceilings, peeling or bubbled paint, warped floors, or rotting wood
- **damp or moist materials**, including condensation on windows or walls

Any one of these signs indicates increased risks to health, and the more that any of them are present, the greater the risk of health problems. Tests that identify the types of mold or the amounts of mold in buildings are not useful in telling us about the health risks. This is *why CDPH does not recommend testing for mold, such as measuring mold spores in the air*.



CDPH

## Causes of Building Dampness that Can Allow Mold to Grow

The dampness that is necessary for indoor mold to grow can come from either inside or outside a building.



**Indoor sources include:**
- leaking or burst water pipes, for instance under sinks inside walls
- not enough venting to the outside by open windows or exhaust fans in places where water is used or moisture is produced (for example, bathrooms, laundry areas, kitchens, and water heaters)
- condensation (water droplets) on cold surfaces, including windows

**Outdoor sources include:**
- water coming in through leaky roofs or poorly-sealed windows, or from flooding
- damp, exposed dirt in crawl spaces
- outdoor surfaces that slope and drain water toward a building, including from a downspout



## Fixing Dampness and Mold Problems

The California Health & Safety Code (HSC §17920.3) says that when dampness or visible mold (or certain other conditions) in a home is a hazard to the health of occupants, the home is *substandard* and the property owner must fix the conditions. The Code excludes mold that is "minor and found on surfaces that accumulate moisture as part of their properly functioning and intended use."

CDPH recommends fixing dampness and mold problems as follows:

- identifying and correcting the source of any water that may allow mold to grow
- rapid drying or removal of damp materials
- cleaning or removing mold and moldy materials as rapidly and safely as possible

Note: if a moldy area is simply bleached, cleaned, or painted over—without fixing the source of the dampness—the mold is likely to grow again.



## Renters in California

The California Health & Safety Code requires property owners to provide a rental unit that is safe and healthy for the people living in it. Prospective renters should look for obvious conditions that show dampness or mold, and also less obvious signs like water leaks under the kitchen and bathroom sinks or moldy odor in a sealed-up home. Also look for conditions likely to cause future problems, like a bathroom that has no working vent fan or no window that opens, or a clothes dryer without an outside vent.

For renters who suspect there is dampness or mold:

1. Tell the property owner or manager. Early detection and correction of the dampness and mold problems can reduce the risks to your health and prevent the problem from getting worse.

2. If your property owner will not respond to your concerns in a reasonable amount of time, contact your local (city or county) code enforcement agency and ask for a code enforcement officer to inspect for violations. Many dampness or mold problems in rental homes are the responsibility of the property owner and must be addressed by them. However, a code enforcement officer may determine that dampness or mold in a building results from a tenant's actions or inactions – for instance, not using available bathroom ventilation during showers.

3. If the local inspector determines there is a violation, they can require the property owner to correct the problem.

## Additional Resources

For general information on dampness and mold and a list of local code enforcement agencies, with a focus on dampness and mold, see www.cdph.ca.gov/iaq/mold. To see an animated video series, Mold in the Home, visit www.cdph.ca.gov/mold.

*Property owners must provide a rental unit that is safe and healthy for the people living in it.*

*Tenants must notify property owners of any dampness or mold problems.*

For more information, visit CDPH website (www.cdph.ca.gov/Pages/contact_us.aspx)



Nihla Olsem's "ACCOUNT LEDGER"

**ACCOUNT LEDGER WITHOUT LOSS**

Apartment Management Consultants - **Amber Grove**

Parameters: T00002880 Transactions Dated From:1/1/1900 to 12/31/2099

| **Name :** | Olsem, Nihla | **Applied :** | 02/25/2022 | | |
|---|---|---|---|---|---|
| **Address :** | 4031 Marconi Ave #98 | **Moved In :** | 03/11/2022 | **Moved Out :** | |
| | Sacramento, CA 95821 | **Lease Start :** | 03/11/2022 | | 07/03/2023 |
| **Resident I.D.:** | T00002880 | **Lease End :** | 04/30/2023 | | |

| Unit | Date | Document | Description | Period | Charge | Credit | Running Total | Balance |
|---|---|---|---|---|---|---|---|---|
| COMMON | 02/25/2022 | 276674199: | CH APPO - Application Fee Paid to On-site | 202202 | 46.00 | | 46.00 | 0 |
| COMMON | 02/25/2022 | 276674199: | PZ PCCO - Application Fee Paid to On-site | 202202 | | 46.00 | 0.00 | 0 |
| COMMON | 02/25/2022 | 276688061: | CH APPO - Application Fee Paid to On-site | 202202 | 46.00 | | 46.00 | 0 |
| COMMON | 02/25/2022 | 276688061: | PZ PCCO - Application Fee Paid to On-site | 202202 | | 46.00 | 0.00 | 0 |
| 98 | 03/11/2022 | : | CH RLL - PDLW | 202203 | 10.00 | | 10.00 | 0 |
| 98 | 03/11/2022 | : | CA RENT - Rent | 202203 | 1032.50 | | 1042.50 | 0 |
| 98 | 03/11/2022 | 0036008105: | PZ PMT - Payment, Check | 20220311 01 | | 1942.50 | -900.00 | 0 |
| 98 | 03/31/2022 | : | PS EDAP - Deposit Applied To Balance | 202203 | | -500.00 | -400.00 | 0 |
| 98 | 04/01/2022 | : | CA RENT - Rent | 202204 | 1475.00 | | 1075.00 | 0 |
| 98 | 04/01/2022 | : | CH RLL - PDLW | 202204 | 10.00 | | 1085.00 | 0 |
| 98 | 04/04/2022 | : | CB LATE - Late Charge. | 202204 | 50.00 | | 1135.00 | 0 |
| 98 | 04/05/2022 | 6590011409: | PZ PMTM - Payment, Money Order | 20220405 04 | | 1485.00 | -350.00 | 0 |
| 98 | 04/08/2022 | : | PS EDAP - Deposit Applied To Balance | 202204 | | -300.00 | -50.00 | 0 |
| 98 | 04/08/2022 | : | PS EDAP - Deposit Applied To Balance | 202204 | | -50.00 | 0.00 | 0 |
| 98 | 05/01/2022 | UB Import: | CK UBT - Trash 031122-033122 | 202205 | 34.53 | | 34.53 | 0 |
| 98 | 05/01/2022 | UB Import: | CK UBSS - service f 031122 -033122 | 202205 | 18.00 | | 52.53 | 0 |
| 98 | 05/01/2022 | UB Import: | CK UBW - Water 031122-033122 | 202205 | 20.70 | | 73.23 | 0 |
| 98 | 05/01/2022 | UB Import: | CK UBS - Sewer 031122-033122 | 202205 | 34.24 | | 107.47 | 0 |
| 98 | 05/01/2022 | : | CA RENT - Rent | 202205 | 1475.00 | | 1582.47 | 0 |
| 98 | 05/01/2022 | : | CH RLL - PDLW | 202205 | 10.00 | | 1592.47 | 0 |
| 98 | 05/03/2022 | 72702029: | PZ PMTM - Payment, Money Order | 20220503 02 | | 485.00 | 1107.47 | 0 |
| 98 | 05/03/2022 | 72702028: | PZ PMTM - Payment, Money Order | 20220503 02 | | 1000.00 | 107.47 | 0 |
| 98 | 05/04/2022 | 1107839431: | PZ PMCH - Payment, Cashier Check | 20220504 02 | | 1592.47 | -1485.00 | 0 |
| 98 | 05/10/2022 | 72702028: Wrong account | PZ PMTM - REVERSE: Payment, Money Order | 20220510 01 | | -1000.00 | -485.00 | 0 |
| 98 | 05/10/2022 | 72702029: Wrong account | PZ PMTM - REVERSE: Payment, Money Order | 20220510 01 | | -485.00 | 0.00 | 0 |
| 98 | 06/01/2022 | UB Import: | CK UBT - Trash 040122-043022 | 202206 | 58.20 | | 58.20 | 0 |
| 98 | 06/01/2022 | UB Import: | CK UBSS - service f 040122 -043022 | 202206 | 3.00 | | 61.20 | 0 |

**ACCOUNT LEDGER WITHOUT LOSS**

Apartment Management Consultants - **Amber Grove**

Parameters: T00002880 Transactions Dated From:1/1/1900 to 12/31/2099

| 98 | 06/01/2022 | UB Import: | CK  UBW - Water 040122-043022 | 202206 | 28.72 | | 89.92 | 0 |
|---|---|---|---|---|---|---|---|---|
| 98 | 06/01/2022 | UB Import: | CK  UBS - Sewer 040122-043022 | 202206 | 52.15 | | 142.07 | 0 |
| 98 | 06/01/2022 | : | CA  RENT - Rent | 202206 | 1475.00 | | 1617.07 | 0 |
| 98 | 06/01/2022 | : | CH  RLL - PDLW | 202206 | 10.00 | | 1627.07 | 0 |
| 98 | 06/03/2022 | 1107839793: | PZ  PMT - Payment, Check | 20220603 01 | | 1627.07 | 0.00 | 0 |
| 98 | 07/01/2022 | UB Import: | CK  UBT - Trash 050122-053122 | 202207 | 51.44 | | 51.44 | 0 |
| 98 | 07/01/2022 | UB Import: | CK  UBSS - service f 050122-053122 | 202207 | 3.00 | | 54.44 | 0 |
| 98 | 07/01/2022 | UB Import: | CK  UBW - Water 050122-053122 | 202207 | 29.12 | | 83.56 | 0 |
| 98 | 07/01/2022 | UB Import: | CK  UBS - Sewer 050122-053122 | 202207 | 51.60 | | 135.16 | 0 |
| 98 | 07/01/2022 | : | CA  RENT - Rent | 202207 | 1475.00 | | 1610.16 | 0 |
| 98 | 07/01/2022 | : | CH  RLL - PDLW | 202207 | 10.00 | | 1620.16 | 0 |
| 98 | 07/04/2022 | : | CB  LATE - Late Charge. | 202207 | 50.00 | | 1670.16 | 0 |
| 98 | 07/05/2022 | 1107840118: | PZ  PMCH - Payment, Cashier Check | 20220705 04 | | 1620.16 | 50.00 | 0 |
| 98 | 07/05/2022 | : no Late fee | CB  LATE - REVERSE: Late Charge. | 202207 | -50.00 | | 0.00 | 0 |
| 98 | 08/01/2022 | UB Import: | CK  UBT - Trash 060122-063022 | 202208 | 41.98 | | 41.98 | 0 |
| 98 | 08/01/2022 | UB Import: | CK  UBSS - service f 060122-063022 | 202208 | 3.00 | | 44.98 | 0 |
| 98 | 08/01/2022 | UB Import: | CK  UBW - Water 060122-063022 | 202208 | 32.04 | | 77.02 | 0 |
| 98 | 08/01/2022 | UB Import: | CK  UBS - Sewer 060122-063022 | 202208 | 52.71 | | 129.73 | 0 |
| 98 | 08/01/2022 | : | CA  RENT - Rent | 202208 | 1475.00 | | 1604.73 | 0 |
| 98 | 08/01/2022 | : | CH  RLL - PDLW | 202208 | 10.00 | | 1614.73 | 0 |
| 98 | 08/03/2022 | 1107840485: | PZ  PMT - Payment, Check | 20220803 01 | | 1614.73 | 0.00 | 0 |
| 98 | 09/01/2022 | UB Import: | CK  UBT - Trash 070122-073122 | 202209 | 60.94 | | 60.94 | 0 |
| 98 | 09/01/2022 | UB Import: | CZ  UBCR - nte_credi 070122-073122 | 202209 | -1.59 | | 59.35 | 0 |
| 98 | 09/01/2022 | UB Import: | CK  UBSS - service f 070122-073122 | 202209 | 3.00 | | 62.35 | 0 |
| 98 | 09/01/2022 | UB Import: | CK  UBW - Water 070122-073122 | 202209 | 36.04 | | 98.39 | 0 |
| 98 | 09/01/2022 | UB Import: | CK  UBS - Sewer 070122-073122 | 202209 | 53.87 | | 152.26 | 0 |
| 98 | 09/01/2022 | : | CA  RENT - Rent | 202209 | 1475.00 | | 1627.26 | 0 |
| 98 | 09/01/2022 | : | CH  RLL - PDLW | 202209 | 10.00 | | 1637.26 | 0 |
| 98 | 09/04/2022 | : | CB  LATE - Late Charge. | 202209 | 50.00 | | 1687.26 | 0 |
| 98 | 09/07/2022 | 310070427: | PZ  PCCO - AMCRentPay.com Payment | 202209 | | 1637.26 | 50.00 | 0 |
| 98 | 09/08/2022 | : Reverse | CB  LATE - REVERSE: Late Charge. | 202209 | -50.00 | | 0.00 | 0 |
| 98 | 09/27/2022 | : | PS  EDAP - Deposit Applied To Balance | 202209 | | -50.00 | 50.00 | 0 |

**ACCOUNT LEDGER WITHOUT LOSS**

Apartment Management Consultants - **Amber Grove**

Parameters: T00002880 Transactions Dated From:1/1/1900 to 12/31/2099

| 98 | 10/01/2022 | UB Import: | CK UBT - Trash 080122-083122 | 202210 | 50.07 | | 100.07 | 0 |
|----|------------|------------|------------------------------|--------|-------|---|--------|---|
| 98 | 10/01/2022 | UB Import: | CK UBSS - service f 080122-083122 | 202210 | 3.00 | | 103.07 | 0 |
| 98 | 10/01/2022 | UB Import: | CK UBW - Water 080122-083122 | 202210 | 31.62 | | 134.69 | 0 |
| 98 | 10/01/2022 | UB Import: | CK UBS - Sewer 080122-083122 | 202210 | 52.15 | | 186.84 | 0 |
| 98 | 10/01/2022 | : | CA RENT - Rent | 202210 | 1475.00 | | 1661.84 | 0 |
| 98 | 10/01/2022 | : | CH RLLG - PDLW | 202210 | 10.00 | | 1671.84 | 0 |
| 98 | 10/03/2022 | 313907489: | PZ PCCO - AMCRentPay.com Payment | 202210 | | 1621.84 | 50.00 | 0 |
| 98 | 11/01/2022 | UB Import: | CK UBT - Trash 090122-093022 | 202211 | 61.01 | | 111.01 | 0 |
| 98 | 11/01/2022 | UB Import: | CZ UBCR - nte_credi 090122-093022 | 202211 | -3.62 | | 107.39 | 0 |
| 98 | 11/01/2022 | UB Import: | CK UBSS - service f 090122-093022 | 202211 | 3.00 | | 110.39 | 0 |
| 98 | 11/01/2022 | UB Import: | CK UBW - Water 090122-093022 | 202211 | 38.59 | | 148.98 | 0 |
| 98 | 11/01/2022 | UB Import: | CK UBS - Sewer 090122-093022 | 202211 | 53.28 | | 202.26 | 0 |
| 98 | 11/01/2022 | 318512978: | PZ PCCO - AMCRentPay.com Payment | 202211 | | 1637.26 | -1435.00 | 0 |
| 98 | 11/01/2022 | : | CA RENT - Rent | 202211 | 1475.00 | | 40.00 | 0 |
| 98 | 11/01/2022 | : | CH RLLG - PDLW | 202211 | 10.00 | | 50.00 | 0 |
| 98 | 11/30/2022 | 322446937: | PZ PCCO - AMCRentPay.com Payment | 202211 | | 1612.15 | -1562.15 | 0 |
| 98 | 12/01/2022 | UB Import: | CK UBT - Trash 100122-103122 | 202212 | 46.32 | | -1515.83 | 0 |
| 98 | 12/01/2022 | UB Import: | CK UBSS - service f 100122-103122 | 202212 | 3.00 | | -1512.83 | 0 |
| 98 | 12/01/2022 | UB Import: | CK UBW - Water 100122-103122 | 202212 | 26.23 | | -1486.60 | 0 |
| 98 | 12/01/2022 | UB Import: | CK UBS - Sewer 100122-103122 | 202212 | 51.60 | | -1435.00 | 0 |
| 98 | 12/01/2022 | : | CA RENT - Rent | 202212 | 1475.00 | | 40.00 | 0 |
| 98 | 12/01/2022 | : | CH RLLG - PDLW | 202212 | 10.00 | | 50.00 | 0 |
| 98 | 01/01/2023 | UB Import: | CK UBT - Trash 110122-113022 | 202301 | 48.02 | | 98.02 | 0 |
| 98 | 01/01/2023 | UB Import: | CK UBSS - service f 110122-113022 | 202301 | 3.00 | | 101.02 | 0 |
| 98 | 01/01/2023 | UB Import: | CK UBW - Water 110122-113022 | 202301 | 28.93 | | 129.95 | 0 |
| 98 | 01/01/2023 | UB Import: | CK UBS - Sewer 110122-113022 | 202301 | 50.02 | | 179.97 | 0 |
| 98 | 01/01/2023 | : | CA RENT - Rent | 202301 | 1475.00 | | 1654.97 | 0 |
| 98 | 01/01/2023 | : | CH RLLG - PDLW | 202301 | 10.00 | | 1664.97 | 0 |
| 98 | 01/04/2023 | : | CB LATE - Late Charge. | 202301 | 50.00 | | 1714.97 | 0 |
| 98 | 01/10/2023 | 331258785: | PZ PCCO - AMCRentPay.com Payment | 202301 | | 1614.97 | 100.00 | 0 |
| 98 | 01/17/2023 | : Reverse | CB LATE - REVERSE: Late Charge. | 202301 | -50.00 | | 50.00 | 0 |

**ACCOUNT LEDGER WITHOUT LOSS**

Apartment Management Consultants - **Amber Grove**

Parameters: T00002880 Transactions Dated From:1/1/1900 to 12/31/2099

| Unit | Date | Reference | Description | Period | Charge | Payment | Balance | |
|---|---|---|---|---|---|---|---|---|
| 98 | 01/18/2023 | Dec holiday concession : | PW CONC - Concession/Special Promotion | 202301 | | 50.00 | 0.00 | 0 |
| 98 | 01/26/2023 | 332791353: | PZ PCCO - AMCRentPay.com Payment | 202301 | | 1609.62 | -1609.62 | 0 |
| 98 | 02/01/2023 | UB Import: | CK UBT - Trash 120122-123122 | 202302 | 40.88 | | -1568.74 | 0 |
| 98 | 02/01/2023 | UB Import: | CK UBSS - service f 120122-123122 | 202302 | 3.00 | | -1565.74 | 0 |
| 98 | 02/01/2023 | UB Import: | CK UBW - Water 120122-123122 | 202302 | 31.22 | | -1534.52 | 0 |
| 98 | 02/01/2023 | UB Import: | CK UBS - Sewer 120122-123122 | 202302 | 49.52 | | -1485.00 | 0 |
| 98 | 02/01/2023 | : | CA RENT - Rent | 202302 | 1475.00 | | -10.00 | 0 |
| 98 | 02/01/2023 | : | CH RLLG - PDLW | 202302 | 10.00 | | 0.00 | 0 |
| 98 | 03/01/2023 | UB Import: | CK UBT - Trash 010123-013123 | 202303 | 44.82 | | 44.82 | 0 |
| 98 | 03/01/2023 | UB Import: | CK UBSS - service f 010123-013123 | 202303 | 3.00 | | 47.82 | 0 |
| 98 | 03/01/2023 | UB Import: | CK UBW - Water 010123-013123 | 202303 | 33.97 | | 81.79 | 0 |
| 98 | 03/01/2023 | UB Import: | CK UBS - Sewer 010123-013123 | 202303 | 51.60 | | 133.39 | 0 |
| 98 | 03/01/2023 | : | CA RENT - Rent | 202303 | 1475.00 | | 1608.39 | 0 |
| 98 | 03/01/2023 | : | CH RLLG - PDLW | 202303 | 10.00 | | 1618.39 | 0 |
| 98 | 03/03/2023 | 340860530: | PZ PCCO - AMCRentPay.com Payment | 202303 | | 1618.39 | 0.00 | 0 |
| 98 | 04/01/2023 | UB Import: | CK UBT - Trash 020123-022823 | 202304 | 47.70 | | 47.70 | 0 |
| 98 | 04/01/2023 | UB Import: | CZ UBCR - nte_credi 020123-022823 | 202304 | -0.79 | | 46.91 | 0 |
| 98 | 04/01/2023 | UB Import: | CK UBSS - service f 020123-022823 | 202304 | 3.00 | | 49.91 | 0 |
| 98 | 04/01/2023 | UB Import: | CK UBW - Water 020123-022823 | 202304 | 39.59 | | 89.50 | 0 |
| 98 | 04/01/2023 | UB Import: | CK UBS - Sewer 020123-022823 | 202304 | 62.76 | | 152.26 | 0 |
| 98 | 04/01/2023 | : | CA RENT - Rent | 202304 | 1475.00 | | 1627.26 | 0 |
| 98 | 04/01/2023 | : | CH RLLG - PDLW | 202304 | 10.00 | | 1637.26 | 0 |
| 98 | 04/03/2023 | 346327144: | PZ PCCO - AMCRentPay.com Payment | 202304 | | 1637.26 | 0.00 | 0 |
| 98 | 05/01/2023 | UB Import: | CK UBT - Trash 030123-033123 | 202305 | 50.75 | | 50.75 | 0 |
| 98 | 05/01/2023 | UB Import: | CK UBSS - service f 030123-033123 | 202305 | 3.00 | | 53.75 | 0 |
| 98 | 05/01/2023 | UB Import: | CK UBW - Water 030123-033123 | 202305 | 32.86 | | 86.61 | 0 |
| 98 | 05/01/2023 | UB Import: | CK UBS - Sewer 030123-033123 | 202305 | 64.88 | | 151.49 | 0 |
| 98 | 05/01/2023 | : | CA RENT - Rent | 202305 | 1475.00 | | 1626.49 | 0 |
| 98 | 05/01/2023 | : | CH RLLG - PDLW | 202305 | 10.00 | | 1636.49 | 0 |
| 98 | 05/04/2023 | : | CB LATE - Late Charge. | 202305 | 50.00 | | 1686.49 | 0 |
| 98 | 05/04/2023 | : Reverse | CB LATE - REVERSE: Late Charge. | 202305 | -50.00 | | 1636.49 | 0 |

**ACCOUNT LEDGER WITHOUT LOSS**

Apartment Management Consultants - **Amber Grove**

Parameters: T00002880 Transactions Dated From:1/1/1900 to 12/31/2099

| 98 | 05/05/2023 | 352658379: | PZ  PCCO - AMCRentPay.com Payment | 202305 | | 1646.49 | -10.00 | 0 |
|----|------------|------------|-----------------------------------|--------|---------|---------|--------|---|
| 98 | 06/01/2023 | UB Import: | CK  UBT - Trash 040123-043023 | 202306 | 49.79 | | 39.79 | 0 |
| 98 | 06/01/2023 | UB Import: | CK  UBSS - service f 040123-043023 | 202306 | 3.00 | | 42.79 | 0 |
| 98 | 06/01/2023 | UB Import: | CK  UBW - Water 040123-043023 | 202306 | 41.84 | | 84.63 | 0 |
| 98 | 06/01/2023 | UB Import: | CK  UBS - Sewer 040123-043023 | 202306 | 53.87 | | 138.50 | 0 |
| 98 | 06/01/2023 | : | CA  RENT - Rent | 202306 | 1475.00 | | 1613.50 | 0 |
| 98 | 06/01/2023 | : | CH  RLLG - PDLW | 202306 | 10.00 | | 1623.50 | 0 |
| 98 | 06/02/2023 | 356588018: | PZ  PCCO - AMCRentPay.com Payment | 202306 | | 1623.50 | 0.00 | 0 |
| 98 | 07/01/2023 | UB Import: | CK  UBT - Trash 050123-053123 | 202307 | 52.72 | | 52.72 | 0 |
| 98 | 07/01/2023 | UB Import: | CK  UBSS - service f 050123-053123 | 202307 | 3.00 | | 55.72 | 0 |
| 98 | 07/01/2023 | UB Import: | CK  UBW - Water 050123-053123 | 202307 | 35.61 | | 91.33 | 0 |
| 98 | 07/01/2023 | UB Import: | CK  UBS - Sewer 050123-053123 | 202307 | 55.08 | | 146.41 | 0 |
| 98 | 07/01/2023 | : | CA  RENT - Rent | 202307 | 1475.00 | | 1621.41 | 0 |
| 98 | 07/01/2023 | : | CH  RLLG - PDLW | 202307 | 10.00 | | 1631.41 | 0 |
| 98 | 07/04/2023 | : | CB  LATE - Late Charge. | 202307 | 50.00 | | 1681.41 | 0 |
| 98 | 07/07/2023 | : | CA  RENT - Rent | 202307 | -1376.67 | | 304.74 | 0 |
| 98 | 07/10/2023 | 14: | CE  DAMG - Damages | 202307 | 205.00 | | 509.74 | 0 |
| 98 | 07/10/2023 | 15: | CE  DAMG - Damages | 202307 | 390.26 | | 900.00 | 0 |
| 98 | 07/10/2023 | 16: | PS  EDAP - Deposit Applied To Balance | 202307 | | 900.00 | 0.00 | 0 |